# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CUSTOMS & INTERNATIONAL ) | |
| TRADE NEWSLETTER, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **V.** ) | **Civil Action No.: 08-0478 (RMC)** |
| ) | |
| U.S. CUSTOMS AND BORDER ) | |
| PROTECTION, ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY, <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant, U.S. Customs and Border Protection, ("CBP"), respectfully moves, pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Plaintiff's action for failure to exhaust administrative remedies. Alternatively, Defendant CBP moves, pursuant to Fed. R. Civ. P 56 for summary judgment on the grounds that no genuine issue of material fact exists and Defendant is, therefore, entitled to judgment as a matter of law.

In support of this motion, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Support, Statement of Material Facts Not In Genuine Issue, and the Declaration of Shari Suzuki, Chief of CBP's Freedom of Information Act Appeals, Policy, and Litigation Branch. A proposed Order consistent with Defendant's motion is attached hereto.

Respectfully submitted,

_____
/s/
_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

      /s/
_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


      /s/
_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, DC 20530
(202) 514-7250


Of Counsel:
Susan C. Shama
Staff Attorney
Office of Associate Chief Counsel, Trade and Finance
U.S. Customs and Border Protection

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>**CUSTOMS & INTERNATIONAL** )<br>**TRADE NEWSLETTER,** )<br> )<br> **Plaintiff,** )<br> )<br> **V.** )<br> )<br>**U.S. CUSTOMS AND BORDER** )<br>**PROTECTION,** )<br> )<br> **Defendant.** )<br>_____ ) | **Civil Action No.: 08-0478 (RMC)** |

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 7(h), Defendant, U.S. Customs and Border Protection, ("CBP"), hereby

submits the following statement.

1.  By letter dated January 7, 2008,  and faxed to CBP on March 11, 2008 at 2:00 p.m.,

Peter S. Herrick, P.A.**,** representing the Customs and International Trade Newsletter

("Newsletter"), requested:

> the names and addresses of the companies who are the subject of CBP's Beef
> Hormone Implementation Directive ["Directive"], copy enclosed, who imported
> the referred to designated products from the European Community during the
> period July 1 to December 31, 2007.

*See* Declaration of Shari Suzuki, Chief of CBP's FOIA Appeals, Policy, and Litigation Branch,

("Suzuki Decl.") ¶ 4, Exhibit A.

2.  By letter dated February 8, 2008, and also faxed to CBP on March 11, 2008 at 2:00

p.m.**,** Newsletter appealed CBP's purported "failure to respond to the request for records made to

your office on January 7, 2008, copy enclosed." Suzuki Decl. ¶ 5, Exhibit B.

3.   Another letter from Newsletter dated March 11, 2008 and faxed to CBP on that same date at 2:00 p.m., stated, "[If] we do not receive the requested records by Friday, March 14, 2008, then we will begin FOIA litigation for the records."  Suzuki Decl. ¶ 6, Exhibit C.

4.   CBP searched for, but was unable to locate, any evidence to indicate that the January 7, 2008 letter or the February 8, 2008 letter were received by CBP before March 11, 2008, when all three letters (January 7, February 8, and March 11) were received in a single fax at 2:00 p.m. Suzuki Decl. ¶ 7.

5.   In a letter dated March 21, 2008, CBP acknowledged receipt of Newsletter's FOIA request dated January 7, 2008.  Suzuki Decl. ¶ 8, Exhibit D.

6.   Newsletter filed this FOIA action on March 20, 2008.  *See* Docket No. 1, Complaint ("Compl.").

7.   In a letter dated April 15, 2008, and signed by Brenda B. Smith, CBP's Executive Director, Trade Policy and Programs, Office of International Trade, CBP denied Newsletter's FOIA request because the information requested "is confidential commercial information." 5 U.S.C. § 552 (b) (4).  Suzuki Decl. ¶ 10, Exhibit E.

8.   The Harmonized Tariff Schedule of the United States ("HTSUS") is a document published by the United States International Trade Commission each year and is the United States' implementation of the internationally agreed upon Harmonized System ("HS").  Suzuki Decl. ¶ 15.  The HS is a complete product classification system covering all imported merchandise.  *Id*.  At the international level, the HS consists of approximately 5,000 article descriptions that appear as four digit headings and six digit subheadings.  *Id*.  These descriptions are arranged into 97 chapters.  *Id*.  The two final chapters, 98 and 99, are reserved for national

2

use by individual countries in the coding of special tariff programs and temporary duty suspensions or increases. *Id*. Generally, goods appear in the HS in categories, beginning with crude and natural products, and continuing in further degrees of complexity through advanced manufactured goods. *Id*. Within a chapter, four digit headings provide the broadest coverage; these headings are further subdivided into six and eight digit subheadings, which cover narrower categories of goods. *Id*.

9. Chapter 99 of the HTSUS is unique to the United States and contains provisions relating to additional duties or other import restrictions imposed by, or pursuant to, collateral legislation. Suzuki Decl. ¶ 16.

10. HTSUS subheading 9903.02 was added when the United States Trade Representative, pursuant to authority granted under section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, created a list of European products subject to duties of 100% to retaliate against the European Community for banning imports of U.S. beef products that had been treated with hormones. Suzuki Decl. ¶ 16. Subheading 9903.02 sets forth a list of 27 specific goods that are subject to increased duties. *Id*.

11. A foreign exporter who wishes to ship goods to the United States usually arranges with a carrier to transport the goods to the United States. Suzuki Decl. ¶ 14. Using information provided by the exporter/shipper, the carrier prepares a bill of lading for each specified lot of goods and completes a Cargo Declaration or Inward Vessel Manifest ("IVM"). *Id*. CBP requires the carrier to present the IVM upon entering an American port. *Id*. Often the descriptions in the IVM consist of broad industry terms. *Id*.

3

12.  Once goods are in a United States port, CBP requires the importer to complete an Entry and an Entry Summary ("Entry Documents") in which the importer must provide detailed information about the shipment, including the HTSUS number applicable to the goods.  Suzuki Decl. ¶ 14.  The HTSUS number represents a very specific description of the cargo.  *Id*. Importers complete the Entry Documents under penalty of law with the awareness that CBP is restricted from disclosing to the public the information that has been provided by the importer. *Id*.

13.  The government does not as a matter of course release information which applies HTSUS numbers to specific shipments of goods.  Suzuki Decl. ¶ 15.

14.  CBP conducted a reasonable search for information and records responsive to Plaintiff's FOIA request.  CBP searched HTSUS subheadings 9903.02.21 through 9903.02.47, because these subheadings cover goods subject to the 100% duty under the Directive.  Suzuki Decl. ¶ 11.

15.  The information that Plaintiff requests is "commercial information" and is "obtained from a person" as defined in FOIA Exemption 4.  Suzuki Decl. Exhibit A.

16.  The information that Plaintiff requests is confidential.  Suzuki Decl. ¶ 12-13.

17.  The pairing of HTSUS subheading 9903.02 with the names and addresses of importers would reveal that a particular importer entered one of the 27 specific goods covered by that subheading.  Suzuki Decl. ¶ 17.

18.  Disclosing the information that Plaintiff requests could expose importers to a competitive disadvantage by identifying the markets in which they are involved or their sources of supply and/or channels of commerce.  Suzuki Decl. ¶ 18.

4

19.  Disclosing the information that Plaintiff requests would provide competitors of importers valuable and confidential information about importers' business operations.  Along with publicly available information, it would permit a competitor of an importer to piece together the major aspects of an import transaction.  Suzuki Decl. ¶¶ 17-18.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, DC 20530
(202) 514-7250

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>CUSTOMS & INTERNATIONAL )<br>TRADE NEWSLETTER, )<br>)<br>     **Plaintiff,** )<br>)<br>  **V.** )<br>)<br>U.S. CUSTOMS AND BORDER )<br>PROTECTION, )<br>)<br>     **Defendant.** )<br>_____ ) | Civil Action No.: 08-0478 (RMC) |

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR
<u>ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT</u>

<u>Preliminary Statement</u>

On March 20, 2008, Plaintiff brought this action against Defendant, the U.S. Customs

and Border Protection ("CBP"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552

*et seq.*, seeking the names and addresses of companies, subject to CBP's Beef Hormone

Implementation Directive, which imported certain products from the European Community from

July 1, 2007 thorough December 31, 2007.  However, CBP did not receive Plaintiff's FOIA

request until March 11, 2008.  In addition, Plaintiff filed an appeal of CBP's failure to respond

on the same date, *i.e.*, March 11, 2008.  Plaintiff, therefore, failed to exhaust its administrative

remedies and for that reason this action should be dismissed.

Alternatively, Defendant CBP has properly determined that the information requested by

Plaintiff is exempt from disclosure pursuant to 5 U.S.C. §§ 552(b)(4) and 552(b)(6) of the FOIA.

Therefore, CBP has not improperly withheld any information from Plaintiff.  This information is

exempt under the FOIA because by combining these names and addresses to publicly available information, Plaintiff would be able to determine precisely the products that these companies import. Inasmuch as that information is confidential and constitutes trade secrets, Defendant properly withheld this information. Indeed, as discussed below, release of this information by CBP would have allowed Plaintiff to obtain the exact information that the Court had denied the plaintiff in *Gilda Industries, Inc. v. U.S. Customs and Border Protection*, 457 F. Supp. 2d 6 (D.D.C. 2006).[1]

# I. BACKGROUND

## A. The Harmonized Tariff Schedule of the United States ("HTSUS")

The HTSUS is a document published by the United States International Trade Commission each year and is the United States' implementation of the internationally agreed upon Harmonized System ("HS"). *See* Declaration of Shari Suzuki, Chief of CBP's FOIA Appeals, Policy, and Litigation Branch, ("Suzuki Decl.") ¶ 15. The HS is a complete product classification system covering all imported merchandise. At the international level, the HS consists of approximately 5,000 article descriptions that appear as four digit headings and six digit subheadings. *Id*. These descriptions are arranged into 97 chapters. *Id*. The two final chapters, 98 and 99, are reserved for national use by individual countries in the coding of special tariff programs and temporary duty suspensions or increases. *Id*. Generally, goods appear in the HS in categories, beginning with crude and natural products, and continuing in further degrees of complexity through advanced manufactured goods. *Id*. Within a chapter, four digit headings

---

[1] In *Gilda*, the plaintiff had requested the names and addresses of all importers for the quarter ending September 30, 2003, who paid 100% duties pursuant to a United States' tariff schedule.

provide the broadest coverage; these headings are further subdivided into six and eight digit subheadings, which cover narrower categories of goods.  *Id.*[2]

Chapter 99 of the HTSUS is unique to the United States and contains provisions relating to additional duties or other import restrictions imposed by, or pursuant to, collateral legislation. Suzuki Decl. ¶ 16.  HTSUS subheading 9903.02 was added when the United States Trade Representative, pursuant to authority granted under section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, created a list of European products subject to duties of 100% to retaliate against the European Community for banning imports of U.S. beef products that had been treated with hormones.  *Id.*  Subheading 9903.02 sets forth a list of 27 specific goods that are subject to increased duties.[3]  *Id.*

A foreign exporter who wishes to ship goods to the United States usually arranges with a carrier to transport the goods to the United States.  Suzuki Decl. ¶ 14.  Using information provided by the exporter/shipper, the carrier prepares a bill of lading for each specified lot of goods and completes a Cargo Declaration or Inward Vessel Manifest ("IVM").  *Id.*  CBP requires the carrier to present the IVM upon entering an American port.  *Id.*  Often the descriptions in the IVM consist of broad industry terms.  *Id.*

In contrast, once goods are in a United States port, CBP requires the importer to complete an Entry and an Entry Summary ("Entry Documents"), in which the importer must provide

---

[2] For example, Chapter 4 of the HTSUS includes heading 0406, which covers cheese and curd. Within this heading, subheading 0406.40 covers blue-veined cheese and subheading 0406.40.20 more specifically covers Roquefort cheese, a type of blue-veined cheese.  Suzuki Decl. ¶ 15.

[3] This Beef Hormone Implementation list is publicly available on CBP's website.  Suzuki Decl. ¶ 16.

detailed information about the shipment, including the HTSUS number applicable to the goods. *Id*. The HTSUS number represents a very specific description of the cargo. *Id*. Importers complete the Entry Documents under penalty of law with the awareness that CBP is restricted from disclosing to the public the information that has been provided by the importer. *Id*. The government does not as a matter of course release information which applies HTSUS numbers to specific shipments of goods. Suzuki Decl. ¶ 15.

       **B.**     **Plaintiff's Request**

       By letter dated January 7, 2008,  and faxed to CBP on March 11, 2008 at 2:00 p.m., Peter S. Herrick, P.A.**,** representing the Customs and International Trade Newsletter ("Newsletter"), requested:

> the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ["Directive"], copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

Suzuki Decl. ¶ 4, Exhibit A.  By letter dated February 8, 2008, and also faxed to CBP on March 11, 2008 at 2:00 p.m.**,** Newsletter stated that it was "a FOIA appeal of CBP's failure to respond to the request for records made to your office on January 7, 2008, copy enclosed." Suzuki Decl. ¶ 5, Exhibit B.  Another letter from Newsletter dated March 11, 2008 and faxed to CBP on that date at 2:00 p.m., stated, "[If] we do not receive the requested records by Friday, March 14, 2008**,** then we will begin FOIA litigation for the records." Suzuki Decl. ¶ 6, Exhibit C.

       CBP searched for, but was unable to locate, any evidence to indicate that the January 7, 2008, letter or the February 8, 2008, letter were received by CBP before March 11, 2008, when all three letters (January 7, February 8, and March 11) were received in a single fax at 2:00 p.m.

Suzuki Decl. ¶ 7.  In a letter dated March 21, 2008, CBP acknowledged receipt of Newsletter's

January 7, 2008, FOIA request ("Request").  Suzuki Decl. ¶ 8, Exhibit D.

 Newsletter filed this FOIA action on March 20, 2008.  *See* Docket No. 1, Complaint

("Compl.").  Just over three weeks later, in a letter dated April 15, 2008**,** and signed by Brenda B.

Smith, CBP's Executive Director, Trade Policy and Programs, Office of International Trade, CBP

denied Newsletter's FOIA request because the information requested "is confidential commercial

information."  5 U.S.C. § 552 (b)(4).  Suzuki Decl. ¶ 10, Exhibit E.

## ARGUMENT

## I. STANDARDS OF REVIEW

### A. Motion to Dismiss Under Rule 12(b)(1)

 A motion under 12(b)(1) "presents a threshold challenge to the court's jurisdiction."

*Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), *aff'd*, 213 F.3d 735 (D.C. Cir. 2000),

*cert. denied*, 531 U.S. 1153 (2001).  "In reviewing a motion to dismiss for lack of subject-matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's

well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."

*Thompson v. Capitol Police Board*, 120 F. Supp. 2d 78, 81 (D.D.C. 2000) (citations omitted).

"The court is not required, however, to accept inferences unsupported by the facts alleged or legal

conclusions that are cast as factual allegations."  *Rann v. Chao, Dep't. of Labor*, 154 F. Supp. 2d

61, 64 (D.D.C. 2001) (citations omitted), *affirmed*, 346 F.3d 192 (D.C. Cir. 2003), *cert. denied*,

543 U.S. 809 (2004).  In addition, "[o]n a motion to dismiss pursuant to Rule 12(b)(1), the

plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a

preponderance of the evidence."  *Thompson*, 120 F. Supp. at 81.

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Fed.

R. Civ. P. 12(b)(1) in two ways. First, the court may determine the motion based solely on the

complaint. *Herbert v. National Academy of Science*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations

of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the

conflicting evidence. *Id*.

### B. Motion for Summary Judgment Under Rule 56

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine

issue" is one whose resolution could establish an element of a claim or defense and, therefore,

affect the outcome of the action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To

determine which facts are material, the Court must look to the substantive law on which each

claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether

there exists a genuine issue of material fact sufficient to preclude summary judgment, the Court

must regard the non-movant's statements as true and accept all evidence and make all inferences

in the non-movant's favor. *Id.*, at 255. A non-moving party, however, must establish more than

the "mere existence of a scintilla of evidence" in support of his position. *Id*. at 252. By pointing

to the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. at 322. "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson v.

Liberty Lobby, Inc.*, at 249-250. The non-movant cannot manufacture genuine issues of material

fact with "some metaphysical doubt as to the material facts." *Matsushita Elc. Indus. Radio Corp.*, 475 U.S. 574, 586 (1986).

### C.  Summary Judgment In FOIA Cases

For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to *de novo* review by the Courts. *Hayden v. National Security Agency Cent. Sec. Serv.*, 608 F.2d 1381, 1384 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937 (1980). In a FOIA suit, an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that each document that falls within the class requested either has been produced, is unidentifiable, or is exempt from disclosure. *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 833 (D.C. Cir. 2001); *Weisberg v. U.S. Dept. of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980).

An agency satisfies the summary judgment requirements in a FOIA case by providing the Court and a plaintiff with affidavits or declarations which show that the documents are exempt from disclosure. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Canning v. United States Dep't of Justice*, 848 F. Supp. 1037, 1042 (D.D.C.) (agencies are typically permitted to meet [their] heavy burden by 'filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed.") (quoting *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C. 1987)). Summary judgment may be granted to an agency in a FOIA case solely on the basis of agency affidavits or declarations if the "affidavits [or declarations] are 'relatively detailed, non-conclusory, and not impugned by evidence . . . of bad faith on the part of the agency.'" *McGhee v. Central Intelligence Agency*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). *See also Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Hayden v.*

*National Security Agency Cent. Sec. Serv.*, 608 F.2d at 1387. "Summary judgment is warranted

on the basis of agency affidavits when the affidavits describe 'the justification for nondisclosure

with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith.'" *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (quoting

*Military Audit Project v. Casey*, 656 F.2d at 738).

 In a FOIA case, the Court may award summary judgment solely based on the information

provided in affidavits or declarations when they describe "the justifications for nondisclosure

with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.

1981).

## II.  PLAINTIFF FAILED TO EXHAUST <br> ADMINISTRATIVE REMEDIES

 The FOIA confers jurisdiction upon the Court to provide relief to a plaintiff only where

requested documents have been "improperly withheld" by an agency.  5 U.S.C. § 552(a)(4)(B).

The courts have interpreted this section of the statute to mean that jurisdiction exists only upon a

showing by the plaintiff that the defendant (1) improperly (2) withheld (3) agency records. *See*

*Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 150 (1980).  Indeed,

"[t]he plaintiff must show that the agency 'contravened all three components of this obligation'

in order for jurisdiction to be valid." *Kuffel v. U.S. Bureau of Prisons*, 882 F. Supp. 1116, 1120

(D.D.C. 1995) (*citing Kissinger*, 445 U.S. at 151.)  Absent such a showing, FOIA confers no

"judicial authority to devise remedies and enjoin agencies."  *Id.*

       Exhaustion of administrative remedies is required under FOIA before a party can seek

judicial review.  *Dettmann v. United States Dep't of Justice*, 802 F.2d 1472, 1477 (D.C. Cir.

1986).  A FOIA requester is deemed to have failed to exhaust administrative remedies whenever

the requester fails to comply with the administrative procedures set forth under FOIA, including:

(1) providing the required proof of identity, *Summers v. United States Dep't of Justice*, 999 F.2d

570, 572-73 (D.C. Cir. 1993);  (2) reasonably describing the records sought, *Gillin v. IRS*, 980

F.2d 819, 822-23 (1ˢᵗ Cir. 1992);  (3) complying with fee requirements, *Trueblood v. United

States Dep't of Treasury*, 943 F. Supp. 64, 68 (D.D.C. 1996); and (4) administratively appealing

a denial of records, *Oglesby v. United States Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990).

*See also* 5 U.S.C. § 552(a)(3) (requester must follow agency's published regulations governing

FOIA requests); *Kessler v. United States*, 899 F. Supp. 644, 645 (D.D.C. 1995) (failure to follow

agency regulations constitutes failure to exhaust administrative remedies).  Where a FOIA

plaintiff attempts to obtain judicial review without having first fully exhausted his administrative

remedies, his lawsuit is subject to dismissal for lack of subject matter jurisdiction.  *Oglesby*, 920

F.2d at 57.

       In this case, this action was filed less than ten days after CBP received Newsletter's FOIA

request and appeal.  *See* Compl.; Suzuki Decl. ¶¶ 4-7.  Plaintiff, therefore, failed to exhaust

administrative remedies.  Accordingly, all claims against Defendant CBP should be dismissed.

## III.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT

### A.  CBP Conducted a Reasonable Search

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records. *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Weisberg v. U.S. Dept. of Justice*, 705 F.2d 1344, 1352 (D.C. Cir. 1983).  This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce relevant material.  *Id.* at 777 n.4.  An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  *Oglesby*, 920 F.2d at 68.  Simply stated, the adequacy of the search is "dependent upon the circumstances of the case."  *Truitt v. Dept. of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

The search standards under FOIA do not place upon the agency a requirement that it prove that all responsive documents have been located.  *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995).  It has been held that " 'the search need only be reasonable; it does not have to be exhaustive.' " *Miller v. Dept. of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) (citing *National Cable Television Association v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby*, 920 F.2d at 68; *see SafeCard Servs. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed,

non-conclusory and submitted in good faith." *Miller,* 779 F.2d at 1383; *Goland,* 607 F.2d at

352. Though the "affidavits submitted by an agency are 'accorded a presumption of good faith,'"

*Carney v. Dept. of Justice*, 19 F.3d 807, 812 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994)

*(quoting SafeCard Servs*., 926 F.2d at 1200), the burden rests with the agency to demonstrate the

adequacy of its search. Once the agency has met this burden through a showing of convincing

evidence, the burden shifts to the requester to rebut the evidence by a showing of bad faith on the

part of the agency. *Miller,* 779 F.2d at 1383. A requester may not rebut agency affidavits with

purely speculative allegations. *See Carney*, 19 F.3d at 813; *SafeCard,* 926 F.2d at 1200;

*Maynard v. CIA*, 986 F.2d 547, 559-560 (1st Cir. 1993).

　　The search that CBP conducted in response to Plaintiff's FOIA request meets this

standard. Newsletter sought the names and addresses of companies, which are the subject of

CBP's Directive for the period from July 1, 2007, to December 31, 2007. Suzuki Decl. ¶ 4.

These companies import designated products from the European Community. *Id*. Thus,

HTSUS subheadings 9903.02.21 through 9903.02.47 were applicable to these importers. Suzuki

Decl. ¶ 11.

　　In response, CBP queried the Automated Commercial System ("ACS"), a comprehensive

compilation of several CBP electronic database systems which accommodates the numerous

transactions involved in day-to-day CBP commercial operations, including importations. Suzuki

Decl. ¶ 11. It contains all of the commercial entry information submitted to CBP at over 300

ports nationwide. *Id*. Therefore, all information that could be responsive to Plaintiff's request

was contained in this electronic system of records. *Id*.

The OT's Trade Information Management Division searched the ACS by checking all entries of imported goods for products classified in subheadings 9903.02.21 through 9903.02.47 of the HTSUS in the date range from July 1 through December 31, 2007.  The search of the ACS database for entries of goods classified in HTSUS subheadings 9903.02.21 through 9903.02.47 produced a list of the names and addresses  of approximately two hundred and forty-four (244) importers.  Suzuki Decl.  *Id*.

**B.   Defendant Properly Withheld Information Under FOIA Exemptions 4 and 6**

As explained below, Defendant properly withheld the information sought by Plaintiff pursuant to FOIA Exemptions 4 and 6, 5 U.S.C. §§ 552(b)(4) and (b)(6).

**1.   Exemption 4**

FOIA Exemption 4 covers two broad categories of information in federal agency records: (1) trade secrets; and (2) information that is (a) commercial or financial, and (b) obtained from a person, and (c) privileged or confidential.  5 U.S.C. § 552(b)(4); *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288, 1290 (D.C. Cir. 1983).  Regarding the latter, if information relates to business or trade, courts generally will accord it the status of "commercial" information for purposes of the FOIA.  It is not necessary to show that the records reveal basic commercial operations; records are deemed commercial so long as the submitter has a "commercial interest" in them.  *Id*. at 1290.  Further, "[i]nformation that a person is required to submit to the Government is considered confidential...if its disclosure is likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Public Citizen Health Research Group v. Food and Drug Admin.,* 185 F.3d 898, 348 (D.C. Cir.

12

1999) (quoting *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).

Plaintiff seeks the names and addresses of companies who were subject to the Directive and which imported products to the United States during a specified period of time.  Suzuki Decl. ¶ 4.   Simply put, Plaintiff is seeking the names and addresses of companies importing goods found under HTSUS subheading 9903.02.  Suzuki Decl. ¶¶ 4, 17.

Plaintiff has conceded that the information it has requested is "commercial" information "obtained from a person."  Suzuki Declaration, Exhibit A; *see Gilda Industries, Inc. v. U.S. Customs and Border Protection*, 457 F. Supp. 2d at 10 (citing *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 1998 WL 34016806 at * 2 (D.D.C. 1998) ( "There is no doubt that all information on an Import Declaration, including HTS numbers, is 'commercial' and is 'obtained from a person.'"), *reversed on other grounds,* 177 F.3d 1022, 1025-1026 (D.C. Cir. 1999). Moreover, the information that Plaintiff seeks is also confidential, because when paired with publicly available information, this information would provide competitors valuable and confidential information about other importers' business operations and allow a competitor to piece together major aspects of an import transaction.  Suzuki Decl. ¶ 17; see *Gilda Industries, Inc. v. U.S. Customs and Border Protection*, 457 F. Supp. 2d at 10-11.

The pairing of HTSUS subheading 9903.02 with the name and address of such an importer would reveal that a particular importer entered one of the 27 specific goods covered by that subheading.  *Id*.  Furthermore, because CBP permits access to IVM information in

13

accordance with 19 U.S.C. § 1431,[4] it would permit a member of the public, including a

competitor of that importer, to utilize the IVM information to piece together the major aspects of

an import transaction and an even more highly specified description of the imported product.

Suzuki Decl. ¶¶ 17-19.   The competitor would be able to locate the IVM information on an

importer for the specific time period requested and obtain information regarding the source of the

imported merchandise, such as country of origin and manufacturer, the importer's supply chain

and the importer's quantity of goods.  Suzuki Decl. ¶ 20.  More importantly, the competitor

would be able to pair the general description of a product from the IVM with the HTSUS number

applicable to importers subject to the Directive to identify, with great specificity, the exact

product imported by a particular importer.  *Id*.;  *See Timken Co. v. U.S. Customs Serv*., 491

F.Supp. 557, 559-560 (D.D.C. 1980) (even if information subject to FOIA request would not in

itself threaten competitive injury, it is properly protected if plaintiff has independent sources of

information which could complete the picture of its competitors) (internal citation omitted).

For example, a competitor might be able to search through the IVM, which provides only

a general description of goods, to discover that a particular importer imported "cheese."

However, if the competitor also has the name and address of an importer and knows that the

importer entered a product classified under HTSUS subheading 9903.02, the competitor would

know that a particular importer imported blue-veined Roquefort cheese in original loaves that

was a product of France classified under HTSUS subheading 9903.02.30.  *Id*.

---

[4] IVM information includes the name and address of the importer or consignees, the name and
address of the shipper, a general description of the goods, quantity, units, weight, and country of
origin.  Suzuki Decl. ¶ 19.

Thus, disclosing the names of importers that had imported specific goods could expose those companies to a competitive disadvantage by identifying the markets in which they are involved or their sources of supply and/or channels of commerce.  Suzuki Decl. ¶ 18.  Even without data from the IVM, a list showing the importer's name paired with the HTSUS number is a disclosure of confidential business information.  *Id*.

In fact, for many products, the HTSUS numbers are finely delineated by product specification.  *Id*.  For example, in the realm of chemicals, many tariff classifications specify only one or a few distinct chemical compounds.  *Id*.  Thus, a company with a "secret ingredient" would have its secret discovered if its competitors learn the chemical description of the products it has imported.  *Id*.  The mere attachment of the HTSUS number to the importer's name represents a very real threat to the importer's business.  *Id*.

Finally, CBP takes its obligations to protect the confidentiality of commercial information very seriously.  Suzuki Decl. ¶ 24.  Many importers expend considerable sums of money to locate and establish business relationships with manufacturers and suppliers of merchandise in the overseas market.  *Id*.  Permitting third parties, including competitors, easy access through the FOIA to the identities of these commercial entities would be manifestly unfair and cause substantial commercial harm to the importers who laboriously worked to establish these relationships.  *Id*.

Additionally, many importers expend considerable sums of money in securing their supply chain.  Suzuki Decl. ¶ 25.  In fact, CBP has initiated a number of programs related to enhancing the security of the mechanics of international trade.  *Id*.  Supply chain safety is one of the primary principles around which these security programs are centered.  *Id*.  One means of

15

ensuring the integrity of supply chains and the safety of cargo is maintaining the confidentiality of documents submitted to CBP, the disclosure of which could reveal the various means that different importers utilize in international trade.  *Id*.

### 2. Exemption 6

Exemption 6 permits an agency to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.A. § 552(b)(6).  The U.S. Supreme Court has interpreted the scope of Exemption 6 broadly, holding that any information that "applies to a particular individual" may qualify for protection if its disclosure would rise to the level of a "clearly unwarranted invasion of privacy.*" United States Department of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) ("The Supreme Court has read Exemption 6 broadly, concluding the propriety of an agency's decision to withhold information does not 'turn upon the label of the file which contains the damaging information.'") (quoting *Washington Post*, 456 U.S. at 601)).

In order to establish that an invasion of personal privacy is "unwarranted" pursuant to Exemption 6, a court "must balance the public interest in disclosure against the interest Congress intended the exemption to protect."  *Dept. of Defense v. Federal Labor Relations Authority*, 510 U.S. 487, 495 (1994).  The only relevant public interest in this equation is that of "contributing significantly to public understanding of the operations or activities of the government."  *Id.  See U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 109 S.Ct. 1468, 1481-1482 (1989) (the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its

16

statutory duties or otherwise let citizens know what their government is up to).  A court need perform this balancing only if a qualifying public interest has been established.  *National Archives and Records Admin. v. Favish*, 124 S.Ct. 1570, 1582 (2004) .  *See Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990) ("We need not linger over the balance; something outweighs nothing every time.") *(quoting NARFE v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)).

In this case, Defendant has alternatively protected the names and addresses of third-party individuals, as opposed to business entities, who have imported products subject to the HTSUS numbers cited by Plaintiff.  Suzuki Decl. ¶ 28.  These individuals have a privacy interest to be free of unwarranted attention outside the context of their employment.  *Id*.

Moreover, in deciding to withhold this information under this exemption, Defendant considered the public interest in its disclosure.  *Id*.  Defendant found that disclosing the names and addresses of these individuals would not shed light on how CBP performs its statutory duties.  *Id*.  Thus, even if this Court finds that an individual's privacy interests in his or her importation and consumption of a particular product is less than great, the information should still be protected because "something outweighs nothing every time."  *Fitzgibbon,* 911 F.2d at 768.  *See also NARFE*, 879 F.2d at 879 (names and addresses of individuals eligible to participate in Federal retirement system protected under Exemption 6 because no public interest in their disclosure).

**IV.   DEFENDANT CANNOT SEGREGATE ANY NON-EXEMPT INFORMATION**

"The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Juarez v. Department of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) (citing 5 U.S.C. § 552(b)).

"This Circuit has long recognized, however, that documents may be withheld in their entirety when nonexempt portions 'are inextricably intertwined with exempt portions [of the record].'" *Id*. (citing *Mead Data Cent., Inc. v. United States Dept. Of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  "A court may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated for this reason." *Id*. (citing *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

To demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." *Mead Data Cent., Inc. v. United States Dept. of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).  The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed.  *Id.*  All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated.  *Armstrong* v. *Executive Office of the President*, 97 F.3d at 578-79.  Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."  *Mead Data*, 566 F.2d at 261, n.55.

In this matter, Plaintiff has narrowly drawn its request to seek precisely that which is protected pursuant to FOIA Exemption 4, namely the association of names and addresses of importers with a particular HTSUS classification.  Suzuki Decl. ¶ 29.  There is simply no way to feasibly segregate portions of a name and/or address in such a way to result in any meaningful portions that could be released to Plaintiff, because the information being sought is the very

information that CBP seeks to protect.  Suzuki Decl. ¶ 29; *See Local 3 International Brotherhood of Electric Workers v. NLRB*, 845 F.2d 1177, 1180 (2nd Cir. 1988) (upholding exemption of entire documents where stripping them of non-exempt information would render them "nonsensical").  Thus, CBP has met its burden to show that there is no reasonably segregable portion of a record that can be provided to Plaintiff.

## CONCLUSION

Plaintiff failed to exhaust administrative remedies and its claims should, therefore, be dismissed.  Alternatively, Defendant has demonstrated that it responded properly to Plaintiff's FOIA request, and that all information has been properly withheld.  Accordingly, Defendant respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/
JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, DC 20530
(202) 514-7250

Of Counsel:
Susan C. Shama
Staff Attorney
Office of Associate Chief Counsel, Trade and Finance
U.S. Customs and Border Protection

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CUSTOMS & INTERNATIONAL TRADE NEWSLETTER,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **V.** | ) **Civil Action No.: 08-0478 (RMC)** |
| **U.S. CUSTOMS AND BORDER PROTECTION,** | ) ) ) |
| **Defendant.** | ) ) |

## <u>ORDER</u>

UPON CONSIDERATION OF Defendant's Motion to Dismiss or Alternatively, Motion for Summary Judgment, Statement of Material Facts To Which There Is No Genuine Issue, and Memorandum of Points and Authorities in Support Thereof, any Opposition thereto, and the entire record herein, it is this _____ day of _____, 2008,

**ORDERED**, that Defendant's motion is **GRANTED**; and it is

**FURTHER ORDERED** that the complaint and all claims against Defendant are dismissed with prejudice.

**FURTHER ORDERED** that Defendant is granted summary judgment on all claims herein.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08-0478 (RMC) |
| U.S. CUSTOMS AND BORDER PROTECTION, | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF SHARI SUZUKI

I, Shari Suzuki, declare the following to be a true and correct statement of facts:

1)      I am the Freedom of Information Act ("FOIA") Appeals Officer, and Chief of the FOIA Appeals, Policy and Litigation Branch ("FAPL"), Regulations and Disclosure Law Division, Regulations and Rulings, Office of International Trade ("OT"), U.S. Customs and Border Protection ("CBP"), U.S. Department of Homeland Security (formerly the U.S. Customs Service, U.S. Department of the Treasury).[1]  Since April 2, 2006, I have been the official charged with the following responsibilities:  (1) giving guidance and instruction to CBP personnel regarding the processing of FOIA requests; (2) adjudicating administrative appeals that concern FOIA requests; and (3) overseeing all CBP activities related to information disclosure under the FOIA. Prior to October 15, 2006, the office was known as the Office of Regulations and Rulings ("OR&R").

---

[1] Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. *See* Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. 108-32 at 4 (2003). Subsequently, on April 23, 2007, a notice was published in the Federal Register (72 FR 20131) informing the public that DHS had changed the name to "U.S. Customs and Border Protection" effective March 31, 2007.

2)    The statements made in this Declaration are made on the bases of: (1) my review of the official files and records of this office; (2) my personal knowledge of the internal operations of this office and agency; and (3) information acquired by me in the course of the performance of my official duties.

3)    I am familiar with the procedures followed by CBP in responding to requests for information from its files pursuant to the provisions of 5 U.S.C. § 552 (the FOIA), and with the procedures followed in responding to the request made by Peter S. Herrick, P.A., representing the Customs and International Trade Newsletter, the Plaintiff in the above-captioned matter.

## CHRONOLOGY

4)    By letter dated January 7, 2008, and faxed to CBP on March 11, 2008 at 2:00 p.m., Peter S. Herrick, P.A., representing the Customs and International Trade Newsletter ("Requester"), requested:

> the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ["Directive"], copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

See Exhibit A.

5)    A letter from the Requester dated February 8, 2008, and faxed to CBP on March 11, 2008 at 2:00 p.m., stated that it was "a FOIA appeal of CBP's failure to respond to the request for records made to your office on January 7, 2008, copy enclosed." See Exhibit B.

6)    A letter from the Requester dated March 11, 2008, and faxed to CBP on that date at 2:00 p.m. stated, "If we do not receive the requested records by Friday, March 14, 2008 then we will begin FOIA litigation for the records." See Exhibit C.

2

7)     CBP searched and was unable to locate any evidence to indicate that the January 7, 2008 letter or the February 8, 2008 letter were received by CBP before March 11, 2008, when all three letters (January 7, February 8, and March 11) were received in a single fax at 2:00 p.m.

8)     In a letter dated March 21, 2008, CBP acknowledged its receipt of the January 7, 2008 request ("Request"). See Exhibit D.

9)     On March 20, 2008, the Requester filed a FOIA action before this Court seeking immediate release of the records requested.

10)    In a letter dated April 15, 2008 and signed by Brenda B. Smith, CBP's Executive Director, Trade Policy and Programs, Office of International Trade, CBP denied the Requester's FOIA request because the information requested "is confidential commercial information." 5 U.S.C. § 552(b)(4) See Exhibit E.

SEARCH FOR AND IDENTIFICATION OF RECORDS
RESPONSIVE TO FOIA REQUEST

11)    Requester sought the names and addresses of companies, which are the subject of CBP's Beef Hormone Implementation Directive ("Directive"), for the period from July 1, 2007 to December 31, 2007. These companies import designated products from the European Community. Subheadings 9903.02.21 through 9903.02.47 of the Harmonized Tariff Schedule of the United Stated ("HTSUS") cover goods subject to duties of 100 percent *ad valorem* under the Beef Hormone Implementation Directive. See paragraph 15, *infra*, for a more detailed description of the HTSUS.

The Automated Commercial System ("ACS")

The ACS is the comprehensive compilation of several CBP electronic database systems which accommodates the numerous transactions involved in day-to-day CBP

3

commercial operations, including importations. It contains all of the commercial entry information submitted to CBP at over 300 ports nationwide.

On April 25, 2008, the OT's Trade Information Management Division searched the ACS by checking all entries of imported goods for products classified in subheadings 9903.02.21 through 9903.02.47 of the HTSUS in the date range from July 1 through December 31, 2007. The search of the ACS database for entries of goods classified in HTSUS subheadings 9903.02.21 through 9903.02.47 produced a list of the names and addresses of approximately two hundred and forty-four (244) importers.

### JUSTIFICATION FOR WITHHOLDING OF INFORMATION UNDER FOIA EXEMPTIONS 4 AND 6

12)    FOIA Exemption 4, 5 U.S.C. § 552(b)(4), exempts from mandatory disclosure matters that are "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." This subsection is intended to protect the interests of both the submitters of the information and the government. It encourages submitters to voluntarily furnish useful commercial or financial information to the government, and it correspondingly provides the government with an assurance that such information will be reliable. The exemption also affords protection to those submitters who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantage that could result from disclosure. The denial of the Request on the basis of Exemption (b)(4) is consistent with the holding in a similar case decided by this court in *Gilda Industries, Inc. v. U.S. Customs and Border Protection*, 457 F. Supp. 2d 6 (D.D.C. 2006).

13)    The requested information is contained in entry documents that importers or their agents who import merchandise into the United States are required (19 U.S.C. §

4

1484) to file with CBP so that CBP can make a determination as to the classification (i.e.,

legal description in accordance with the HTSUS (19 U.S.C. § 1202)), value, rate of duty,

compliance with CBP restrictions (e.g., Harbor Maintenance Fees, Merchandise

Processing Fees) and compliance with other agency assessments (e.g., the Department of

Agriculture (produce), the Department of Commerce (textiles, antidumping and

countervailing duties), the Food and Drug Administration (pharmaceuticals, tainted

foodstuffs)). The documents required to be submitted to CBP consist of, *inter alia*,

declarations, invoices, bills of lading, packing lists and other documents containing

information from which customs duties may be determined. This information sets forth

the identities of the parties, manufacturers or sources of supply, purchasers, volume of

merchandise purchased, cost or value and other similar commercial or financial

information. CBP has long maintained that the information on entry documentation is

confidential commercial information warranting a categorical denial of disclosure.

14) A foreign exporter who wishes to ship goods to this country generally

arranges with a carrier to transport the goods to the United States. Using information

provided by the exporter/shipper, the carrier prepares a bill of lading for each specified

lot of goods, and completes a Cargo Declaration or Inward Vessel Manifest (IVM). The

IVM lists all the bills of lading on the vessel and it provides information about each

shipment, including a general description of the goods. Often the manifest descriptions

consist of broad industry terms. CBP requires the carrier to present the IVM on entry to

an American port. Once the goods are in the U.S. port, CBP requires the importer to

complete an Entry and an Entry Summary. On these documents, the importer must

provide detailed information about the shipment, including the HTSUS number

applicable to the goods. The HTSUS number represents a very specific description of the cargo. Although the IVM and the Entry/Entry Summary each contain a description of the imported goods, they are very different documents, prepared by different persons, and prepared under different circumstances. The carrier prepares the IVM generally with the details derived second-hand from the shipper and the document need only have a general description of the goods. In contrast, importers themselves provide information on the Entry and Entry Summary and they describe goods in terms of HTSUS numbers which provide a far more precise and detailed description than the one found on the IVM. Furthermore, importers complete the Entry and Entry Summary under penalty of law with the awareness that CBP is restricted from disclosing the information provided to the public. Thus, the description of goods found in the Entry and Entry Summary have more detail and assurance of accuracy than the generic description found in the IVM. The small amount of information available on the manifest is usually not sufficient to identify individual transactions. The description provided by the HTSUS number, unlike information contained in the aggregate on the vessel manifest, is required to be provided to CBP by the importer as part of the Entry and Entry Summary and represents the description of the cargo.

15)    The HTSUS is the United States' implementation of the internationally agreed upon Harmonized System ("HS"). The HTSUS is a document published by the United States International Trade Commission each year. The HS is a complete product classification system (i.e., it covers all imported merchandise). At the international level, the HS consists of approximately 5,000 article descriptions that appear as four digit headings and six digit subheadings. These descriptions are arranged into 97 chapters.

6

The two final chapters, 98 and 99, are reserved for national use by individual countries in the coding of special tariff programs and temporary duty suspensions or increases. Goods generally appear in the HS in categories, beginning with crude and natural products, and continuing in further degrees of complexity through advanced manufactured goods. For example, live animals are classified in Chapter 1, animal hides and skins in Chapter 41, and leather footwear in Chapter 64. Within a chapter, four digit headings provide the broadest coverage; these headings are further subdivided into six and eight digit subheadings, which cover narrower categories of goods. For example, Chapter 4 of the HTSUS includes heading 0406, which covers cheese and curd. Within this heading, subheading 0406.40 covers blue-veined cheese, and subheading 0406.40.20 more specifically covers Roquefort cheese (one of several types of blue-veined cheese) imported in original loaves. Alone, without other information associated with it, an HTSUS classification number is no more sensitive or in need of confidential treatment than the aggregation of HTSUS numbers published as the complete HTSUS. However, the specific use of HTSUS numbers is not published. The government does not as a matter of course release information which applies HTSUS numbers to specific shipments of goods.

16)    Chapter 99 of the HTSUS is unique to the United States and contains provisions relating "to legislation and to executive and administrative actions pursuant to duly constituted authority, under which . . . (b) Additional duties or other import restrictions are imposed by, or pursuant to, collateral legislation." U.S. Note 1 to Chapter 99, HTSUS. Subheading 9903.02, HTSUS, was added when the United States Trade Representative, pursuant to authority granted under section 301 of the Trade Act of 1974

(19 U.S.C. § 2411), created a list of European products subject to 100 percent duties to retaliate against the European Community for banning imports of U.S. beef products treated with hormones. The action was taken in accordance with a World Trade Organization Appellate Body Decision on the trade dispute. Subheading 9903.02 sets forth a list of 27 specific goods that are subject to increased duties. For example, subheading 9903.02.25 covers swine meat, fresh or chilled. This Beef Hormone Implementation list is publicly available on CBP's website.

17)    In this case, the Requester sought the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive who imported products referenced in the directive from the European Community during a specified period. The Requester, thus, seeks the names and addresses of companies importing goods found under HTSUS subheading 9903.02. The pairing of HTSUS subheading 9903.02 with the name and address of an importer would reveal that a particular importer entered one of the 27 specific goods covered by that subheading. It would also permit a member of the public, such as a competitor of an importer, to utilize his or her access to the vessel manifest information to piece together the major aspects of an import transaction and an even more highly specified description of the imported product.

18)    Disclosing the names of importers that imported specific goods could expose those companies to a competitive disadvantage by identifying the markets in which they are involved or their sources of supply and/or channels of commerce. Even in the absence of manifest data altogether, a list showing the importer's name paired with the HTSUS number is a disclosure of business confidential information. For many

8

products, the HTSUS numbers are finely delineated by product specification. In the realm of chemicals, for example, many tariff classifications specify only one or a few distinct chemical compounds. A company known to have a "secret ingredient" would have its secret discovered rather quickly when their competitor knows the chemical description of the products it has entered. Other tariff classifications are equally specific, in matters as diverse as textile fiber content, method of manufacture, intended use and in some cases, unit price. The mere attachment of the HTSUS number to the importer's name represents a very real threat to the importer's business.

19)     CBP permits access to vessel manifest information in accordance with 19 U.S.C. § 1431 as implemented by 19 CFR § 103.31. Vessel manifest information accessible, pursuant to 19 CFR § 103.31, includes the name and address of the importer or consignee, the name and address of the shipper, a general description of the goods, quantity, units, weight, and country of origin. A member of the general public may request from CBP information contained on the vessel manifest. Additionally, there are commercial services which also provide specific manifest information. The manifest is required of every vessel which arrives and makes entry into the United States.

20)     The association of subheading HTSUS 9903.02 with the specific names and addresses of importers, as was requested in this matter, would permit a member of the public, such as a competitor of a particular importer, to utilize her or his access to vessel manifest information to piece together the major aspects of an import transaction. With access to this information, the importer's competitor would be able to locate manifest information on the importer for the specific time period requested, and obtain information regarding the source of the imported merchandise (such as country of origin

9

and the manufacturer), its supply chain (such as the port of lading, the shipper or freight forwarder), and its quantity. More importantly, the competitor would be able to pair the general description of a product from the vessel manifest with the HTSUS number applicable to importers subject to the Beef Hormone Implementation Directive (and specified in the FOIA request) to identify, with great specificity, the exact product imported by a particular importer. For example, a requester might be able to search through the vessel manifest to discover that a particular importer imported "cheese" since the vessel manifest only provides a general description of the goods. However, when a requester is armed with the name and address of the importer and knowledge that this importer entered a product classified under HTSUS subheading 9903.02, access to the vessel manifest information would reveal that the particular importer imported Blue-veined Roquefort cheese in original loaves that was a product of France classified under HTSUS subheading 9903.02.30.

21)    Plaintiff is requesting more than the mere release of the importers' names and addresses. By asking CBP to release the names and addresses associated with a specific HTSUS classification number, Plaintiff is asking CBP to pair the names and addresses with shipments of specific goods during a specific time frame. In other words, Plaintiff is seeking information that would reveal the specific description of a precise product imported by a particular importer.[2]

22)    19 U.S.C. § 1431(c) and 19 CFR § 103.31 provide for disclosure/release of "the general character of the cargo" but not the far more specific HTSUS classification number. Had Congress desired the public to have access to the more specific HTSUS

---

[2] CBP's disclosure of this information is a factor a business might consider in determining whether to import merchandise, and might result in a decision not to import at all.

classification number associated with the identity of a particular importer, the statute and implementing regulations would have so provided.

23)     Furthermore, subparagraph (c)(1)(A) of 19 U.S.C. § 1431 permits public disclosure of names and addresses of shippers, importers or consignees contained on the vessel manifests, unless the shipper, importer or consignee makes a biennial certification requesting confidential treatment of its name and address. The fact that an importer can claim confidential treatment of its name and address firmly establishes that name and address information is considered to be commercially sensitive information in certain contexts.

24)     CBP takes its obligations to protect the confidentiality of commercial information very seriously. Many importers expend considerable sums of money to locate and establish business relationships with manufacturers and suppliers of merchandise in the overseas market place. Permitting third parties, including competitors, easy access (through the small costs of a FOIA request) to the identities of these commercial entities would be manifestly unfair and cause substantial commercial harm to the importers who laboriously worked to establish these relationships.

25)     Additionally, many importers expend considerable sums of money in securing their supply chains. CBP has initiated a number of programs related to enhancing the security of the mechanics of international trade.[3] Supply chain safety is one of the primary principles around which these security programs are centered. However, by aggregating the information that would be made available in response to the instant FOIA request and information available to the public, a requester could uncover

---

[3] Examples of such programs include the Customs-Trade Partnership Against Terrorism (C-TPAT), the 24-hour Rule, and the Container Security Initiative (CSI).

key details concerning an importer's supply chain, such as the identity of the manufacturer, country of origin, freight forwarder, port of lading and/or shipper.[4] One of CBP's priority missions is to prevent terrorists and terrorist weapons from entering the United States and the security of cargo is one of the key national security challenges that we currently face. One means of ensuring the integrity of supply chains and the safety of cargo is maintaining the confidentiality of documents submitted to CBP, the disclosure of which could reveal the various means that different importers utilize in international trade. Thus, maintaining the confidentiality of information contained in entry documents is critical to CBP in effectively pursuing this mission.

26)    Plaintiff has requested that CBP relate HTSUS numbers, applicable to the Beef Hormone Implementation Directive, to specific names and addresses through a disclosure pursuant to the FOIA. Once such a disclosure is made, the names, addresses, and HTSUS classification numbers become part of the public record and must be disclosed to any requester under the principle that disclosure to one is disclosure to all. The FOIA provides for the disclosure of information to the public and does not differentiate regarding the need or reason the requester seeks the data. While CBP realizes that some requesters may have a greater need or more legitimate purpose for obtaining requested information, the FOIA precludes an agency from any consideration of that need. Thus, if CBP releases this information to Plaintiff, CBP must also release, upon request, the information to competitors of the importers whose names and addresses are the subject of this request.

---

[4] For example, if a U.S. factory is secure from attack, a terrorist could identify other entities in the supply chain and attempt to attack these other more vulnerable locations.

27)     The Trade Secrets Act (18 U.S.C. § 1905) ("TSA") imposes personal sanctions against Government employees who improperly disclose confidential commercial information. The provisions of the TSA have been interpreted to be coextensive with FOIA exemption (b)(4); anything that is exempt under (b)(4) would also be prohibited from disclosure under the TSA. The effect of this interpretation is that the TSA precludes any discretionary release of otherwise exempt (b)(4) information pursuant to the FOIA.

28)     Section 552(b)(6) of Title 5 of the U.S. Code exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." This protection is afforded to information that would infringe on the personal privacy of individuals about whom it pertains. When considering the use of Exemption (b)(6), the question one must entertain is this: whether disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The resolution of this issue involves a balancing of the public's right to know the information against the individual's right to privacy. Pursuant to Exemption (b)(6), CBP has withheld the names of third-party individuals included on the list of importers. Private third-parties have a privacy interest to be free of unwarranted attention outside the context of their employment or business activities. Disclosing the withheld information would not shed light on how CBP performs its statutory duties. The public's interest in knowing the personal identifying information of third-parties engaged in customs business transactions does not outweigh the personal privacy interests of these third-parties. To reveal the withheld information would constitute a clearly unwarranted invasion of personal privacy.

13

29)     CBP's review of the information sought revealed that the information Plaintiff requests CBP to segregate from entry documents is in itself exempt from disclosure.  See Exhibit A.  The information being sought is the very information that CBP seeks to protect.  The association of HTSUS numbers associated with the Beef Hormone Implementation Directive to the importer's name and address represents a very real threat to the importer's business.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on June 27, 2008.

_____

Shari Suzuki, Chief
FOIA Appeals, Policy and Litigation Branch
Office of International Trade

# Exhibit A

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

January 7, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

Peter S. Herrick, P. A. is representing the media requester, Customs & International Trade Newsletter in its request for records under the Freedom of Information Act, as amended, 5 U.S.C. §552, *et. seq.* We request the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ["Directive"], copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

The records we are seeking are "commercial" information that was "obtained from a person." Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (USDC DC 2006). The release of this information would not impair CBP's ability to obtain necessary information in the future. Furthermore, the release of the information will not cause substantial harm to the competitive position of the companies subject to the

1

directive.

This request differs in several aspects from those decided in *Gilda*. Here, the requester is the media and not an importer. The requester will never be in competition with the companies subject to the directive. The requester does not want the HTSUS subheading numbers and/or knowledge of the products that these companies import. The requester does not want information released from an Import Declaration [whatever that is] [1]. We do not want to associate a specific shipment of goods with a specific HTSUS subheading number with a specific importer.

As an example, if you provide only Gilda's name and address, the requester will not know what products Gilda imports nor which HTSUS subheading numbers it uses nor from which country it imports, just from its name and address.

There is no worry in this request as there was in *Gilda*, that Gilda would steal business away from or otherwise disrupt the operations of its competitors. Moreover, providing only the names and addresses makes it very easy to segregate "protected information" from this requests.

We agree in advance to pay for reasonable search and copy charges. We expect the records to be made available within 20 days, *viz.* January 27, 2007.

Sincerely

Peter S. Herrick

Enclosure

---

[1] We believe your use of the phrase "Import Declaration" in your declaration of June 12, 2006 mislead the court as there is no CBP document known as an "Import Declaration." There is of course a declaration, not under oath, on the entry summary.

2

# Exhibit B

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

February 8, 2008

<u>TELECOPY ONLY (202-572-8747)</u>

<u>FREEDOM OF INFORMATION ACT APPEAL</u>

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

This is a FOIA appeal of CBP's failure to respond to the request for records made to your office on January 7, 2008, copy enclosed.

Sincerely,

Peter S. Herrick

Enclosure

# Exhibit C

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

March 11, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT APPEAL

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

If we do not receive the requested records by Friday, March 14, 2008 then we will begin FOIA litigation for the records.

Sincerely,

Peter S. Herrick

Enclosure

# Exhibit D

March 21, 2008

DIS-2-OT:FD
2008F2953

Mr. Roy Leon
Peter Herrick, P.A.
3520 Crystal View Court
Miami, FL 33133

Dear Mr. Leon:

This is in reference to your request under the Freedom of Information Act (FOIA) dated January 7, 2008 in which you requested information on companies that were subject to the Beef Hormone Directive.

We attempt to process requests in order of their receipt. Accordingly, we must first process similar requests previously received from other persons and organizations. Nevertheless, we shall act with all due diligence to process this request as soon as possible. Please be advised, even if no responsive records are located or if all records are determined to be exempt from disclosure, you may still be responsible for the payment of fees determined due in accordance with Title 5 U.S.C. § 552, and 6 CFR § 5.11.

Please refer to file number 2008F2953 on any future correspondence related to this request. Additional information on U.S. Customs and Border Protection's FOIA procedures may be viewed at www.cbp.gov.

Thank you
FOIA Division

# Exhibit E

U.S. Department of Homeland Security
Washington, DC 20229



**U.S. Customs and
Border Protection**

APR 1 5 2008

Mr. Peter Herrick
Peter S. Herrick, P.A. Attorneys At Law
3520 Crystal View Court
Miami, Florida 33133

Dear Mr. Herrick:

This is in reply to your Freedom of Information Act (FOIA) request of January 7, 2008. We are unable to provide you with the information you are requesting as it is confidential commercial information as described in 5 USC 552(b)4.

If you consider this response to constitute a denial of your request of disclosure, you may appeal to Regulations and Rulings, U.S. Customs and Border Protection, FOIA Appeal, Policy & Litigation Branch, Mint Annex, 5th Floor, 1300 Pennsylvania Avenue, N.W., Washington, DC 20229. Your appeal must be made in writing within 35 days after the date of this notification.

If you have any questions or need additional information about this request, please contact Mr. Howard Duchan, Office of International Trade, at (202) 863-6020.

Sincerely,

*Brenda B Smith*

Brenda B. Smith
Executive Director, Trade Policy and Programs
Office of International Trade