## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CUSTOMS & INTERNATIONAL TRADE NEWSLETTER,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 08-0478 (RMC)** |
| **U. S. CUSTOMS AND BORDER PROTECTION,** | ) ) ) | |
| **Defendant.** | ) ) / | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

Plaintiff, Customs & International Trade Newsletter ["Newsletter"] respectfully opposes defendant's, U. S. Customs and Border Protection ["CBP"], motion to dismiss Newsletter's action for failure to exhaust administrative remedies. Alternatively, Newsletter opposes CBP's motion for summary judgment on the grounds that there are genuine issues of material fact, and, CBP, is, therefore, not entitled to judgment as a matter of law.

In support of this motion, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Opposition; Statement of Material Facts At Issue; the declaration of Peter S. Herrick; and, the PIERS declaration. A proposed Order consistent with Newsletter's opposition is attached.

Respectfully submitted,

_____/s/_____

1

PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email:  pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was

sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for

defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 14, 2008.


_____/s/_____
Peter S. Herrick

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CUSTOMS & INTERNATIONAL TRADE NEWSLETTER,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 08-0478 (RMC)** |
| **U. S. CUSTOMS AND BORDER PROTECTION,** | ) ) ) | |
| **Defendant.** | ) ) ) / | |

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE IS A GENUINE ISSUE

Pursuant to LCvR 7(h), plaintiff, Customs & International Trade Newsletter ["Newsletter"] states the material facts for which there is a genuine issue:

1.    By letter of January 7, 2008, Newsletter requested, under the Freedom of Information Act ["FOIA"] from the defendant, U. S. Customs and Border Protection ["CBP"], the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive.  [Peter S. Herrick ["Herrick"] Declaration, ¶ 1].

2.    Since CBP did not respond to the January 7th letter, Newsletter faxed a FOIA appeal to CBP in a letter dated February 8, 2008.  [Herrick Dec. ¶ 2]

3.    The fax receipts for the January 7th and February 8th letters are evidence that they were received by CBP on those dates.

4.    Newsletter has not received the April 15, 2008 letter from Brenda B. Smith.

1

[Herrick Dec. ¶ 19]

5.    CBP is not restricted from releasing the names and addresses of companies that file Entries with CBP. [Herrick Dec. ¶ 18; PIERS Dec.]

6.    The information Newsletter requests is not confidential. [Herrick Dec. ¶¶ 4 and 7; PIERS Dec.]

7.    The pairing of HTSUS subheading 9903.02 with the names and addresses of importers would not reveal that a particular importer entered one of the 27 specific goods covered by that subheading. [Herrick Dec. ¶¶ 8 and 10]

8.    Disclosing the information that Newsletter requests could not expose importers to a competitive disadvantage by identifying the markets in which they are involved or their sources of supply and/or channels of commerce. [Herrick Dec. ¶¶ 7 and 11]

9.    Disclosing the information that Newsletter requests would not provide competitors of importers valuable and confidential information about importers' business operations. Along with publicly available information, it would not permit a competitor of an importer to piece together the major aspects of an import transaction. [Herrick Dec. ¶¶ 7 and 11]

10.    The idea that pairing the names and addresses of companies with HTSUS subheading 9903.02 would cause competitive harm is a generalized and conclusory statement without proof. [Herrick Dec. ¶ 8]

11.    There is a permanent public record of the names and addresses of importers paying 100% duties pursuant to HTSUS subheading 9903.02. [PIERS Declaration]

2

Respectfully submitted,

_____/s/_____

PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email: pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was

sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for

defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 14, 2008.

_____/s/_____
Peter S. Herrick

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 08-0478 (RMC) |
| U. S. CUSTOMS AND BORDER PROTECTION, ) | |
| Defendant. ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR
ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

On January 7, 2008, plaintiff, Customs & International Trade Newsletter ["Newsletter"] faxed a Freedom of Information Act ["FOIA"] request for records to the defendant, U. S. Customs and Border Protection ["CBP"]. Since there was no response from CBP Newsletter faxed a FOIA appeal to CBP in a letter of February 8, 2008. Newsletter exhausted its administrative remedies pursuant to 5 U.S.C. §552(a)(6)(c)(i). The complaint was filed on March 20, 2008. The requested names and addresses are not exempt under FOIA. This case is distinguishable from Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (D.D.C. 2006).

# I. BACKGROUND

## A.   Harmonized Tariff Schedule of the United States ("HTSUS")

CBP is not restricted in releasing information provided by importers. [Herrick Dec. ¶ 4]  From the information released by Customs, PIERS provides a description of the goods and other data.  [Herrick Dec. ¶ 6; PIERS Declaration]  HTSUS subheading 9903.02 may have terminated by operation of law on July 27, 2007.  Gilda Industries, Inc. v. United States, USCIT Civil Action No. 07-474.

## B.   Plaintiff's Request

Newsletter does not understand how CBP could not find its letters of January 7th and February 8th.  For both letters there is a fax receipt that the letters were received by CBP. [Herrick Dec. ¶¶ 1 and 2]  Newsletter never received Brenda B. Smith's letter of April 15, 2008.  [Herrick Dec. ¶ 19]

## ARGUMENT

## I. STANDARD OF REVIEW

## A.   Motion to Dismiss Under Rule 12(b)(1)

By the preponderance of evidence, *viz.* the fax receipts for the January 7th and February 8th letters, Newsletter has met its burden of persuasion.  Thompson v. Capitol Police Board, 120 F. Supp. 2d 78, 81 (D.D.C. 2000).  Newsletter exhausted its administrative remedies.  As such this Court has subject matter jurisdiction as Newsletter's complaint was filed upon the exhaustion of its administrative remedies.  By accepting the complaint's well-pled factual allegations as true and by drawing all reasonable inferences in Newsletter's

2

favor, the motion to dismiss must be denied.

## B.    Motion For Summary Judgment Under Rule 56

Newsletter agrees with the cases cited by government counsel as to whether a motion

for summary judgment should be denied.

## C.    Summary Judgment In FOIA Cases

From N.Y.C. Apparel FZE v. U. S. Customs and Border Protection, 2006 U.S. Dist.

LEXIS 4078 (D.D.C. 2006) at *11:

> "Courts will grant a motion for summary judgment if 'the pleadings,
> depositions, answers to interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine issue as to any material fact
> and that the moving party is entitled to judgment as a matter of law.' Fed. R.
> Civ. P. 56(c). When ruling on a motion under Rule 56(c), the Court must view
> the evidence in the light most favorable to the non-moving party. VoteHemp,
> Inc. v. Drug Enforcement Admin., 237 F. Supp. 2d 55, 59 (D.D.C. 2002)
> (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed.
> 2d 265 (1986)). The non-moving party, however, cannot rely on 'mere
> allegations or denials . . . but . . . must set forth specific facts showing that
> there is a genuine issue for trial.' Harrison v. Executive Office for U.S.
> Attorneys, 377 F. Supp. 2d 141, 145 (D.D.C. 2005) (quoting Anderson v.
> Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202
> (1986)).
>
> In a FOIA action, 'the defendant agency has the burden . . . of demonstrating
> that the requested documents are exempt from disclosure under [the] FOIA.'
> Miller v. Dep't of Navy, 383 F. Supp. 2d 5, 13 (D.D.C. 2005) (citing 5 U.S.C.
> § 552(a)(4)(B); Al-Fayed v. CIA, 349 U.S. App. D.C. 223, 254 F.3d 300, 305
> (D.C. Cir. 2001)). The Court will grant summary judgment to the government
> in a FOIA case only if the defendant agency can prove 'that it has fully
> discharged its obligations under the FOIA, after the underlying facts and the
> inferences to be drawn from them are construed in the light most favorable to
> the FOIA requester. Friends of Blackwater v. United States DOI, 391 F. Supp.
> 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. Dep't of Treasury, 10 F.
> Supp. 2d 3, 11 (D.D.C. 1998)). To satisfy its burden and prove that it has fully
> discharged its FOIA obligations, a defendant agency typically submits a

Vaughn index, which provides 'a relatively detailed justification' for each withheld document, 'specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of [the] withheld document to which they apply.' King v. Dep't of Justice, 265 U.S. App. D.C. 62, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting Mead Data Central, Inc. v. Dep't of Air Force, 184 U.S. App. D.C. 350, 566 F.2d 242, 251 (D.C. Cir 1977)); see also Vaughn, 484 F.2d at 827. Moreover, a court, in granting summary judgment, may also rely on affidavits submitted by the agency 'if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith.' Military Audit Project v. Casey, 211 U.S. App. D.C. 135, 656 F.2d 724, 738 (D.C. Cir. 1981). Thus, in a lawsuit brought to compel the production of documents under the FOIA, 'an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested either has been produced . . . or is wholly [, or partially,] exempt [from disclosure].' Students Against Genocide v. Dep't of State, 347 U.S. App. D.C. 235, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978), cert. denied, 445 U.S. 927, 100 S. Ct. 1312, 63 L. Ed. 2d 759 (1980))."

## II.  PLAINTIFF EXHAUSTED ITS ADMINISTRATIVE REMEDIES

We are unaware why the government refers to "providing the required proof of identity." Summers v. United States Dep't of Justice, 999 F. 2d 570 (D.C. Cir. 1993) is inapplicable as it concerns a privacy waiver, not an issue in this case.

The January 7th letter reasonably described the records sought. There were no fee requirements. The February 8th letter was a timely appeal. Newsletter exhausted its administrative remedies pursuant to 5 U.S.C. §552(a)(6)(C)(i). This Court has jurisdiction pursuant to 5 U.S.C. §552(a)(4)(B).

## III.  DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT

### A.    CBP May or May Not Have Conducted A Reasonable Search

CBP claims it has identified a list of names and addresses of approximately 244 importers who meet Newsletter's criteria. Newsletter has no reason to doubt the accuracy of this number.

**B.     Defendant Improperly Withheld Information Under FOIA Exemption 4**

**1.     Exemption 4**

The information Newsletter seeks is not confidential. When the names and addresses are paired with publicly available information this information would not provide competitors valuable and confidential information about other importers' business operations and allow a competitor to piece together major aspects of an import transaction. [Herrick Dec. ¶¶ 8 and 10]. CBP already provides the names and addresses of importers to the public. [Suzuki Dec. ¶ 19; Herrick Dec. ¶ 4; PIERS Dec.]

Any importer or any person, whether they are competitors or not, by subscribing to PIERS can obtain information regarding the source of the imported merchandise, such as country of origin and manufacturer, the importer's supply chain and the importer's quantity of goods. [Herrick Dec. ¶ 7; PIERS Dec. ¶ 7] This is because CBP has released this information to PIERS. A perfect example of the public information regards Gilda's importations. [Herrick Dec. ¶ 6; PIERS Dec.]

The analysis to determine competitive harm was set forth in <u>Changzhou Laosan Group v. U. S. Customs and Border Protection Bureau</u>, 2005 U.S. Dist. LEXIS 7075 (D.D.C. 2005) *14; reconsideration granted in part and denied in part, 374 F. Supp. 2d 129 (D.D.C. 2005):

5

"The criterion for assessing the competitive harm prong of *National Parks* has been interpreted to require both a showing of (1) actual competition and (2) a likelihood of substantial competitive injury. See CNA Financial Corp. v. Donovan, 265 U.S. App. D.C. 248, 830 F.2d 1132, 1152 (D.C. Cir. 1987). With regard to the second element, the Court need only 'exercise its judgment in view of the nature of the material sought and competitive circumstances in which the submitter does business,' but 'no actual adverse effect on competition need be shown.' Nat'l Parks & Conservation Ass'n v. Kleppe, 178 U.S. App. D.C. 376, 547 F.2d 673, 675 (D.C. Cir. 1976). The exemption protects persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication. (Id. at 678.) Courts have, however, rejected competitive harm claims when agencies provide conclusory statements of competitive harm. See Pac. Architects & Eng'rs, Inc. v. Renegotiation Bd., 164 U.S. App. D.C. 276, 505 F.2d 383, 384 (D.C. Cir. 1974)) (requiring agencies to provide more than generalized assertions and conclusory allegations). But the agency is not required to provide 'detailed economic analysis of the competitive environment.' *Kleppe*, 547 F.2d at 679.

In an attempt to support its Exemption 4 claim, defendant essentially argues for a blanket exemption for entry documents based on two cases where entry documents were shielded from disclosure under Exemption 4. (Def.'s Mot. at 13, citing Inter Ocean Free Zone v. United States Customs Service, 982 F. Supp. 867, 869-70 (S.D. Fla. 1997), and Timken Co. v. United States Customs Service, 531 F. Supp. 194, 200-01 (D.D.C. 1981) ("Timken II").) As explained by defendant, 'based on these court rulings, CBP has maintained that entry documents and Automated Commercial System (ACS) records comprised of entry information are categorically exempt from disclosure to third parties.' (Stump Decl. PP 27 & 28 ('CBP applies a categorical exclusion to the CF 7512's. . . .').) Similarly, with respect to the second category of information, defendant also takes a categorical approach, claiming that the documents include confidential information, 'i.e., from whom the merchandise was purchased, the quantity of merchandise being imported, the value of the merchandise, the customers of exporters and a description of the exporters' business operations and organization. This is not the type of information a commercial entity would give to a competitor. It would enable a commercial to learn a great deal about its competitor, including the identification of the supplier and the cost and amount of merchandise purchased.' (Id. P 29.) Defendant also argues in its Reply that even if the information in the documents relates to plaintiff's merchandise, the documents were not submitted by the plaintiff to CBP and are thus exempt because they

6

implicate the confidential commercial information of third parties, and since plaintiff has failed to obtain an authorization from any of these parties for the release of their information, it cannot show that release of the information will cause competitive harm. (Def.'s Reply at 8-9.) These arguments are unpersuasive.

First, defendant, not plaintiff, has the burden of proof, and it cannot sustain this burden by faulting plaintiff for not obtaining authorizations from third parties. On the contrary, as is often the case, the defendant notifies the submitters of the confidential information, 5 and in many cases, files the submitter's objections to disclosure with the court to assist it in determining the propriety of the Exemption 4 claim. 6

FOOTNOTES

5 In fact, Exec. Order No. 12,600 § 1 provides for mandatory notification of submitters whenever an agency 'determines that it may be required to disclose' such information under FOIA. 52 Fed. Reg. 23781, 23781 (June 23, 1987).

6 Indeed, courts have rejected claims of competitive harm when supported only by agency affidavits. See, e.g., N.C. Network for Animals v. USDA, 1991 U.S. App. LEXIS 1555, 1991 WL 10757, at *4 (4th Cir. Feb. 5, 1991); Wiley Rein & Fielding v. United States Dep't of Commerce, 782 F. Supp. 675, 676 (D.D.C. 1992); Brown v. Dep't of Labor, No. 89-1220, 1991 U.S. Dist. LEXIS 1780, at *7 (D.D.C. Feb. 15, 1991).

**Nor may defendant, as it has done here, rely on generalized and conclusory allegations of competitive harm without so much as a showing of actual competition, an identification of the competitor whose interests are at issue, or an explanation as to how the release of specific information would result in harm to the competitor**. See, e.g., Pub. Citizen Research Group v. FDA, 337 U.S. App. D.C. 343, 185 F.3d 898, 906 (D.C. Cir. 1999) ('conclusory and generalized allegations of substantial competitive harm . . . cannot support an agency's decision to withhold requested documents.') (internal citation omitted). In particular, defendant cannot merely rest on a claim that 'this is not the type of information a commercial entity would give to a competitor. It would enable a commercial entity to learn a great deal about its competitor, including the identification of the supplier and the cost and amount of merchandise purchased.' (Stump Decl. P 29.)

7

Nor may defendant's categorical approach be sustained by reference to two cases where entry documents were found to be exempt. In both *Timken II* and *Inter Ocean Free Zone*, the agency supported its position with detailed affidavits. For instance, in *Inter Ocean Free Zone*, the court relied on an affidavit from the company alleging competitive harm to sustain its finding, 982 F. Supp. at 872, and in *Timken II*, the court had a detailed affidavit from the competitor, a Japanese exporter, as well as letters from the counsel of the Japanese company and their related American importers of roller bearings. 531 F. Supp. 194, 197 n.2. See also <u>Timken v. United States Customs Serv.</u>, 491 F. Supp. 557, 559-60 (D.D.C. 1980) ("Timken I") (relying on two detailed affidavits from the agency that demonstrated competitive harm to both the importer American Koyo Corporation ("AKO") and the exporter Koyo Seiko because the release of data could have 'allowed the competition to approximate the production costs of Koyo and the profit margin of AKC' and threatened competitive injury by revealing 'competitive strengths[,] . . . weaknesses," and the marketing strategy of Koyo companies and its distributors.) Thus, these cases do not support the approach advocated by defendant here." [Emphasis Added]

In this case the government has only presented generalized and conclusory statements of competitive harm. The government has presented no evidence of actual competition, an identification of the competitor whose interests are at issue or an explanation as to how the release of specific information would result in harm to the competitor.

### a.    The Blue Cheese Example Is Invalid

The government claims that if the competitor had the name and address of an importer he could discern that under HTSUS subheading 9903.02.30 a particular importer imported blue-veined Roquefort cheese in original loaves that was a product of France. This is wrong. According to the Directive products under HTSUS subheading 9903.02.30 could be imported from Austria, Belgium and/or 12 other countries. Since this subheading refers to subheadings 0406.40.20 or 0406.40.40 these cheeses could be in original loaves at

8

2/7%/kg or "other" 5.5%/kg.

### b.    CBP Failed To Follow Executive Order 12,600

There is no evidence that CBP advised the approximately 244 importers that Newsletter was seeking their names and addresses and did they object. [Herrick Dec. ¶ 17]

### c.    CBP Has Released The Names And Addresses Of Companies Who Have Filed Entries With CBP

American flagged vessels that undergo repairs outside of the United States are required to file a vessel repair entry with CBP at their first United States port of entry.  In Peter S. Herrick, P. A. v. U. S. Customs and Border Protection, D.D.C. Civil Action No. 08-0036(RBW) CBP provided a spread sheet with the requested names and addresses. [Herrick Dec. ¶ 18]

### d.    The "Secret Ingredient" Example Has No Proof

The government claims that in the realm of chemicals, the release of names and addresses could lead to a discovery of a competitor's "secret ingredient."  There is no proof to support this claim.  Furthermore, the HTSUS chapters 28-38 contain thousands of descriptions of chemicals.  [Herrick Dec. ¶ 12]

### e.    The Names And Addresses Newsletter Seeks Has Been Made Public

There has been a waiver of Exemption 4.  This "exemption can serve no purpose once information...becomes public."  Cottone v. Reno, 193 F. 3d 550, 555 (D.C. Cir. 1999).  In Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (D.D.C. 2006) this Court at page 12 stated the Gilda had the initial burden of pointing to specific

9

information that is a permanent public record. The exact name and address for Gilda who is one of the 244 importers is contained in the PIERS data. [Herrick Dec. ¶ 6] The PIERS data is a permanent and public record dating to 1950. [Herrick Dec. ¶ 7; PIERS Dec.] While in <u>Gilda</u>, <u>supra</u>, p 13 this Court stated: "[v]ehicle [sic] manifest information is inherently less detailed and less reliable than the Import Declaration filed by an importer." This may not always be the case since CBP has accused many an importer of fraud on their import declarations. [Herrick Dec. ¶ 9]

### f.    **Newsletter Has No Competitors**

In <u>Gilda</u>, <u>supra</u>, p. 13 this Court was concerned that release of the requested names and addresses "...could allow Gilda to steal business away from or otherwise disrupt the operations of its competitors." Newsletter is a periodic publication of Peter S. Herrick, P.A. It is not a competitor of any importer. Newsletter has no intention to steal business or disrupt the operations of these importers.

### 2.    **Exemption 6**

Newsletter is not interested in importations by individuals.

## IV.    **DEFENDANT CAN SEGREGATE NON-EXEMPT INFORMATION**

Defendant can and must segregate the requested names and addresses. In <u>Mead Data Cent., Inc. v. United States Dept. of the Air Force</u>, 566 F. 2d 242, 260 (D.C. Cir. 1977) the court stated:

> "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material. It has long been a rule in this Circuit that

10

non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions. In 1974, Congress expressly incorporated that requirement into the FOIA, which now states that 'any reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt.' 5 U.S.C. § 552(b) (Supp. V 1975)." (footnotes omitted)

Again the government is engaged in providing general and conclusory statements that what is being requested must be protected. CBP can prepare a spread sheet with the names and addresses exactly as it did for the vessel repair entries. [Herrick Dec. ¶18] The names and addresses are not inextricably intertwined with exempt portions and they are included in a permanent and public place. "One should normally presume that a request for information under the FOIA is a request for all or any, not for all or none, of the information." Public Citizen Health Research Group v. FDA, 185 F. 3d 898, 907 (D.C. Cir. 1999),

## CONCLUSION

There is an ample basis for this Court to distinguish this case from Gilda, supra. The government has failed to demonstrate a likelihood of substantial competitive injury. The exact information requested is in the permanent public domain. The government has relied on generalized and conclusory statements to support its Exemption 4 claims. CBP has already demonstrated it is willing to provide names and addresses of companies who file entries with CBP. CBP has demonstrated it can segregate names and addresses from the documents filed with CBP.

Respectfully submitted,

11

_____/s/_____
PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email:  pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was

sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for

defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 14, 2008.


_____/s/_____
Peter S. Herrick

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL<br>TRADE NEWSLETTER,<br><br>Plaintiff,<br><br>v.<br><br>U. S. CUSTOMS AND BORDER<br>PROTECTION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 08-0478 (RMC)<br>)<br>)<br>)<br>)<br>)<br>/ |

## DECLARATION OF PETER S. HERRICK

I, Peter S. Herrick, declare the following to be a true and correct statement of facts:

1.      In a letter of January 7, 2008 the plaintiff requested records under the Freedom of Information Act ["FOIA"]. This letter was telecopied to the FOIA Office, U. S. Customs and Border Protection ["CBP"]. This letter and a fax receipt of the letter at that office are enclosed as Exhibit A.

2.      In a letter of February 8, 2008 the plaintiff telecopied a FOIA appeal to this same office. A copy of this letter and a fax receipt at that office are enclosed as Exhibit B.

3.      Plaintiff sought the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive, Exhibit C, who imported products reference in the directive from the European Community during a specified period. The pairing of HTSUS subheading 9903.02 with the name and address of an importer would not

1

reveal that a particular importer entered one of the 27 specific goods covered by that subheading.

4.    CBP already releases information on imports to the public. This information originates from the AMS manifest. (19 C.F.R. §103.31(e)(3)). Specifically the information released to the public is as follows:

Shipper's name and address @ 13 & 14

Consignee's name and address @ 15 & 16

Description of goods @ 20

5.    The only importer who has been identified as being the subject of the directive is Gilda Industries, Inc. because of its litigation. From this litigation we know that Gilda imports toasted breads from Spain that are classified under HTSUS subheading 1905.40 free of duty, but subject to HTSUS subheading 9903.02.35 at a 100% duty rate.

6.    On July 1, 2008 I accessed a PIERS CD for November, 2002. As Exhibit D I printed from this CD information on the importation of toasted breads by Gilda from Spain. *Inter alia* it has Gilda's name and address; its commodity description; its harmonized code number and its supplier.

7.    On July 1, 2008 I accessed the PIERS website; www.piers.com. Exhibit E are documents I downloaded from this website. A document entitled PIERS Trade Data Competitive Comparison details, *inter alia*, the quality of their data. A document entitled PIERS TI details how any person who subscribes to their service can search their data base provided to them by CBP. A document entitled PIERS U.S. Waterborne Import Historical

2

Data details how PIERS retains a permanent public record of import data going back to 1950. A document entitled PIERS Global Trade Intelligence at Work citing examples such as product marketing, remote sourcing, etc.

8.    Pairing the names and addresses with HTSUS subheadings would not reveal the specific description of a precise product by a particular importer.  HTSUS subheadings 9903.02.35 and 1905.40 in the first instance classifies rusks, toasted bread and similar toasted products.  This is not a precise description.  Turning to the Explanatory Notes to the HTSUS subheading 1905.40 further describes as:  "**Rusks, toasted bread and similar products,** whether or not sliced or ground, with or without the addition of butter or other fats, sugar, eggs or other nutritive substances."   No competitor of Gilda's would know whether its toasted bread contained butter and/or sugar and/or eggs by associating a name and address with an HTSUS subheading.

9.    The plaintiff is not seeking information from an entry or entry summary.  The government has introduced no proof that the "description  of goods found in the Entry and Entry Summary have more detail and assurance of accuracy that the generic description found in a vessel's manifest.  In fact, CBP quite often  resorts to 19 U.S.C. §1592 because of false entry information, e.g. United States v. Ford Motor Company, 463 F. 3d 1286 (Fed. Cir. 2006).

10. The directive lists more than 27 specific goods.  Just a cursory count of the products from HTSUS subheadings 9903.02.21 to 47 lists approximately 47 products. Further, the directive notes there are many additional products to be included from chapters

3

1-97.

11.    A competitor of an importer will get much more information from the PIERS' reports than trying to deduce information combining a company's name and address to an HTSUS subheading.  The PIERS reports have already identified markets of the importers; their sources of supply; and, their channels of commerce.

12.    The government has failed to offer any proof that in the "realm of chemicals" how a company's "secret ingredient" could be discovered from the thousands of chemical classifications in Chapters 28-38, HTSUS.

13.    The government has failed to prove how the release of the requested names and addresses would permit a competitor to identify with "great specificity" the exact product imported by a particular importer.  If an importer is bringing in Blue-veined Roquefort cheese in original loaves  from France all that is needed is a trip to the grocery store to discover the competitors.

14.    The government has provided no evidence that any company for whom the plaintiff has requested the name and address has ever requested confidentiality under 19 U.S.C. §1431.

15.    The government has provided no evidence that the release of the requested names and addresses would be manifestly unfair and cause substantial commercial harm to the importers who laboriously worked to establish these relationships.

16.    Amazingly, the government has played the "terrorist" card at paragraph 25 of the Suzuki declaration.  The PIERS records have already released the "supply chain" as a

4

permanent public record.

17.    It is my understanding that CBP was required to notify the approximately 244 importers pursuant to Executive Order 12600 dated June 23, 1987 that our law firm wanted their name and address. It does not appear that CBP followed this Executive Order.

18.    In an unrelated case, <u>Peter S. Herrick, P. A. v. U. S. Customs and Border Protection</u>, D.D.C. Civil Action No. 08-0036(RBW) my law firm requested the names and addresses of companies who had filed vessel repair entries with CBP. These entries are very similar to the Entry and Entry Summary referred to by CBP. CBP provided the requested names and addresses without hesitation. A spreadsheet of the names and addresses of the companies filing vessel repair entries is enclosed as Exhibit F.

19.    The Suzuki declaration at Exhibit E has a letter purportedly mailed to my office. We have no record of receiving this letter. I did receive an email from government counsel that a letter like this was being mailed to me.

20.    On July 9, 2008 I entered into a contract for PIERS to provide me with a declaration to be used in this proceeding. Enclosed as Exhibit G is the PIERS contract and payment.

I declare under penalty of perjury that the foregoing is true and correct, including Exhibits A, B, C, D, E, F, & G to the best of my knowledge and belief.

Executed on July __14__, 2008.

Peter S. Herrick

5

# EXHIBIT A

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

January 7, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

Peter S. Herrick, P. A. is representing the media requester, Customs & International Trade Newsletter in its request for records under the Freedom of Information Act, as amended, 5 U.S.C. §552, *et. seq.* We request the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ["Directive"], copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

The records we are seeking are "commercial" information that was "obtained from a person." Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (USDC DC 2006). The release of this information would not impair CBP's ability to obtain necessary information in the future. Furthermore, the release of the information will not cause substantial harm to the competitive position of the companies subject to the

1

directive.

    This request differs in several aspects from those decided in *Gilda*. Here, the requester is the media and not an importer. The requester will never be in competition with the companies subject to the directive. The requester does not want the HTSUS subheading numbers and/or knowledge of the products that these companies import. The requester does not want information released from an Import Declaration [whatever that is] [1]. We do not want to associate a specific shipment of goods with a specific HTSUS subheading number with a specific importer.

    As an example, if you provide only Gilda's name and address, the requester will not know what products Gilda imports nor which HTSUS subheading numbers it uses nor from which country it imports, just from its name and address.

    There is no worry in this request as there was in *Gilda*, that Gilda would steal business away from or otherwise disrupt the operations of its competitors. Moreover, providing only the names and addresses makes it very easy to segregate "protected information" from this requests.

    We agree in advance to pay for reasonable search and copy charges. We expect the records to be made available within 20 days, *viz.* January 27, 2007.

                     Sincerely,

                     Peter S. Herrick

Enclosure

---

[1] We believe your use of the phrase "Import Declaration" in your declaration of June 12, 2006 mislead the court as there is no CBP document known as an "Import Declaration." There is of course a declaration, not under oath, on the entry summary.

**U.S. Customs and Border Protection**
Securing America's Borders
CBP.gov

Friday, January 4, 2008

SEARCH

Home | About CBP | Contacts | Ports | Questions | Forms | Publications | Legal | Contracting | Sitemap

**Newsroom    Border Security    Import    Export    Travel    Careers**

# Import

Home / Import / Commercial Enforcement /

### Antidumping and Countervailing Duties (ADCVD)

### Broker Management

### Cargo Control

### Cargo Summary

### Carriers

### Commercial Enforcement

### Communications to Trade

### Duty Rates/HTS

### Informed Compliance

### Infrequent Importer/Traveler

### International Agreements

### Operations Support

### Regulatory Audit

### Textiles and Quotas

### Trade Initiatives



Report
Suspicious Activity to
1-800-BE-ALERT

## Beef Hormone Implementation

(04/10/2007)

CLA-2:FO:TP:EOA YLT


print

TO: All Directors, Field Operations; Area and Port Directors

FROM: Director, Trade Programs

RE: National OAS, APD's, Trade Operations, National Import Specialists, All Field National Import Specialists, Import Specialists, National and Port Account Managers, Entry Officers, Inspectors, ABI Client Representatives, Importers and Brokers

PASS TO: National OAS, APD's, Trade Operations, National Import Specialists, All Field National Import Specialists, Import Specialists, National and Port Account Managers, Entry Officers, Inspectors, ABI Client Representatives, Importers and Brokers

### see also:

**in Commercial Enforcement:**

Kimberley Process Diamonds

Enforcement of TSA Requirements for SAFETEA-LU

Bioterrorism

Wood Packaging Materials (WPM)

Intellectual Property Rights

C-TPAT: Customs-Trade Partnership Against Terrorism

Protecting the Food Supply: Agriculture Inspections

...more

## Purpose

As authorized by Sections 301 and 306 of the Trade Act of 1974, the United States Trade Representative (USTR) has determined modifications to the rates of duty on designated products from certain member countries of the European Communities (EC). This memorandum is to transmit those changes, implementation procedures, and program responsibilities for these duty modifications.

## Authorities

19 U.S.C. 1202, as amended
19 U.S.C. 1505, as amended
19 C.F.R. 24.3(e)
19 C.F.R. 24.3a(a) and (b)(2)
19 C.F.R. 146.2, 146.32, 146.41
19 C.F.R. 152.2
Customs Directive 099 3550-071

## Responsibilities

Port Directors are responsible for ensuring the adequacy of bonds at cargo release and the collection of the 100 percent ad valorem rate of duty, with interest, if applicable, for importations of the designated products from the specified countries. Port Directors are also responsible for the accuracy of quota input, monitoring broker compliance with respect to this program, measuring the effectiveness of this program and implementing local measures, if needed, for improvement.

The Chief, Other Government Agency Liaison, Trade Programs, OFO is responsible for program coordination and implementation.

The Director, National Commodity Specialist Division, OR&R is responsible for ensuring resolution of classification issues.

National Import Specialists, NCSD, OR&R, in conjunction with National OAS, OST, are responsible for creating and maintaining selectivity criteria.

## Procedures

For all merchandise classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings listed below, that is entered, or withdrawn from warehouse, for consumption on or after July 29, 1999, a duty of 100 percent ad valorem will be collected. Subject merchandise for which estimated duties are deposited at the column 1 rate of duty are to be classified under the appropriate Chapter 99 subheading and liquidated at the 100 percent ad valorem rate of duty with any applicable interest on the underpayment of duties.

Merchandise classifiable in the HTSUS subheadings listed below that is admitted to U.S. foreign-trade zones on or after July 29, 199 must be admitted as "privileged foreign status" as defined in 19 C.F.R. 146.41.

## New HTSUS Subheadings in Subchapter III, Chapter 99

Articles the product of Austria, Belgium, Denmark, Finland, France, the Federal Republic of Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, or Sweden:

P. 1

* * * Transmission Result Report(MemoryTX) ( Jan. 7. 2008 11:02AM ) * * *

Date/Time: Jan. 7. 2008 11:01AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
| --- | --- | --- | --- | --- | --- |
| 8600 | Memory TX | 12025729747 | P. 3 | OK | |

Reason for error
E.1) Hang up or line fail
E.3) No answer
E.2) Busy
E.4) No facsimile connection

**PETER S. HERRICK, P.A.**
**ATTORNEYS AT LAW**

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

January 7, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester Customs & International Trade Newsletter

Dear Ms. Suzuki:

Peter S. Herrick, P. A. is representing the media requester, Customs & International Trade Newsletter in its request for records under the Freedom of Information Act, as amended, 5 U.S.C. §552, *et seq.* We request the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ("Directive"), copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

The records we are seeking are "commercial" information that was "obtained from a person." Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (USDC DC 2006). The release of this information would not impair CBP's ability to obtain necessary information in the future. Furthermore, the release of the information will not cause substantial harm to the competitive position of the companies subject to the

1

# EXHIBIT B

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

February 8, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT APPEAL

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

This is a FOIA appeal of CBP's failure to respond to the request for records made to your office on January 7, 2008, copy enclosed.

Sincerely,

Peter S. Herrick

Enclosure

# PETER S. HERRICK, P.A.
## ATTORNEYS AT LAW

**MAIL TO:**
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

January 7, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
U S Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:     Customs & International Trade Newsletter

Dear Ms. Suzuki:

Peter S. Herrick, P. A. is representing the media requester, Customs & International Trade Newsletter in its request for records under the Freedom of Information Act, as amended, 5 U.S.C. §552, *et. seq.* We request the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive ["Directive"], copy enclosed, who imported the referred to designated products from the European Community during the period July 1 to December 31, 2007.

The records we are seeking are "commercial" information that was "obtained from a person." Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (USDC DC 2006). The release of this information would not impair CBP's ability to obtain necessary information in the future. Furthermore, the release of the information will not cause substantial harm to the competitive position of the companies subject to the

1

directive.

This request differs in several aspects from those decided in *Gilda*. Here, the requester is the media and not an importer. The requester will never be in competition with the companies subject to the directive. The requester does not want the HTSUS subheading numbers and/or knowledge of the products that these companies import. The requester does not want information released from an Import Declaration [whatever that is] [1]. We do not want to associate a specific shipment of goods with a specific HTSUS subheading number with a specific importer.

As an example, if you provide only Gilda's name and address, the requester will not know what products Gilda imports nor which HTSUS subheading numbers it uses nor from which country it imports, just from its name and address.

There is no worry in this request as there was in *Gilda*, that Gilda would steal business away from or otherwise disrupt the operations of its competitors. Moreover, providing only the names and addresses makes it very easy to segregate "protected information" from this requests.

We agree in advance to pay for reasonable search and copy charges. We expect the records to be made available within 20 days, *viz.* January 27, 2007.

Sincerely,

Peter S. Herrick

Enclosure

---

[1] We believe your use of the phrase "Import Declaration" in your declaration of June 12, 2006 mislead the court as there is no CBP document known as an "Import Declaration." There is of course a declaration, not under oath, on the entry summary.

2

.

**PETER S. HERRICK, P.A.**
**ATTORNEYS AT LAW**

MAIL TO:
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-0347
Of Counsel: Roy Leon

301 East Ocean Blvd.
Suite 530
Long Beach, CA 90802
Tel. 562-628-2355
Email: pherrick@bellsouth.net
Web: CustomsLawyer.Net

February 8, 2008

TELECOPY ONLY (202-572-8747)

FREEDOM OF INFORMATION ACT APPEAL

Shari Suzuki, Chief
FOIA Appeals, Policy & Litigation Branch
Office of Regulations and Rulings
US Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington DC 20229

Requester:    Customs & International Trade Newsletter

Dear Ms. Suzuki:

This is a FOIA appeal of CBP's failure to respond to the request for records made to
your office on January 7, 2008, copy enclosed.

Sincerely,

Peter S. Herrick

Enclosure

# EXHIBIT C

SEARCH GO

▊ **About CBP** ▊ **Newsroom** ▊ **Border Security** ▊ **Trade** ▊ **Travel** ▊ **Careers**

**Trade**

Home / Trade / Priority Trade Issues / Agriculture /

**Automated Systems and Operational Support**

**Basic Importing and Exporting**

**Cargo Security**

**CBP Legal Decisions and Publications**

**Priority Trade Issues**

**Trade Outreach**

**Trade Programs**



Report
Suspicious Activity to
**1-800-BE-ALERT**



What's **New**
*in Trade*

# Beef Hormone Implementation

(04/10/2007)

CLA-2:FO:TP:I:OA  YLT

🖨
print

## Purpose
As authorized by Sections 301 and 306 of the Trade Act of 1974, the United States Trade Representative (USTR) has determined modifications to the rates of duty on designated products from certain member countries of the European Communities (EC). This memorandum is to transmit those changes, implementation procedures, and program responsibilities for these duty modifications.

## Authorities
19 U.S.C. 1202, as amended
19 U.S.C. 1505, as amended
19 C.F.R. 24.3(e)
19 C.F.R. 24.3a(a) and (b)(2)
19 C.F.R. 146.2, 146.32, 146.41
19 C.F.R. 152.2
Customs Directive 099 3550-071

## Responsibilities
Port Directors are responsible for ensuring the adequacy of bonds at cargo release and the collection of the 100 percent ad valorem rate of duty, with interest, if applicable, for importations of the designated products from the specified countries. Port Directors are also responsible for the accuracy of quota input, monitoring broker compliance with respect to this program, measuring the effectiveness of this program and implementing local measures, if needed, for improvement.

The Chief, Other Government Agency Liaison, Trade Programs, OFO is responsible for program coordination and implementation.

The Director, National Commodity Specialist Division, OR&R is responsible for ensuring resolution of classification issues.

National Import Specialists, NCSD, OR&R, in conjunction with National OAS, OST, are responsible for creating and maintaining selectivity criteria.

## Procedures
For all merchandise classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings listed below, that is entered, or withdrawn from warehouse, for consumption on or after July 29, 1999, a duty of 100 percent ad valorem will be collected. Subject merchandise for which estimated duties are deposited at the column 1 rate of duty are to be classified under the appropriate Chapter 99 subheading and liquidated at the 100 percent ad valorem rate of duty with any applicable interest on the underpayment of duties.

Merchandise classifiable in the HTSUS subheadings listed below that is admitted to U.S. foreign-trade zones on or after July 29, 199 must be admitted as "privileged foreign status" as defined in 19 C.F.R. 146.41.

### New HTSUS Subheadings in Subchapter III, Chapter 99
**Articles the product of Austria, Belgium, Denmark, Finland, France, the Federal Republic of Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, or Sweden:**

**Meat of bovine animals, fresh or chilled (provided for in heading 0201)**

**9903.02.21**
Articles of subheading 0201.10.05, 0201.10.10, 0201.20.02, 0201.20.04, 0201.20.06, 0201.20.10, 0201.20.30, 0201.20.50, 0201.30.02, 0201.30.04, 0201.30.06, 0201.30.10, 0201.30.30 or 0201.30.50

**9903.02.22**
Articles of subheading 0201.10.50, 0201.20.80 or 0201.30.80

**Meat of bovine animals, frozen (provided for in heading 0202)**

**9903.02.23**
Articles of subheading 0202.10.05, 0202.10.10, 0202.20.02, 0202.20.04, 0202.20.06, 0202.20.10, 0202.20.30, 0202.20.50, 0202.30.02, 0202.30.04, 0202.30.06, 0202.30.10, 0202.30.30 or 0202.30.50

**9903.02.24**
Articles of subheading 0202.10.50, 0202.20.80 or 0202.30.80

**9903.02.25**
Meat of swine, fresh or chilled (provided for in subheading 0203.11, 0203.12, or 0203.19)

**9903.02.26**
Carcasses and half-carcasses of swine, frozen (provided for in subheading 0203.21)

**9903.02.27**
Hams, shoulders and cuts thereof, with bone in, of swine, frozen (provided for in subheading 0203.22)

**9903.02.28**
Edible offal of bovine animals, fresh or chilled (provided for in subheading 0206.10)

**9903.02.29**
Edible offal of bovine animals, frozen (provided for in subheading 0206.21, 0206.22 or 0206.29)

**9903.02.30**
Roquefort cheese (provided for in subheading 0406.40.20 or 0406.40.40)

**9903.02.31**
Onions (other than onion sets or pearl onions not over 16 mm in diameter) and shallots, fresh or chilled (provided for in subheading 0703.10.40)

## see also:

⟡ **in Agriculture:**

Overview of Agriculture: A Priority Trade Issue (PTI)

Quota Information for Agricultural Products

What is the Importance of U.S. Agriculture Inspection?

The Agriculture Inspection Process
(pdf - 853 KB.)

Import Alerts

Wood Packaging Materials (WPM)

National Agriculture Release Program (NARP)

...more

⟡ **on cbp.gov:**

Entry, Summary, and Drawback Point of Contact

Truffles, fresh or chilled (provided for in subheading 0709.52)

### 9903.02.33
Dried carrots, whole, cut, sliced, broken or in powder, but not further prepared (provided for in subheading 0712.90.10)

### 9903.02.34
Other prepared or preserved meat, meat offal or blood, of liver of any animal (provided for in subheading 1602.20)

### 9903.02.35
Rusks, toasted bread and similar toasted products (provided for in subheading 1905.40)

### 9903.02.36
Juices of any other single fruit, not elsewhere specified or included, not fortified with vitamins or minerals, unfermented and not containing added spirit, whether or not containing added sugar or other sweetening matter (provided for in subheading 2009.80.60)

### 9903.02.37
Roasted chicory and other roasted coffee substitutes and extracts, essences and concentrates thereof (provided for in subheading 2101.30)

### 9903.02.38
Prepared mustard (provided for in subheading 2103.30.40)

**Articles the product of France, the Federal Republic of Germany, or Italy:**

### 9903.02.39
Tomatoes prepared or preserved otherwise than by vinegar or acetic acid, whole or in pieces (provided for in subheading 2002.10)

**Articles the product of France or the Federal Republic of Germany:**

### 9903.02.40
Guts, bladders and stomachs of animals (other than fish), whole and pieces thereof, fresh, chilled, frozen, salted, in brine, dried or smoked (provided for in heading 0504)

### 9903.02.41
Soups and broths and preparations therefor (provided for in subheading 2104.10)

### 9903.02.42
Single yarn (other than sewing thread), not put up for retail sale, containing 85 percent or more by weight of artificial staple fibers (provided for in subheading 5510.11

**Articles the product of France:**

### 9903.02.43
Hams, shoulders and cuts of meat with of swine, with bone in, salted, in brine, dried or smoked (provided for in subheading 0210.11)

### 9903.02.44
Wool grease (other than crude wool grease) and fatty substances derived from wool grease (including lanolin) (provided for in subheading 1505.90)

### 9903.02.45
Chocolate and other food preparations containing cocoa, in blocks, slabs or bars, filled, weighing 2 kg or less each (provided for in subheading 1806.31)

### 9903.02.46
Lingonberry and raspberry jams (provided for in subheading 2007.99.05)

### 9903.02.47
Products suitable for use as glues or adhesives (other than animal glue, including casein glue, but not including fish glue) put up for retail sale as glues or adhesives, not exceeding a net weight of 1 kg (provided for in subheading 3506.10.50)

Please note that the United Kingdom is not included among the countries for items 9903.02.21 through 9903.02.47, HTSUS. Note also that items 9903.02.39 through 9903.02.47, HTSUS, are limited to the member countries listed for those items. Accordingly, the countries that are NOT listed for a subheading will remain at the column 1 rate of duty in chapters 1-97.

For classification purposes, the product descriptions are not intended to limit the scope of the products that are subject to the increased duties. The HTSUS subheading from chapters 1-97 cited in the description shall determine whether a product is subject to this additional duty.

### Quota Merchandise
Please note that ABI transmissions cannot be made for articles classified in 9903.02.22 and 9903.02.24, HTSUS, because these articles remain subject to the additional duties provided for in 9904.02.01 through 9904.02.37, HTSUS. Field personnel processing these entries for QSUP should enter the 9904 classification in the first tariff field and the Chapter 2 number in the second tariff field. The 9903 number should be entered in the remarks column.

ABI transmissions for 9903.02.21 and 9903.02.23, HTSUS, are permitted. Field personnel will follow established quota procedures to process these entries.

Questions concerning this should be directed to the:
Office of International Trade
Trade Policy and Programs
( Entry, Summary, and Drawback Point of Contact )

How to
Use the Website

Featured RSS Links

What's New ▪▪ Contacts ▪▪ Ports ▪▪ Questions ▪▪ Forms ▪▪ Sitemap

EEO | FOIA | Privacy Statement | Get Plugins | En Español

Department of
Homeland Security

USA.gov

Inquiries (877) CBP-5511  |  International Callers (703) 526-4200  |  TTD (866) 880-6582  |  Media Only (202) 344-1780

# EXHIBIT D

**PIERS**
PORT IMPORT EXPORT REPORTING SERVICE

# AMS Bill of Lading Detail
Source: AMS Database

**Shipper**
GENERAL NOLI
VALENCIA CALLE REINA 6-4 PISO 46011
SPAIN   SPAIN

**Consignee**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Notify Party**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Also Notify**

## Packaging Information

| | | | |
|---|---|---|---|
| **Weight:** | 7090 KG | **Measurements:** | 35 CM |
| **Quantity:** | 1696 BOX | **TEU's:** | 2.00 |

## Shipment Detail

| | | | |
|---|---|---|---|
| **Carrier:** MSCU - MEDITERRANEAN SHIPPING CO | | **Country of Origin:** | SPAIN |
| **Vessel:** P&O NED. FALCON | | **Coastal Region:** | EAST |
| **Voyage:** 504R | | **US Port:** 5201 | MIAMI |
| **B/L:** MSCUJ1675923 | | **For Port:** 42737 | LE HAVRE |
| **Pre Carrier:** BILBAO | | **US Dest:** | |
| **Lloyd's Code:** 8619053 | | **For Dest:** | |
| **Inbond Code:** | | **Mode of Transport:** 10 | |
| **Estimated Value:** $ 11,875.00 | | **Arrival Date:** | 11/24/2002 |

## AMS Commodities

| Container | Qty | Description |
|---|---|---|
| MSCU8318231 | 1696 | TOASTED BREAD |

## PIERS Commodities

| Qty | Units | Commodity Description | Harm Code | JOC Code |
|---|---|---|---|---|
| 1696 | CTN | TOASTED BREAD | 190540 | 130100C |

*Note: Bills of lading that contain multiple commodities will list the total weight and TEU's for the entire bill of lading*

This listing contains information which is the property of the Journal of Commerce. It is provided for the exclusive use of our clients in accordance with our purchase agreement.
It may not be sold or released for the benefit of a third party. Commonwealth Business Media,Inc 33 Washington St., 13 fl.,Newark,NJ 07102

# EXHIBIT E

Global Intelligence Solutions®

Find Out How Companies Use PIERS / Complete Product Catalogue / Become a Subscriber

About PIERS    Customer Support | Contact PIERS | Newsroom | Trade Insights

PIERS Home > Trade Data > Competitive Comparison

Trade Data                                Register for Newsletter | Register for Market Tips | Register for More Info

- Competitive Comparison

## PIERS Trade Data Competitive Comparison

The data that is at the core of PIERS trade databases – selected information gathered from the ship manifests and bills of lading – is available to the public under the Freedom of Information Act, subject to U.S. Customs regulations. Since PIERS was launched over 30 years ago, competitors have routinely entered the marketplace as purveyors of this raw data. None has yet matched PIERS on the comprehensiveness, verifiable quality, or added value of its trade information.

|  | PIERS | Competition |
|---|---|---|
| Experience | • Roots go back to 1827 founding of the *Journal of Commerce*.<br>• Launched by the *JoC* over 30 years ago as its first venture in electronic information.<br>• Created the current trade data business with its 1980s' Freedom of Information Act filings to obtain access to Customs documents. | • Entered business after the year 2000. |
| Data Coverage | • U.S. containerized imports, bulk and breakbulk, as documented by both Automated Manifest System (AMS) and hardcopy filings.<br>• U.S. containerized exports, bulk and breakbulk, as documented by bills of lading.<br>• Historical data on cargoes moved through U.S. ports: available electronically back through 1984, on microfiche back through the 1950s.<br>• Latin American and Asian cross-border trade data, collected in cooperation with national Customs authorities. | • U.S. containerized imports as received from the Automated Manifest System (AMS) – does not include bulk/breakbulk data, does not capture non-AMS filings.<br>• *No export coverage.*<br>• Historical data available electronically back through 2003.<br>• *No international trade data.* |
| Data Quality | • Port reporters on-site verify data accuracy.<br>• Proprietary rules and audit protocols identify and resolve missing and/or inaccurate data elements.<br>• Records are cross-checked against maritime industry records – including Lloyds Ship Register and the carriers' own data. | • *No staff deployed for data collection or verification.*<br>• AMS data is relayed to customers as is – without corrections or amendments. |
| Value-Added | • Translates into standardized shipping records.<br>• Assigns harmonized tariff codes and commodity descriptions.<br>• Estimates value of cargoes.<br>• Enhances transaction detail with background information on trading parties.<br>• Records vehicle identification numbers (VINs). | • AMS data is relayed to customers *as is* – without corrections or amendments. |
| Pricing | • Subscription-based pricing reflects client's individual selection of import and/or export datasets (choice of geographic regions, tradelanes, commodities, etc.) relevant to business needs. | • Subscription-based pricing … with only one option available (one year's subscription to current + two years' historical import data). |

**PIERS import-export trade databases are unique: This is global commercial intelligence you'll find nowhere else in the world.**

PIERS Financial

i-PIERS
U.S. Waterborne Import
Historical Data
Maritime Research

Trade Intelligence @
PIERS.com

PIERS TI (Trade
Intelligence)
PIERS Trade Profiles
PIERS Trade Finance

PIERS International
Products

Indian Import-Export
Trade Database
Korean Import-Export
Trade Database
Mexican Waterborne Trade
Database
South American Trade
Database

Features
Use this Data
Subscription Information
See a Sample
Request More Info
Back to Product Catalogue

Anytime, anywhere Web access — with sophisticated search and report-generation capabilities — to PIERS U.S. import and export data, from the latest data available (government-authorized for release two weeks after filing) to up to 36 months of historical data.

**Sources:** This is information gathered by PIERS directly from the **bills of lading** and **manifests** filed both manually and through the **U.S. Customs** Automated Manifest System (AMS). PIERS adds value by auditing, standardizing and validating the data, and by assigning harmonized tariff codes to all manifest commodity descriptions.

Features:

**PIERS TI** is a **three-step application** that makes it easy to **Search** the PIERS database, view and organize your **Results**, and generate a variety of **Reports**.

**Step 1: Select Search criteria.**

Search up to 12 months and retrieve up to 99,000 records at a time. Save search and report formats for easy periodic updating and comparison. Choose from:

- **Basic search criteria:** Find the basic who, what, when, and where of U.S. trade with the world. **PIERS TI Smart Fields** automatically hunt for search terms through multiple relevant fields to capture more data.

- **Advanced search criteria:** Conduct more detailed searches, such as shipments by bill of lading number, carrier, or twenty-foot equivalent unit (TEU) count. Or use **Smart Fields** to search across multiple fields for a key term – a company name, for example.

- **Miscellaneous search criteria:** Search the database by specialized categories, such as the estimated value of the cargo.

**Step 2: Organize Results.**

View and organize your search results in several ways:

- Select from a **range of field combinations** to view your results.

- Sort results **numerically** or **alphabetically**.

- Mark or unmark records to **include in** or **remove from Reports.**

**Step 3: Generate Reports.**

Reports can be displayed and printed in PDF format, and/or downloaded (up to 20,000 results per search) directly into MS Excel* spreadsheets. Select among a choice of **five basic types of reports** (offering more than 20 possible report options in all):

- **Detail Reports** provide a complete picture of an import or export transaction — supplying all the details on individual bills of lading, including identifying information of the parties involved in the trade, shipment detail, and detailed commodity information.

- **Profile Reports** survey the activities of the parties to a trade: the foreign shipper (the supplier), the consignee (importer), or the notify party — and reveal what, how much and with whom they are trading. U.S. export data includes profile reports of the U.S. shippers, the commodities and destination countries in U.S. export trade.

- **Summary Reports** aggregate transactions by weight, TEUs and shipments, enabling users to review summaries by specific criteria, such as foreign shippers or U.S. exporters, commodities and trading countries.

- **Ranking Reports** list the top foreign shippers (suppliers), U.S. shippers (exporters), U.S. consignees (importers), commodities or countries – with graphs making the information accessible at a glance.

- **Trending Reports** track monthly trends in U.S. export trade by country, commodity or U.S. exporter.

Use this data:

- **Identify & qualify new suppliers:** Search by harmonized tariff code, commodity description, geographic location; sort by volume, estimated value, level of activity.

- **Find new customers:** Look up consignees or notify parties; search by commodity, product, brand; follow purchasing patterns to spot importers of the products you sell.

- **Detect emerging market demand:** See where the need for products like yours is rising — or being met by competitors.

- **Measure market share:** Rank sellers by activity, volumes, estimated values; identify buyers' mainstay suppliers.

- **Monitor the competition:** Weekly updates keep you on top of your industry's or sector's waterborne commerce.

- **Protect your intellectual property and brand equity:** See that your branded products get to the markets they were meant for (and detect when they've been diverted or counterfeited).

**Subscription Information:**

An annual subscription to **PIERS TI** provides unlimited access via the Web to PIERS U.S. import data, U.S. export data, or both, from the current release to as far back as 36 months.

> \* *Microsoft Excel is a registered trademark of Microsoft Corporation.*

See a Sample

Request More Information

Back to Product Catalogue

PIERS
Global Intelligence Solutions®

About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insights

PIERS Home > Complete Product Catalogue > US Waterborne Import Historical Data

**PIERS Essential Products**
- i-PIERS
- U.S. Waterborne Import Historical Data
- Maritime Research

**TradeIntelligence® PIERS.com**
- PIERS TI (Trade Intelligence)
- PIERS Trade Profiles
- PIERS Trade Finance

**PIERS International Products**
- Indian Import-Export Trade Database
- Korean Import-Export Trade Database
- Mexican Waterborne Trade Database
- South American Trade Database

# PIERS U.S. Waterborne Import Historical Data

Historical information on **U.S. waterborne imports.**

*Sources:* The PIERS archives.

**Features:**

- U.S. waterborne import data from **1950 through 1980 ...** bill of lading and manifest data stored on microfiche: a PIERS information specialist will assist in researching this material

- U.S. waterborne import data from **1980 through 1991 ...** bill of lading and manifest data available in electronic format: a PIERS information specialist will assist in developing customized datasets.

- U.S. waterborne import data from **1992 through today ...** bill of lading and manifest data enhanced with additional information on foreign shippers, estimated value of goods - all the data fields provided by PIERS U.S. Waterborne Import product - available in electronic format: a PIERS information specialist will assist in developing customized datasets.

**Data fields include:**

- **Who ...** bill of lading number, carrier, consignee name & address, in-bond code, manifest number, notify parties' names & addresses, pre-carrier, shipper name & address, vessel, vessel registry, voyage number.

- **What ...** ... AMS detailed commodity description, container number, harmonized tariff code, marks & numbers, PIERS commodity description.

  Cargo quantity/unit of measure; cargo weight & volume; container size.

- **When ...** arrival date, departure date, lading date.

- **Where ...** coastal region, country of origin, foreign destination, foreign port name & code, U.S. final destination, U.S. port name & code.

**Use this data:**

- **Discover authoritative evidence for legal cases ...** PIERS historical data has been accepted as evidence in establishing liability in asbestos and other toxic tort and product liability cases.

- **Monitor contract and trade agreement compliance ...** PIERS detailed information clearly establishes chains of custody, uncovers breaches in sole-sourcing agreements, yields evidence of dumping, gray market diversions, etc.

- **Protect intellectual property ...** PIERS data is used to trace counterfeiting, trademark piracy, parallel importing, bootlegged shipments.

- **Build long-range market studies ...** PIERS is a reliable and accessible source of data on decades-old commercial transactions and trade patterns.

See a Sample

Request More Information

Back to Product Catalogue

**Page Index**
Features
Data Fields
Data Applications
See a Sample
Request More Info
Back to Product Catalogue

PIERS Home > How Companies Use PIERS >

**Articles**
Attack of The Clones
Bright Outlook for Ag Exports
Cleared for Take-Off
Details Count in a Tight Market
Detecting Dumping
Detecting Trademark Pirates
Discovering Cost-saving Opportunities
Discovering a Global Dimension
A Few Good Sources
Fixing Liability
Keeping up as Customers Go Global
Measuring New Markets
Opening the Door to Sales
Port of San Diego Comes Back to PIERS
Protecting MPEG Patents
Remote Sourcing
Sharper Focus for Product Marketing
Shortcut to Settlement
Sourcing Medical Products
Tips from a PIERS Users' Conference
Tracing Parallel Imports
Tricks of the Investigators Trade

## PIERS Global Trade Intelligence at Work

**Businesses with a global perspective** use PIERS trade intelligence to:

- Find new suppliers, new markets and new business opportunities
- Benchmark performance against the competition
- Defend intellectual property against infringement and counterfeiting
- Support strategic decision-making
- Arbitrate trade disputes
- Understand international trade trends and forecasts

To see how commercial enterprises and government agencies have put PIERS to work for them, browse these **customer applications stories**:

### Attack of the Clones
The car may be exported, but its cloned VIN can stay behind to cover illegal traffic in stolen or salvaged cars — as **Carfax** found out with some help from PIERS intelligence. Read more

### Bright Outlook for Ag Exports
Ocean transport rates make the Pacific Rim the market of choice for U.S. ag exports. The **USDA** uses PIERS data to report on ocean transport trends. Read more

### Cleared for Take-Off
Most business initiatives fail because they're launched without an unbiased appraisal of market realities. PIERS can supply the hard facts about your markets and your competitors. Read more

### Details Count in a Tight Market
The chemical industry is experiencing a resurgence ... but with higher costs and heated competition, it's critical to keep close track on the marketplace - as **Arkema Inc.** does. Read more

### Detecting Dumping
PIERS makes it easier for **Chattem Chemicals** to monitor shipping for below-market-price imports ... and compile the evidence for antidumping claims. Read more

### Detecting Trademark Pirates
A California-based maker of color cosmetics had its trade name pirated; PIERS helped identify the culprit. Read more

### Discovering Cost-saving Opportunities
For **PointTrade Services, Inc.** an international trade and customs services provider and consultancy, PIERS *Trade Profiles* is a tool for identifying and estimating savings for client importers. Read more

### Discovering a Global Dimension
One bank identified untapped demand for its lucrative trade financing products within its existing customer base with the help of PIERS import-export trade data. Read more

### A Few Good Sources
The **Army Corps of Engineers** relies on a few good sources for the information that guides its planning, including the U.S. Census, Customs, and PIERS. Read more

### Fixing Liability
PIERS historical data can supply the evidence needed in asbestos cases where the claim of injury is made years — or decades — after exposure. Read more

### Keeping up as Customers Go Global
Commercial services providers use *Trade Profiles* to keep up with — or, better yet, anticipate — the needs of their customers as they move into world markets. Read more

### Measuring New Markets
A Gulf Coast barge company turned to PIERS for the hard data that will test the feasibility of their business model. Read more

### Opening the Door to Sales
*Trade Profiles* supports sales tactics and marketing strategy at **Lynden International**, providers of freight transport and logistics services. Read more

### Port of San Diego Comes Back to PIERS
The Port of San Diego tried an alternate provider of trade data only to find critical details missing. Read more

### Protecting MPEG Patents
**Audio MPEG, Inc.**, finds PIERS Trade Intelligence is an invaluable asset in its business of licensing patents in the consumer electronics industry. Read more

### Remote Sourcing
Is there any substitute for being there when it comes to finding and qualifying new sources for global supply chains? PIERS trade data supplies an alternative. Read more

### Sharper Focus for Product Marketing
**LINPAC Materials Handling** uses *Trade Profiles* to focus on companies in the industries — and shipping the volumes — its packaging solutions best serve. Read more

### Shortcut to Settlement
PIERS import data bolstered **Zeta Espacial's** claim that its U.S. distributor had not honored their exclusive agreement. Read more

### Sourcing Medical Products
An international distributor finds PIERS is "tremendous resource" for locating new vendors – and monitoring existing suppliers. Read more

### Tips from a PIERS Users' Conference
A PIERS Users' Conference included a panel of customers who discussed how they use commercial intelligence in their companies — **Trans-i Technologies, Inc.**, and **Dow**. Read more

**Tracing Parallel Imports**
Gray-market goods undermine prices and brands. A trade minimization process helps Mercedes-Benz foster Khong Guan fight back. Read more

**Tricks of the Investigators Trade**
The **James Mintz Group** specializes in "finding hidden business facts quickly, quietly, cost-effectively."
Read more

# EXHIBIT F



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

June 26, 2008

VIA ELECTRONIC TRANSMISSION
pherrick@bellsouth.net

Mr. Peter S. Herrick, Esq.
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133-4025

> Re: Herrick v. U.S. Customs and Border Protection,
> Civ. Act. No. 08-0036 (JR)

Dear Mr. Herrick:

As was requested in the aforementioned FOIA matter, please find attached a three page spreadsheet with the names and addresses of companies that have paid vessel repair duties for the period 2/1/2006 through 11/15/2007.

I am also sending you a Notice of Dismissal. Should you need anything further, please do not hesitate to call me at (202) 305-1334.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

/s/

By: _____

HEATHER GRAHAM-OLIVER
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| AMBERMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| AMERICA CARGO TRANSPORT INC | 16300 CHRISTENSEN ROAD | SUITE 203 | TUKWILA | WA | 98188-3403 |
| AMERICAN OVERSEAS MARINE CORPORATION | 100 NEWPORT AVENUE EXT | | QUINCY | MA | 02171-1734 |
| AMERICAN ROLL ON ROLL OFF | 1 MAYNARD DRIVE | | PARK RIDGE | NJ | 07656-1878 |
| APL MARITIME LTD | 6901 ROCKLEDGE DRIVE | | BETHESDA | MD | 20817-1817 |
| CENTRAL GULF LINES INC | PO BOX 1987 | | MOBILE | AL | 36633-1987 |
| CROWLEY PETROLEUM SERVICES INC | 9487 REGENCY SQUARE BOULEVARD | | JACKSONVILLE | FL | 32225-8126 |
| E-SHIPS INC | 1 WHITEHALL STREET | | NEW YORK | NY | 10004-2109 |
| FORTUNE MARITIME LLC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |
| GLOBAL CONTAINER LINES LTD | 100 QUENTIN ROOSEVELT BOULEVARD | SUITE103 | GARDEN CITY | NY | 11530-4843 |
| HORIZON LINES LLC | 1675 LINCOLN AVENUE | BUILDING 300 | TACOMA | WA | 98421-2906 |
| INTERMARINE LLC | 365 CANAL STREET | SUITE 2400 | NEW ORLEANS | LA | 70130-1142 |
| ISS MARINE SERVICES INC | 118 NORTH ROYAL STREET | SUITE 400 | MOBILE | AL | 36602-3603 |
| K-SEA TRANSPORTATION LLC | 2700 WEST COMMODORE WAY | | SEATTLE | WA | 98199-1246 |
| LIBERTY MARITIME CORPORATION | 1979 MARCUS AVENUE | SUITE 20 | NEW HYDE PARK | NY | 11042-1002 |
| LOWER LAKES TRANSPORTATION COMPANY | 625 MAIN STREET | PORT DOVER | CANADA | ON | N0A1N0 |
| LUXMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| MAERSK LINE LTD | 1 COMMERCIAL PLACE | 20TH FLOOR | NORFOLK | VA | 23510-2103 |

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| MAREMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| MARINE TRANSPORT MANAGEMENT INC | 9487 REGENCY SQUARE BOULEVARD | | JACKSONVILLE | FL | 32225-8126 |
| MAR-TEX SHIPPING/CHARTING AGENCY | 1314 TEXAS STREET | SUITE 814 | HOUSTON | TX | 77002-3500 |
| MATSON NAVIGATION COMPANY INC | 555 12TH STREET | | OAKLAND | CA | 94607-4046 |
| MORAN TOWING & TRANSPORTATION | 50 LOCUST AVENUE | | NEW CANAAN | CT | 06840-4737 |
| OCEAN BULK SHIPS INC | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| OSG CAR CARRIERS INC | 666 3RD AVENUE | | NEW YORK | NY | 10017-4011 |
| SARGEANT MARINE INC | 3020 NORTH MILITARY TRAIL | SUITE 100 | BOCA RATON | FL | 33431-1805 |
| SEABULK INTERNATIONAL INC | 2200 ELLER DRIVE | | FORT LAUDERDALE | FL | 33316-0000 |
| SEALIFT INC | 68 WEST MAIN STREET | SUITE 200 | OYSTER BAY | NY | 11771-2298 |
| SEA STAR LINE LLC | 200 NORTH DAIRY ASHFORD STREET | | HOUSTON | TX | 77079-1101 |
| SHELL OFFSHORE INC | 200 NORTH DAIRY ASHFORD STREET | | HOUSTON | TX | 77079-1101 |
| STRONG PATRIOT LLC | 68 SOUTHFIELD AVENUE | SUITE 210 | STAMFORD | CT | 06902-7237 |
| STRONG VESSEL OPERATORS LLC SVO | 68 SOUTHFIELD AVENUE | SUITE 210 | STAMFORD | CT | 06902-7237 |
| TECO OCEAN SHIPPING | 702 NORTH FRANKLIN STREET | FLOOR 5 | TAMPA | FL | 33602-4440 |
| THE FISHING COMPANY OF ALASKA INC | 200 WEST THOMAS STREET | SUITE 440 | SEATTLE | WA | 98119-4215 |
| TRANSATLANTIC LINES LLC | 6 LINCOLN AVENUE | | GREENWICH | CT | 06830-5751 |
| TRANSBULK CARRIERS INC | 666 3RD AVENUE | | NEW YORK | NY | 10017-4011 |

FOIA 2008F1621

2 of 3

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| U.S. MARITIME ADMINISTRATION | 400 7TH STREET SW | ROOM 2122 | WASHINGTON | DC | 20590-0001 |
| USS CHARTERING LLC | PO BOX 2945 | | EDISON | NJ | 08818-2945 |
| VICTORY MARITIME INC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |
| WALLENIUS WILHELMSEN LOGISTICS | 188 BROADWAY | | WOODCLIFF LAKE | NJ | 07677-8067 |
| WATERMAN STEAMSHIP CORPORATION | PO BOX 2008 | | MOBILE | AL | 36552-2008 |
| WILSON SHIPPING COMPANY LLC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |

FOIA 2008F1621

# EXHIBIT G

# *SUBSCRIPTION AGREEMENT*

*PIERS*
Global Intelligence Solutions

Salesperson: Aliet Martinez            Phone: 1-800-991-9994 x 145            Fax: 954-628-0085

Client:        **Peter S. Herrick, Attorney**

Client Contact:    **Peter S. Herrick**

Client Address:  **3520 Crystal Vilew Ct - Miami, FL 33132**

This Subscription Agreement and the accompanying PIERS User License Agreement set forth the terms and conditions upon which Commonwealth Business Media, Inc., acting through its PIERS division ("PIERS"), will make certain PIERS Product(s) available to the Client identified above.  Client acknowledges that it has read and accepted the terms and conditions of the EULA.

1.  **Effective Date:**    **07/09/2008**
2.  **PIERS Products:** The following PIERS Products are subject to this Agreement:
    ☒ PIERS Declaration

    **Medium:**
    ☒ E-mail

    **Subscription Frequency:**
    ☒ One Time

    **Special Comments**        **ORDERING A PIERS CERTIFICATION**

5.  Fees: Client shall pay a Fee for the selected PIERS Product(s) as follows:

    PIERS Certification - $500

    **Please check the appropriate payment type:**

    ☑ Credit Card
    Credit Card Type:  *MC*
                      *6588 3200 2084 2135*
    Credit Card Number:              Expiration Date: *01/09*      Approval Code: *200*
    Name as it appears on credit card: *Peter S. Herrick*    Zip Code (of credit card billing address): *33133*

    **Credit CARDHOLDER'S Signature:**

**For PIERS**                                  **For Client**

Signed:    *Aliet Martinez*              Signed:

Print Name:  **Aliet Martinez**           Print Name: *Peter S Herrick*

Date:  _____                    Date:  *07/09/08*

Title:    **Regional Manager**            Title:  *Attorney*

Phone:    **1-800-991-9994 x 145**         Phone:  *305 858 2332*

                                          E-Mail:  *pherrick @ Solysouth. net*

● Page 2

July 9, 2008

For PIERS internal purposes only: WFOrder No. _____

# PIERS User Agreement

The following terms and conditions are incorporated in and are a part of the attached Subscription Agreement between PIERS and the Client identified in the Subscription Agreement.

1. **License**

PIERS grants Client a non-exclusive, non-transferable, revocable license, without the right to sublicense, to download and use Licensed Information identified in the Subscription Agreement, solely and exclusively in connection with the pursuit of Client's business by the Authorized Employees designated in the Subscription Agreement, during the Term of this Agreement, subject to the terms of this Agreement. PIERS grants Client no other right or license with respect to Licensed Information, whether by implication, estoppel, operation of law, or otherwise. All rights not expressly granted to Client by this Agreement are reserved to PIERS or its licensors.

2. **Restrictions on Use of Licensed Information**

Client and its Authorized Employees shall **not**: (a) directly or indirectly, allow any third party to download or use Licensed Information; (b) disclose the substance of Licensed Information to any third party, except that Authorized Employees may communicate discrete data derived from Licensed Information to third parties in order to carry out Client's business; (c) modify, reverse engineer, disassemble, or decompile any software programs associated with Licensed Information; (d) store or transmit Licensed Information in or to any web site, newsgroup, mailing list, or electronic bulletin board, or regularly or systematically store Licensed Information in electronic or print form, without the prior written consent of PIERS. Any breach of these restrictions may result in immediate termination of this Agreement and liability for damages.

3. **Ownership and Confidentiality of Licensed Information**

Client acknowledges that PIERS and its licensors own all right, title and interest in and to Licensed Information and all associated software and other materials. Client agrees that it shall not remove, obscure, or modify any copyright, trademark, or other form of proprietary notice or indicia of origin on Licensed Information, or use PIERS's trademarks or other form of proprietary notice or indicia of origin absent the prior written consent of PIERS. Client further acknowledges that Licensed Information contain valuable trade secrets and confidential information of PIERS and its licensors, and Client agrees to take all reasonable measures to maintain the confidentiality of Licensed Information and to ensure that it is not downloaded, used, or disclosed by or to third parties.

4. **Injunctive Relief**

Client acknowledges that any unauthorized use, disclosure, or transfer of Licensed Information may diminish substantially the value of such information and cause PIERS irreparable harm. Therefore, Client agrees that PIERS shall be entitled to injunctive or other equitable relief, without any requirement to post an injunction or surety bond, in addition to all available legal remedies, arising from or related to any breach of the obligations of Client or its Authorized Employees of the provisions of Sections 1 through 3.

5. **Payment of Subscription Fee and Taxes**

PIERS will issue monthly invoices in U.S. dollars to Client for the Subscription Fee(s) set forth in the Subscription Agreement, plus payment of all applicable sales and other taxes which may be levied or assessed based on Client's payment for, or use of, Licensed Information, and any other amounts that may be due and payable under this Agreement. Client shall pay each invoice within thirty (30) days of the date of the invoice. All payments are non-refundable.

6. **Term and Termination**

This Agreement shall be in effect for the Initial Term set forth in the Subscription Agreement. Either party may terminate a subscription on or after the subscription terms by giving the other party not less than thirty (30) days' prior written notice. PIERS may terminate this Agreement, with immediate effect upon written notice to Client, if Client breaches a material provision of this Agreement. Upon the termination or expiration of this Agreement for any reason, Client shall promptly remove or delete all software and data related to Licensed

*PIERS is a division of Commonwealth Business Media, Inc.*

● Page 3

July 9, 2008

Information from all computer equipment and electronic memories, and return all tangible copies of Licensed Information and associated documentation to PIERS.

7.    **Disclaimer of Warranties**

Client expressly acknowledges that Licensed Information and associated data are derived from third-party sources, such as ship manifests and other documents submitted to the United States Customs Service by shippers, freight forwarders, and consignees, over which PIERS has no control, and that PIERS has not made, and does not make, any representations whatsoever as to the accuracy, completeness, reliability, or timeliness of Licensed Information. PIERS accordingly makes no warranties with respect to Licensed Information or associated software, and **DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OF LICENSED INFORMATION.**

8.    **Disclaimer of Liability**

PIERS SHALL HAVE NO LIABILITY TO CLIENT OR ANY OTHER ENTITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFIT OR GOODWILL, OR OTHER DAMAGES OR LOSSES, NO MATTER HOW CAUSED, FOR ANY CLAIM OR DEMAND ARISING OUT OF OR RELATING TO: (i) THIS AGREEMENT OR ITS PERFORMANCE; (ii) THE CORRUPTION OR ERASURE OF DATA OR INFORMATION TRANSMITTED, RECEIVED, OR STORED IN ANY MANNER; and (iii) ANY SOFTWARE ERRORS OR BUGS, COMPUTER VIRUSES, OR ANY INABILITY TO ACCESS THE INTERNET OR SERVERS HOSTING LICENSED INFORMATION.

9.    **Force Majeure**

PIERS shall not be deemed to be in default for any delay or failure in performance or interruption of the delivery of Licensed Information resulting directly or indirectly from any cause or circumstance beyond its reasonable control, including but not limited to failure of electronic or mechanical equipment or communication lines, telephone or other interconnect problems, computer viruses, unauthorized access, theft, operator errors, severe weather, earthquakes, or natural disasters, strikes or other labor problems, wars, or governmental restrictions.

10.    **Unauthorized Use**

Client agrees to immediately notify PIERS if it becomes aware of any unauthorized use of Licensed Information or any Software.

11.    **Entire Agreement and Amendment**

This User Agreement and the attached Subscription Agreement constitute the entire and complete understanding of the parties and supersede all prior communications, representations, understandings, and agreements, whether oral or written, by or between the parties. This Agreement may only be amended or modified by written instrument executed by both parties.

12.    **Governing Law and Forum Selection**

The parties consent and agree that the construction, interpretation, and enforcement of this Agreement shall be governed by the laws of the United States of America and the State of New Jersey, without reference to any choice of law principles, and that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. The parties further consent and agree that the courts of the State of New Jersey or the United States District Court for the District of New Jersey shall have exclusive jurisdiction over any claim or dispute arising under or related to this Agreement. Client hereby irrevocably waives any objection to the jurisdiction, process, or venue of any such court, and to the validity, effectiveness, execution, and enforcement of any order or judgment (including, but not limited to, judgment by default) of any such court in relation to this Agreement.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 08-0478 (RMC) |
| U. S. CUSTOMS AND BORDER PROTECTION, | ) ) ) |
| Defendant. | ) ) |

## PIERS DECLARATION

1.      My name is Aliet Martinez.  I'm over 21 years of age.  I have personal knowledge of the facts stated in this declaration, and the facts stated in this declaration are true and correct.

2.      I am a Regional Manager at PIERS Global Intelligence ("PIERS"). PIERS is an acronym, which stands for the Port Import Export Reporting Service.

3.      PIERS maintains a comprehensive database of timely, accurate, import and export information on all the cargoes moving through ports in the United States, Mexico, Latin America, and Asia.  PIERS collects data from over 25,000 bills of lading *every day*.

4.      PIERS has access to import and export data through the U.S. Freedom of Information Act and other federal laws.  In fact, federal law authorizes press organizations, such as PIERS, to copy certain publicly available shipping documents.

5.      PIERS obtains information about shipments arriving to U.S. ports from vessel manifests and from the U.S. Customs & Border Protection's Automated Manifest System ("AMS") data tapes.  Reporters throughout the United States—including Alaska, Hawaii, and Puerto Rico—collect import information from all U.S. ports.

6.      PIERS' information is verified by PIERS' quality-control staff, members of which audit PIERS' records every month.  They check PIERS' information against a list of vessels arriving at U.S. Ports.  PIERS' obtains this list from the U.S. Customs &

Border Protection ("CBP"). PIERS does not alter the information in any way. If there is a discrepancy between PIERS' information and the information from the CBP, PIERS requests the appropriate documentation either from the CBP, or the shipping company, and if necessary corrects any error. In addition, shipping companies and importers that subscribe to PIERS verify their own shipments in PIERS' system and notify PIERS of any discrepancies, which PIERS verifies and, if necessary, corrects.

7.      Companies worldwide rely on the data PIERS collects to find new suppliers, new markets, and new business opportunities; to compare their performance to their competitors'; to defend intellectual property rights against infringement and counterfeiting; to understand international trade trends; to support strategic decision-making; and to resolve trade disputes in arbitration and litigation. Shipping companies and importers that subscribe to PIERS even use PIERS to verify their own shipments.

8.      PIERS has the most complete commercially available collection of AMS data. The AMS data details each importer's name, city and state, each exporter's name, city and country, each export shipment's port of departure and destination, a description of the commodity and its weight, quantity, unit of measure, and PIERS product code, and vessel name.

9.      AMS Data comes directly from the CBP. PIERS does not amend, edit, or consolidate this data.

10.     PIERS employees and representatives review the data underlying the AMS Data in the regular course of PIERS' business, and it is the regular course of PIERS's business for a PIERS employee or representative—with knowledge of the AMS Data—to obtain the underlying documents and data from the CBP. CBP obtains this information and documents pursuant to CBP's official obligations, and CBP is obliged to provide access to this data.

11.     True and correct copies of "Import Bill of Lading Detail" are attached hereto. This report is a data compilation that PIERS prepared in the regular practice of its ordinary business activities. The information contained in the report was recorded at or near the time the data was collected from AMS data by a person with knowledge of that data.

12.     Courts routinely admit in evidence PIERS reports like the report in Exhibit 1. I have personal knowledge of such instances.

13.     With three exceptions—"TEU's," "Estimated Value," and "PIERS COMMODITY CODES"—all the information in the Import Bill of Lading Detail comes

from bills of lading in the AMS data. The information from AMS data is stated verbatim in the Bill of Lading Detail, without being amended, consolidated, or edited.

14.     "TEU's" in the Detail refers to the number of "Twenty Foot Equivalent Units"—or containers—used for that particular shipment.

15.     The figure for "Estimated Value" is based on a proprietary table that PIERS has developed. The PIERS table incorporates the "waterborne values" from the United States Department of Commerce. PIERS generates the "Estimated Value" by multiplying the average value from its proprietary reference table by the number of metric tons in that particular shipment.

16.     The description in "PIERS COMMODITIES" comes verbatim from the description of the shipment in the bill of lading, as stated in the AMS data from CBP.

I declare under penalty of perjury that all of the foregoing is true and correct.

Executed on July 10, 2008, at Miramar, FL.

Aliet Martinez



**About PIERS** | Customer Support | Contact PIERS | Newsroom | Free Insights

Find Out How Companies Use PIERS / Complete Product Catalogue / Become a Subscriber

PIERS Home > Trade Data > Competitive Comparison

- Competitive Comparison

## PIERS Trade Data Competitive Comparison

The data that is at the core of PIERS trade databases – selected information gathered from the ship manifests and bills of lading – is available to the public under the Freedom of Information Act, subject to U.S. Customs regulations. Since PIERS was launched over 30 years ago, competitors have routinely entered the marketplace as purveyors of this raw data. None has yet matched PIERS on the comprehensiveness, verifiable quality, or added value of its trade information.

|  | PIERS | Competition |
|---|---|---|
| Experience | • Roots go back to 1827 founding of the *Journal of Commerce*.<br>• Launched by the *JoC* over 30 years ago as its first venture in electronic information.<br>• Created the current trade data business with its 1980s' Freedom of Information Act filings to obtain access to Customs documents. | • Entered business after the year 2000. |
| Data Coverage | • U.S. containerized imports, bulk and breakbulk, as documented by both Automated Manifest System (AMS) and hardcopy filings.<br>• U.S. containerized exports, bulk and breakbulk, as documented by bills of lading.<br>• Historical data on cargoes moved through U.S. ports: available electronically back through 1984, on microfiche back through the 1950s.<br>• Latin American and Asian cross-border trade data, collected in cooperation with national Customs authorities. | • U.S. containerized imports as received from the Automated Manifest System (AMS) – does not include bulk/breakbulk data, does not capture non-AMS filings.<br>• *No export coverage.*<br>• Historical data available electronically back through 2003.<br>• *No international trade data.* |
| Data Quality | • Port reporters on-site verify data accuracy.<br>• Proprietary rules and audit protocols identify and resolve missing and/or inaccurate data elements.<br>• Records are cross-checked against maritime industry records – including Lloyds Ship Register and the carriers' own data. | • *No staff deployed for data collection or verification.*<br>• AMS data is relayed to customers as is – without corrections or amendments. |
| Value-Added | • Translates into standardized shipping records.<br>• Assigns harmonized tariff codes and commodity descriptions.<br>• Estimates value of cargoes.<br>• Enhances transaction detail with background information on trading parties.<br>• Records vehicle identification numbers (VINs). | • AMS data is relayed to customers as is – without corrections or amendments. |
| Pricing | • Subscription-based pricing reflects client's individual selection of import and/or export datasets (choice of geographic regions, tradelanes, commodities, etc.) relevant to business needs. | • Subscription-based pricing ... with only one option available (one year's subscription to current + two years' historical import data). |

PIERS import-export trade databases are unique: This is global commercial intelligence you'll find nowhere else in the world.

# PIERS TI™ (Trade Intelligence)

I-PIERS

U.S. Waterborne Import
Historical Data

Maritime Research

PIERS TI (Trade
Intelligence)

PIERS Trade Profiles

PIERS Trade Finance

Indian Import-Export
Trade Database

Korean Import-Export
Trade Database

Mexican Waterborne Trade
Database

South American Trade
Database

Page Index

Features
Use this Data
Subscription Information
See a Sample
Request More Info
Back to Product Catalogue

Anytime, anywhere Web access – with sophisticated search and report-generation capabilities – to PIERS U.S. Import and export data, from the latest data available (government-authorized for release two weeks after filing) to up to 36 months of historical data.

**Sources:** This is information gathered by PIERS directly from the bills of lading and manifests filed both manually and through the **U.S. Customs Automated Manifest System (AMS)**. PIERS adds value by auditing, standardizing and validating the data, and by assigning harmonized tariff codes to all manifest commodity descriptions.

## Features:

PIERS TI is a three-step application that makes it easy to **Search** the PIERS database, view and organize your **Results**, and generate a variety of **Reports**.

### Step 1: Select Search criteria.

Search up to 12 months and retrieve up to 99,000 records at a time. Save search and report formats for easy periodic updating and comparison. Choose from:

- **Basic search criteria:** Find the basic who, what, when, and where of U.S. trade with the world. PIERS TI Smart Fields automatically hunt for search terms through multiple relevant fields to capture more data.

- **Advanced search criteria:** Conduct more detailed searches, such as shipments by bill of lading number, carrier, or twenty-foot equivalent unit (TEU) count. Or use Smart Fields to search across multiple fields for a key term – a company name, for example.

- **Miscellaneous search criteria:** Search the database by specialized categories, such as the estimated value of the cargo.

### Step 2: Organize Results.

View and organize your search results in several ways:

- Select from a range of field combinations to view your results.

- Sort results numerically or alphabetically.

- Mark or unmark records to include in or remove from Reports.

### Step 3: Generate Reports.

Reports can be displayed and printed in PDF format, and/or downloaded (up to 20,000 results per search) directly into MS Excel® spreadsheets. Select among a choice of five basic types of reports (offering more than 20 possible report options in all):

- **Detail Reports** provide a complete picture of an import or export transaction – supplying all the details on individual bills of lading, including identifying information of the parties involved in the trade, shipment detail, and detailed commodity information.

- **Profile Reports** survey the activities of the parties to a trade: the foreign shipper (the supplier), the consignee (importer), or the notify party – and reveal what, how much and with whom they are trading. U.S. export data includes profile reports of the U.S. shippers, the commodities and destination countries in U.S. export trade.

- **Summary Reports** aggregate transactions by weight, TEUs and shipments, enabling users to review summaries by specific criteria, such as foreign shippers or U.S. exporters, commodities and trading countries.

- **Ranking Reports** list the top foreign shippers (suppliers), U.S. shippers (exporters), U.S. consignees (importers), commodities or countries – with graphs making the information accessible at a glance.

- **Trending Reports** track monthly trends in U.S. export trade by country, commodity or U.S. exporter.

### Use this data:

- **Identify & qualify new suppliers:** Search by harmonized tariff code, commodity description, geographic location; sort by volume, estimated value, level of activity.

- **Find new customers:** Look up consignees or notify parties; search by commodity, product, brand; follow purchasing patterns to spot importers of the products you sell.

- **Detect emerging market demand:** See where the need for products like yours is rising – or being met by competitors.

- **Measure market share:** Rank sellers by activity, volumes, estimated values; identify buyers' mainstay suppliers.

- **Monitor the competition:** Weekly updates keep you on top of your industry's or sector's waterborne commerce.

- **Protect your intellectual property and brand equity:** See that your branded products get to the markets they were meant for (and detect when they've been diverted or counterfeited).

**Subscription Information:**

An annual subscription to **PIERS TI** provides unlimited access via the Web to PIERS U.S. import data, U.S. export data, or both, from the current release to as far back as 36 months.

\* *Microsoft Excel is a registered trademark of Microsoft Corporation.*

See a Sample

Request More Information

Back to Product Catalogue

**PIERS**
Global Intelligence Solutions®

Find Out How Companies Use PIERS    Complete Product Catalogue    Become a Subscriber

About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insights

PIERS Home > Complete Product Catalogue > US Waterborne Import Historical Data

**Products**
i-PIERS
U.S. Waterborne Import Historical Data
Maritime Research

**Trade Directories**
PIERS TI (Trade Intelligence)
PIERS Trade Profiles
PIERS Trade Finance

**PIERS International Trade Data**
Indian Import-Export Trade Database
Korean Import-Export Trade Database
Mexican Waterborne Trade Database
South American Trade Database

## PIERS U.S. Waterborne Import Historical Data

Historical information on **U.S. waterborne imports.**

*Sources:* The PIERS archives.

Features:

- U.S. waterborne import data from **1950 through 1980** ... bill of lading and manifest data stored on microfiche: a PIERS Information specialist will assist in researching this material

- U.S. waterborne import data from **1980 through 1991** ... bill of lading and manifest data available in electronic format: a PIERS Information specialist will assist in developing customized datasets.

- U.S. waterborne import data from **1992 through today** ... bill of lading and manifest data enhanced with additional information on foreign shippers, estimated value of goods - all the data fields provided by PIERS U.S. Waterborne Import product - available in electronic format: a PIERS Information specialist will assist in developing customized datasets.

Data fields include:

- **Who** ... bill of lading number, carrier, consignee name & address, in-bond code, manifest number, notify parties' names & addresses, pre-carrier, shipper name & address, vessel, vessel registry, voyage number.

- **What** ... ... AMS detailed commodity description, container number, harmonized tariff code, marks & numbers, PIERS commodity description.

  Cargo quantity/unit of measure; cargo weight & volume; container size.

- **When** ... arrival date, departure date, lading date.

- **Where** ... coastal region, country of origin, foreign destination, foreign port name & code, U.S. final destination, U.S. port name & code.

Use this data:

- **Discover authoritative evidence for legal cases** ... PIERS historical data has been accepted as evidence in establishing liability in asbestos and other toxic tort and product liability cases.

- **Monitor contract and trade agreement compliance** ... PIERS detailed information clearly establishes claims of custody, uncovers breaches in sole-sourcing agreements, yields evidence of dumping, gray market diversions, etc.

- **Protect intellectual property** ... PIERS data is used to trace counterfeiting, trademark piracy, parallel importing, bootlegged shipments.

- **Build long-range market studies** ... PIERS is a reliable and accessible source of data on decades-old commercial transactions and trade patterns.

See a Sample

Request More Information

Back to Product Catalogue

**Page Index**
Features
Data Fields
Data Applications
See a Sample
Request More Info
Back to Product Catalogue



**PIERS**
Global Intelligence Solutions®



Find Out How Companies Use PIERS    Complete Product Catalogue    Become a Subscriber

About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insight

PIERS Home > How Companies Use PIERS >

**Articles**

Attack of The Clones

Bright Outlook for Ag
Exports

Cleared for Take-Off

Details Count in a Tight
Market

Detecting Dumping

Detecting Trademark
Pirates

Discovering Cost-saving
Opportunities

Discovering a Global
Dimension

A Few Good Sources

Fixing Liability

Keeping up as Customers
Go Global

Measuring New Markets

Opening the Door to Sales

Port of San Diego Comes
Back to PIERS

Protecting MPEG Patents

Remote Sourcing

Sharper Focus for Product
Marketing

Shortcut to Settlement

Sourcing Medical Products

Tips from a PIERS Users'
Conference

Tracing Parallel Imports

Tricks of the Investigators
Trade

## PIERS Global Trade Intelligence at Work

Businesses with a global perspective use PIERS trade intelligence to:

- Find new suppliers, new markets and new business opportunities
- Benchmark performance against the competition
- Defend intellectual property against infringement and counterfeiting
- Support strategic decision-making
- Arbitrate trade disputes
- Understand international trade trends and forecasts

To see how commercial enterprises and government agencies have put PIERS to work for them, browse these **customer applications stories:**

**Attack of the Clones**
The car may be exported, but its cloned VIN can stay behind to cover illegal traffic in stolen or salvaged cars — as Carfax found out with some help from PIERS intelligence. Read more

**Bright Outlook for Ag Exports**
Ocean transport rates make the Pacific Rim the market of choice for U.S. ag exports. The USDA uses PIERS data to report on ocean transport trends. Read more

**Cleared for Take-Off**
Most business initiatives fail because they're launched without an unbiased appraisal of market realities. PIERS can supply the hard facts about your markets and your competitors. Read more

**Details Count in a Tight Market**
The chemical industry is experiencing a resurgence ... but with higher costs and heated competition, it's critical to keep close track on the marketplace - as Arkema Inc. does. Read more

**Detecting Dumping**
PIERS makes it easier for Chattem Chemicals to monitor shipping for below-market-price imports ... and compile the evidence for antidumping claims. Read more

**Detecting Trademark Pirates**
A California-based maker of color cosmetics had its trade name pirated; PIERS helped identify the culprit. Read more

**Discovering Cost-saving Opportunities**
For PointTrade Services, Inc., an international trade and customs services provider and consultancy, PIERS *Trade Profiles* is a tool for identifying and estimating savings for client importers. Read more

**Discovering a Global Dimension**
One bank identified untapped demand for its lucrative trade financing products within its existing customer base with the help of PIERS import-export trade data. Read more

**A Few Good Sources**
The Army Corps of Engineers relies on a few good sources for the information that guides its planning, including the U.S. Census, Customs, and PIERS. Read more

**Fixing Liability**
PIERS historical data can supply the evidence needed in asbestos cases where the claim of injury is made years — or decades — after exposure. Read more

**Keeping up as Customers Go Global**
Commercial services providers use *Trade Profiles* to keep up with — or, better yet, anticipate — the needs of their customers as they move into world markets. Read more

**Measuring New Markets**
A Gulf Coast barge company turned to PIERS for the hard data that will test the feasibility of their business model. Read more

**Opening the Door to Sales**
*Trade Profiles* supports sales tactics and marketing strategy at Lynden International, providers of freight transport and logistics services. Read more

**Port of San Diego Comes Back to PIERS**
The Port of San Diego tried an alternate provider of trade data only to find critical details missing. Read more

**Protecting MPEG Patents**
Audio MPEG, Inc., finds PIERS Trade Intelligence is an invaluable asset in its business of licensing patents in the consumer electronics industry. Read more

**Remote Sourcing**
Is there any substitute for being there when it comes to finding and qualifying new sources for global supply chains? PIERS trade data supplies an alternative. Read more

**Sharper Focus for Product Marketing**
LINPAC Materials Handling uses *Trade Profiles* to focus on companies in the industries — and shipping the volumes — its packaging solutions best serve. Read more

**Shortcut to Settlement**
PIERS import data bolstered Zela Espacial's claim that its U.S. distributor had not honored their exclusive agreement. Read more

**Sourcing Medical Products**
An international distributor finds PIERS is "tremendous resource" for locating new vendors – and monitoring existing suppliers. Read more

**Tips from a PIERS Users' Conference**
A PIERS Users' Conference included a panel of customers who discussed how they use commercial intelligence in their companies — Trans-i Technologies, Inc., and Dow. Read more

**Tracing Parallel Imports**
Gray market goods undermine prices and tarnish trade names; PIERS helps food importer **Khong Guan**
fight back. Read more

**Tricks of the Investigators Trade**
The **James Mintz Group** specializes in "finding hidden business facts quickly, quietly, cost-effectively."
Read more



## AMS Bill of Lading Detail
### Source: AMS Database

Page 1
7/ 1/2008

**Shipper**
GENERAL NOLI
VALENCIA CALLE REINA 6-4 PISO 46011
SPAIN   SPAIN

**Consignee**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Notify Party**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Also Notify**

**Packaging Information**

| | | | |
|---|---|---|---|
| Weight: | 7090 KG | Measurements: | 35 CM |
| Quantity: | 1696 BOX | TEU's: | 2.00 |

**Shipment Detail**

| | | | |
|---|---|---|---|
| Carrier: MSCU - MEDITERRANEAN SHIPPING CO | | Country of Origin: | SPAIN |
| Vessel:  P&O NED. FALCON | | Coastal Region: | EAST |
| Voyage: 504R | | US Port:  5201 | MIAMI |
| B/L:    MSCUJ1675923 | | For Port: 42737 | LE HAVRE |
| Pre Carrier:    BILBAO | | US Dest: | |
| Lloyd's Code:   8619053 | | For Dest: | |
| Inbond Code: | | Mode of Transport: 10 | |
| Estimated Value:  $ 11,875.00 | | Arrival Date: | 11/24/2002 |

### AMS Commodities

| Container | Qty | Description |
|---|---|---|
| MSCU8318231 | 1696 | TOASTED BREAD |

### PIERS Commodities

| Qty | Units | Commodity Description | | Harm Code | JOC Code |
|---|---|---|---|---|---|
| 1696 | CTN | TOASTED BREAD | | 190540 | I30100C |

---

*Note: Bills of lading that contain multiple commodities will list the total weight and TEU's for the entire bill of lading*

This listing contains information which is the property of the Journal of Commerce. It is provided for the exclusive use of our clients in accordance with our purchase agreement.
It may not be sold or released for the benefit of a third party. Commonwealth Business Media, Inc 33 Washington St., 13 fl., Newark, NJ 07102

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, ) ) ) Plaintiff, ) ) v. ) ) U. S. CUSTOMS AND BORDER PROTECTION, ) ) Defendant. ) _____/ | Civil Action No. 08-0478 (RMC) |

## ORDER

UPON CONSIDERATION OF Plaintiff's Opposition To Defendant's Motion To Dismiss or Alternatively, Motion for Summary Judgment, Statement of Material Facts To Which There Are Genuine Issues, and Memorandum of Points and Authorities in Opposition Thereof, and the entire record herein, it is this _____ day of _____, 2008,

**ORDERED** that Defendant's Motion To Dismiss is **DENIED**; and it is

**FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

_____
UNITED STATES DISTRICT JUDGE