## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CUSTOMS & INTERNATIONAL**<br>**TRADE NEWSLETTER,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**U. S. CUSTOMS AND BORDER**<br>**PROTECTION,**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 08-0478 (RMC)**<br>)<br>)<br>)<br>)<br>)<br>/ |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Customs & International Trade Newsletter ["Newsletter"] respectfully moves the Court for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure on the grounds that there are no genuine issues of material fact, and, plaintiff, is, therefore, entitled to judgment as a matter of law.

In support of this motion, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Support; Statement of Material Facts Not At Issue; the declaration of Peter S. Herrick; and, the PIERS declaration.  A proposed Order consistent with Newsletter's motion is attached.

Respectfully submitted,

_____/s/_____

PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court

1

Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email: pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was

sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for

defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 15, 2008.


_____/s/_____
Peter S. Herrick

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08-0478 (RMC) |
| U. S. CUSTOMS AND BORDER PROTECTION, | ) ) ) | |
| Defendant. | ) ) / | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE ARE NO GENUINE ISSUES

Pursuant to LCvR 7(h), plaintiff, Customs & International Trade Newsletter ["Newsletter"] states the material facts for which there are no is a genuine issues:

1.    There is a permanent public record of the names and addresses Newsletter has requested. [Peter S. Herrick Declaration ¶¶ 4 & 5; PIERS Dec.]

2.    CBP is not restricted from releasing the names and addresses of companies that file Entries with CBP. [Herrick Dec. ¶ 2; PIERS Dec.]

3.    The information Newsletter requests is not confidential. [Herrick Dec. ¶¶ 4 and 5; PIERS Dec.]

4.    The pairing of HTSUS subheading 9903.02 with the names and addresses of importers would not reveal that a particular importer entered one of the 27 specific goods covered by that subheading. [Herrick Dec. ¶¶ 6 and 8]

1

5.    Disclosing the information that Newsletter requests could not expose importers to a competitive disadvantage by identifying the markets in which they are involved or their sources of supply and/or channels of commerce.  [Herrick Dec. ¶ 5 and 9; PIERS Dec.]

6.    Disclosing the information that Newsletter requests would not provide competitors of importers valuable and confidential information about importers' business operations.  Along with publicly available information, it would not permit a competitor of an importer to piece together the major aspects of an import transaction.  [Herrick Dec. ¶ 6]

7.    In <u>Gilda Industries, Inc. v. United States</u>, USCIT Civil Action No. 07-474 the plaintiff is alleging that HTSUS subheading 9903.02 terminated by operation of law on July 29, 2007. [Herrick Dec. ¶ 16]

Respectfully submitted,

_____/s/_____
PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email:  pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 15, 2008.

2

_____/s/_____
Peter S. Herrick

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| U. S. CUSTOMS AND BORDER PROTECTION, | ) ) |
| | ) |
| Defendant. | ) |

Civil Action No. 08-0478 (RMC)

_____/

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

#### Preliminary Statement

On January 7, 2008, plaintiff, Customs & International Trade Newsletter ["Newsletter"] faxed a Freedom of Information Act ["FOIA"] request for records to the defendant, U. S. Customs and Border Protection ["CBP"]. Since there was no response from CBP Newsletter faxed a FOIA appeal to CBP in a letter of February 8, 2008. Newsletter exhausted its administrative remedies pursuant to 5 U.S.C. §552(a)(6)(c)(i). The complaint was filed on March 20, 2008. The requested names and addresses are not exempt under FOIA. This case is distinguishable from Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (D.D.C. 2006). There is a permanent public record of the names and addresses requested by Newsletter so that FOIA Exemption 4 is inapplicable.

1

# I. BACKGROUND

## A.  Harmonized Tariff Schedule of the United States ("HTSUS")

CBP is not restricted in releasing information provided by importers. [Herrick Dec. ¶ 2] CBP is required by 19 C.F.R. §103.31(e)(3) to release names and addresses of importers to the public.  [Herrick Dec. ¶ 2]  From the information released by Customs, PIERS provides a description of the goods and other data.  [Herrick Dec. ¶ 5; PIERS Declaration] HTSUS subheading 9903.02 may have terminated by operation of law on July 27, 2007. Gilda Industries, Inc. v. United States, USCIT Civil Action No. 07-474. [Herrick Dec. ¶ 16]

## B.  Plaintiff's Request

In a letter to CBP dated January 7, 2008 Newsletter requested the names and addresses of the companies who are the subject  of CBP's Beef Hormone Implementation Directive. [Herrick Dec. ¶ 1] Since CBP did not respond to the January 7th letter Newsletter filed a FOIA appeal with CBP in a letter of February 8, 2008.  This litigation was commenced when CBP failed to respond to the FOIA appeal.  In a letter of April 15, 2008 CBP's Brenda B. Smith's stated CBP would not release the requested names and addresses.

## ARGUMENT

## I. STANDARD OF REVIEW

## A.  Motion For Summary Judgment Under Rule 56 IN FOIA CASES

From N.Y.C. Apparel FZE v. U. S. Customs and Border Protection, 484 F. Supp. 2d 77, 85:

> "Courts will grant a motion for summary judgment if 'the pleadings,

2

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 369 U.S. App. D.C. 122, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). The Court must therefore draw 'all justifiable inferences' in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party, however, cannot rely on 'mere allegations or denials.' Burke v. Gould, 351 U.S. App. D.C. 1, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting *Anderson*, 477 U.S. at 248) (quotation marks omitted). Thus, 'conclusory allegations unsupported by factual data will not create a triable issue of fact.' Pub. Citizen Health Research Group v. FDA, 337 U.S. App. D.C. 343, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted). If the Court concludes that 'the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof,' then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Moreover, 'in ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.' Shays v. FEC, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) (citation omitted)."

## II.  PLAINTIFF EXHAUSTED ITS ADMINISTRATIVE REMEDIES

The January 7th letter reasonably described the records sought.  There were no fee requirements.  The February 8th letter was a timely appeal.  Newsletter exhausted its administrative remedies pursuant to 5 U.S.C. §552(a)(6)(C)(i).  This Court has jurisdiction pursuant to 5 U.S.C. §552(a)(4)(B).

## III.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT

### A.    CBP May or May Not Have Conducted A Reasonable Search

CBP claims it has identified a list of names and addresses of approximately 244

3

importers who meet Newsletter's criteria.  Newsletter has no reason to doubt the accuracy of this number.

## B.  **Defendant Improperly Withheld Information Under FOIA Exemption 4**

## 1.  **Exemption 4**

The information Newsletter seeks is not confidential.  When the names and addresses are paired with publicly available information this information would not provide competitors valuable and confidential information about other importers' business operations and allow a competitor to piece together major aspects of an import transaction. [Herrick Dec. ¶ 6].  CBP already provides the names and addresses of importers to the public.  [Suzuki Dec. ¶ 19; Herrick Dec. ¶ 2; PIERS Dec.]

Any importer or any person, whether they are competitors or not, by subscribing to PIERS can obtain information regarding the source of the imported merchandise, such as country of origin and manufacturer, the importer's supply chain and the importer's quantity of goods.  [Herrick Dec. ¶ 5; PIERS Dec. ¶ 7]  This is because CBP has released this information to PIERS.  A perfect example of the public information regards Gilda's importations.  [Herrick Dec. ¶ 4; PIERS Dec.]

The analysis to determine competitive harm was set forth in Changzhou Laosan Group v. U. S. Customs and Border Protection Bureau, 2005 U.S. Dist. LEXIS 7075 (D.D.C. 2005) *14; reconsideration granted in part and denied in part, 374 F. Supp. 2d 129 (D.D.C. 2005):

"The criterion for assessing the competitive harm prong of *National*

4

*Parks* has been interpreted to require both a showing of (1) actual competition and (2) a likelihood of substantial competitive injury. See <u>CNA Financial Corp. v. Donovan</u>, 265 U.S. App. D.C. 248, 830 F.2d 1132, 1152 (D.C. Cir. 1987). With regard to the second element, the Court need only 'exercise its judgment in view of the nature of the material sought and competitive circumstances in which the submitter does business,' but 'no actual adverse effect on competition need be shown.' <u>Nat'l Parks & Conservation Ass'n v. Kleppe</u>, 178 U.S. App. D.C. 376, 547 F.2d 673, 675 (D.C. Cir. 1976). The exemption protects persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication. (Id. at 678.) Courts have, however, rejected competitive harm claims when agencies provide conclusory statements of competitive harm. See <u>Pac. Architects & Eng'rs, Inc. v. Renegotiation Bd.</u>, 164 U.S. App. D.C. 276, 505 F.2d 383, 384 (D.C. Cir. 1974)) (requiring agencies to provide more than generalized assertions and conclusory allegations). But the agency is not required to provide 'detailed economic analysis of the competitive environment.' *Kleppe*, 547 F.2d at 679.

In an attempt to support its Exemption 4 claim, defendant essentially argues for a blanket exemption for entry documents based on two cases where entry documents were shielded from disclosure under Exemption 4. (Def.'s Mot. at 13, citing <u>Inter Ocean Free Zone v. United States Customs Service</u>, 982 F. Supp. 867, 869-70 (S.D. Fla. 1997), and <u>Timken Co. v. United States Customs Service</u>, 531 F. Supp. 194, 200-01 (D.D.C. 1981) ("Timken II").) As explained by defendant, 'based on these court rulings, CBP has maintained that entry documents and Automated Commercial System (ACS) records comprised of entry information are categorically exempt from disclosure to third parties.' (Stump Decl. PP 27 & 28 ('CBP applies a categorical exclusion to the CF 7512's. . . .').) Similarly, with respect to the second category of information, defendant also takes a categorical approach, claiming that the documents include confidential information, 'i.e., from whom the merchandise was purchased, the quantity of merchandise being imported, the value of the merchandise, the customers of exporters and a description of the exporters' business operations and organization. This is not the type of information a commercial entity would give to a competitor. It would enable a commercial to learn a great deal about its competitor, including the identification of the supplier and the cost and amount of merchandise purchased.' (Id. P 29.) Defendant also argues in its Reply that even if the information in the documents relates to plaintiff's merchandise, the documents were not submitted by the plaintiff to CBP and are thus exempt because they implicate the confidential commercial information of third parties, and since

plaintiff has failed to obtain an authorization from any of these parties for the release of their information, it cannot show that release of the information will cause competitive harm. (Def.'s Reply at 8-9.) These arguments are unpersuasive.

First, defendant, not plaintiff, has the burden of proof, and it cannot sustain this burden by faulting plaintiff for not obtaining authorizations from third parties. On the contrary, as is often the case, the defendant notifies the submitters of the confidential information, 5 and in many cases, files the submitter's objections to disclosure with the court to assist it in determining the propriety of the Exemption 4 claim. 6

FOOTNOTES

5 In fact, Exec. Order No. 12,600 § 1 provides for mandatory notification of submitters whenever an agency 'determines that it may be required to disclose' such information under FOIA. 52 Fed. Reg. 23781, 23781 (June 23, 1987).

6 Indeed, courts have rejected claims of competitive harm when supported only by agency affidavits. See, e.g., <u>N.C. Network for Animals v. USDA</u>, 1991 U.S. App. LEXIS 1555, 1991 WL 10757, at *4 (4th Cir. Feb. 5, 1991); <u>Wiley Rein & Fielding v. United States Dep't of Commerce</u>, 782 F. Supp. 675, 676 (D.D.C. 1992); <u>Brown v. Dep't of Labor, No. 89-1220</u>, 1991 U.S. Dist. LEXIS 1780, at *7 (D.D.C. Feb. 15, 1991).

**Nor may defendant, as it has done here, rely on generalized and conclusory allegations of competitive harm without so much as a showing of actual competition, an identification of the competitor whose interests are at issue, or an explanation as to how the release of specific information would result in harm to the competitor**. See, e.g., <u>Pub. Citizen Research Group v. FDA</u>, 337 U.S. App. D.C. 343, 185 F.3d 898, 906 (D.C. Cir. 1999) ('conclusory and generalized allegations of substantial competitive harm . . . cannot support an agency's decision to withhold requested documents.') (internal citation omitted). In particular, defendant cannot merely rest on a claim that 'this is not the type of information a commercial entity would give to a competitor. It would enable a commercial entity to learn a great deal about its competitor, including the identification of the supplier and the cost and amount of merchandise purchased.' (Stump Decl. P 29.)

Nor may defendant's categorical approach be sustained by reference to two

cases where entry documents were found to be exempt. In both *Timken II* and *Inter Ocean Free Zone*, the agency supported its position with detailed affidavits. For instance, in *Inter Ocean Free Zone*, the court relied on an affidavit from the company alleging competitive harm to sustain its finding, 982 F. Supp. at 872, and in *Timken II*, the court had a detailed affidavit from the competitor, a Japanese exporter, as well as letters from the counsel of the Japanese company and their related American importers of roller bearings. 531 F. Supp. 194, 197 n.2. See also Timken v. United States Customs Serv., 491 F. Supp. 557, 559-60 (D.D.C. 1980) ("Timken I") (relying on two detailed affidavits from the agency that demonstrated competitive harm to both the importer American Koyo Corporation ("AKO") and the exporter Koyo Seiko because the release of data could have 'allowed the competition to approximate the production costs of Koyo and the profit margin of AKC' and threatened competitive injury by revealing 'competitive strengths[,] . . . weaknesses," and the marketing strategy of Koyo companies and its distributors.) Thus, these cases do not support the approach advocated by defendant here." [Emphasis Added]

In this case the government has only presented generalized and conclusory statements of competitive harm. The government has presented no evidence of actual competition, an identification of the competitor whose interests are at issue or an explanation as to how the release of specific information would result in harm to the competitor.

### a.    **CBP Failed To Follow Executive Order 12,600**

There is no evidence that CBP advised the approximately 244 importers that Newsletter was seeking their names and addresses and did they object. [Herrick Dec. ¶ 13]

### b.    **CBP Has Released The Names And Addresses Of Companies Who Have Filed Entries With CBP**

American flagged vessels that undergo repairs outside of the United States are required to file a vessel repair entry with CBP at their first United States port of entry. In Peter S. Herrick, P. A. v. U. S. Customs and Border Protection, D.D.C. Civil Action No. 08-

0036(RBW) CBP provided a spread sheet with the requested names and addresses. [Herrick Dec. ¶ 14]

### c.    The Names And Addresses Newsletter Seeks Has Been Made Public

There has been a waiver of Exemption 4. This "exemption can serve no purpose once information...becomes public." Cottone v. Reno, 193 F. 3d 550, 555 (D.C. Cir. 1999). "Under our public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." [citations omitted] Cottone, supra, p. 554. "The burden of proving that withheld information is already in the public domain rests with the plaintiff, who must 'point[] to specific information in the public domain that appears to duplicate that being withheld.'" [citations omitted] N.Y.C., supra, p. 90.

PIERS obtains information about shipments arriving in United States ports from CBP. [PIERS Dec. ¶ 5]. PIERS obtains information from CBP's AMS data which includes the name, city and state of importers. [PIERS Dec. ¶ 8] PIERS data fields include the "consignee name & address." [PIERS Dec., Exhibit 1, p. 4]

In Gilda Industries, Inc. v. U. S. Customs and Border Protection, 457 F. Supp. 2d 6 (D.D.C. 2006) this Court at page 12 stated the Gilda had the initial burden of pointing to specific information that is a permanent public record. The exact name and address for Gilda who is one of the 244 importers is contained in the PIERS data. [Herrick Dec. ¶ 4; PIERS Dec.] The PIERS data is a permanent and public record dating to 1950. [Herrick Dec. ¶ 5; PIERS Dec.] While in Gilda, supra, p 13 this Court stated: "[v]ehicle [sic]

8

manifest information is inherently less detailed and less reliable than the Import Declaration filed by an importer." This may not always be the case since CBP has accused many an importer of fraud on their import declarations. [Herrick Dec. ¶ 7] Furthermore, PIERS data has been admitted by courts as evidence. [PIERS Dec. ¶ 12] Companies worldwide rely on the accuracy of PIERS data. [PIERS Dec. ¶¶ 6, 7 & 8]

### d.    <u>Newsletter Has No Competitors</u>

In <u>Gilda</u>, <u>supra</u>, p. 13 this Court was concerned that release of the requested names and addresses "...could allow Gilda to steal business away from or otherwise disrupt the operations of its competitors." Newsletter is a periodic publication of Peter S. Herrick, P.A. It is not a competitor of any importer. Newsletter has no intention to steal business or disrupt the operations of these importers.

### 2.    <u>Exemption 6</u>

Newsletter is not interested in importations by individuals.

## IV.   <u>DEFENDANT CAN SEGREGATE NON-EXEMPT INFORMATION</u>

Defendant can and must segregate the requested names and addresses. In <u>Mead Data Cent., Inc. v. United States Dept. of the Air Force</u>, 566 F. 2d 242, 260 (D.C. Cir. 1977) the court stated:

> "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material. It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions. In 1974, Congress expressly incorporated that requirement into the FOIA, which now states that 'any reasonably segregable portion of a record shall be provided . . . after deletion

of the portions which are exempt.' 5 U.S.C. § 552(b) (Supp. V 1975)."
(footnotes omitted)

Again the government is engaged in providing general and conclusory statements that
what is being requested must be protected. CBP can prepare a spread sheet with the names
and addresses exactly as it did for the vessel repair entries. [Herrick Dec. ¶14] The names
and addresses are not inextricably intertwined with exempt portions and they are included
in a permanent and public place. "One should normally presume that a request for
information under the FOIA is a request for all or any, not for all or none, of the
information." Public Citizen Health Research Group v. FDA, 185 F. 3d 898, 907 (D.C. Cir.
1999),

## CONCLUSION

There is an ample basis for this Court to distinguish this case from Gilda, supra. The
government has failed to demonstrate a likelihood of substantial competitive injury. The
exact information requested is in the permanent public domain. Since it is in the permanent
public domain Exemption 4 has been vitiated. The government has relied on generalized
and conclusory statements to support its Exemption 4 claims. CBP has already
demonstrated it is willing to provide names and addresses of companies who file entries with
CBP. CBP has demonstrated it can segregate names and addresses from the documents filed
with CBP.

WHEREFORE, Newsletter respectfully requests the Court to order the defendant to
immediately release the requested names and addresses.

Respectfully submitted,

_____/s/_____
PETER S. HERRICK, D.C. Bar #137935
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133
Tel. 305-858-2332
Fax. 305-858-6347
Email:  pherrick@bellsouth.net
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above-described motion was

sent by regular U. S. Mail to Judith A. Kidwell, Esq., Assistant U. S. Attorney, attorney for

defendant, 555 4th Street NW, Room E4905, Washington DC 20001 on July 15, 2008.


_____/s/_____
Peter S. Herrick

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 08-0478 (RMC) |
| U. S. CUSTOMS AND BORDER PROTECTION, ) | |
| Defendant. ) | |

## DECLARATION OF PETER S. HERRICK

I, Peter S. Herrick, declare the following to be a true and correct statement of facts:

1.    Plaintiff sought the names and addresses of the companies who are the subject of CBP's Beef Hormone Implementation Directive, Exhibit A, who imported products reference in the directive from the European Community during a specified period.  The pairing of HTSUS subheading 9903.02 with the name and address of an importer would not reveal that a particular importer entered one of the 27 specific goods covered by that subheading.

2.    CBP already releases information on imports to the public.  This information originates from the AMS manifest.  (19 C.F.R. §103.31(e)(3)).  Specifically the information released to the public is as follows:

Shipper's name and address @ 13 & 14

1

Consignee's name and address @ 15 & 16

Description of goods @ 20

3.     The only importer who has been identified as being the subject of the directive is Gilda Industries, Inc. because of its litigation.  From this litigation we know that Gilda imports toasted breads from Spain that are classified under HTSUS subheading 1905.40 free of duty, but subject to HTSUS subheading 9903.02.35 at a 100% duty rate.

4.     On July 1, 2008 I accessed a PIERS CD for November, 2002.  As Exhibit B I printed from this CD information on the importation of toasted breads by Gilda from Spain. *Inter alia* it has Gilda's name and address; its commodity description; its harmonized code number and its supplier.

5.     On July 1, 2008 I accessed the PIERS website; www.piers.com.  Exhibit C are documents I downloaded from this website.  A document entitled PIERS Trade Data Competitive Comparison details, *inter alia*, the quality of their data.  A document entitled PIERS TI details how any person who subscribes to their service can search their data base provided to them by CBP.  A document entitled PIERS U.S. Waterborne Import Historical Data details how PIERS retains a permanent public record of import data going back to 1950.  A document entitled PIERS Global Trade Intelligence at Work citing examples such as product marketing, remote sourcing, etc.

6.     Pairing the names and addresses with HTSUS subheadings would not reveal the specific description of a precise product by a particular importer.  HTSUS subheadings 9903.02.35 and 1905.40 in the first instance classifies rusks, toasted bread and similar toasted

products. This is not a precise description.  Turning to the Explanatory Notes to the HTSUS

subheading 1905.40 further describes as:  "**Rusks, toasted bread and similar products,**

whether or not sliced or ground, with or without the addition of butter or other fats, sugar,

eggs or other nutritive substances."   No competitor of Gilda's would know whether its

toasted bread contained butter and/or sugar and/or eggs by associating a name and address

with an HTSUS subheading.

       7.    The plaintiff is not seeking information from an entry or entry summary.  The

government has introduced no proof that the "description  of goods found in the Entry and

Entry Summary have more detail and assurance of accuracy that the generic description

found in a vessel's manifest.  In fact, CBP quite often  resorts to 19 U.S.C. §1592 because

of false entry information, e.g. United States v. Ford Motor Company, 463 F. 3d 1286 (Fed.

Cir. 2006).

      8. The directive lists more than 27 specific goods.  Just a cursory count of the products

from HTSUS subheadings 9903.02.21 to 47 lists approximately 47 products.  Further, the

directive notes there are many additional products to be included from chapters 1-97.

       9.    A competitor of an importer will get much more information from the PIERS'

reports than trying to deduce information combining a company's name and address to an

HTSUS subheading.  The PIERS reports have already identified markets of the importers;

their sources of supply; and, their channels of commerce.

      10.    The government has provided no evidence that any company for whom the

plaintiff has requested the name and address has ever requested confidentiality under 19

U.S.C. §1431.

11.    The government has provided no evidence that the release of the requested names and addresses would be manifestly unfair and cause substantial commercial harm to the importers who laboriously worked to establish these relationships.

12.    The PIERS records have already released the "supply chain" as a permanent public record.

13.    It is my understanding that CBP was required to notify the approximately 244 importers pursuant to Executive Order 12600 dated June 23, 1987 that our law firm wanted their name and address.  It does not appear that CBP followed this Executive Order.

14.    In an unrelated case, <u>Peter S. Herrick, P. A. v. U. S. Customs and Border Protection</u>, D.D.C. Civil Action No. 08-0036(RBW) my law firm requested the names and addresses of companies who had filed vessel repair entries with CBP.  These entries are very similar to the Entry and Entry Summary referred to by CBP.  CBP provided the requested names and addresses without hesitation.  A spreadsheet of the names and addresses of the companies filing vessel repair entries is enclosed as Exhibit D.

15.    On July 9, 2008 I entered into a contract for PIERS to provide me with a declaration to be used in this proceeding.  Enclosed as Exhibit E is the PIERS contract and payment.

4

I declare under penalty of perjury that the foregoing is true and correct, including

Exhibits A, B, C, D & E to the best of my knowledge and belief.

Executed on July ___15___, 2008.

Peter S. Herrick

# EXHIBIT A

About CBP  ·  Newsroom  ·  Border Security  ·  Trade  ·  Travel  ·  Careers

**Trade**

Automated Systems and
Operational Support

Basic Importing and
Exporting

Cargo Security

CBP Legal Decisions and
Publications

Priority Trade Issues

Trade Outreach

Trade Programs



Report
Suspicious Activity to
1-800-BE-ALERT

What's New
in Trade

Home / Trade / Priority Trade Issues / Agriculture /

## Beef Hormone Implementation

(04/10/2007)

CLA-2:FO:TP:I:OA YLT

### Purpose

As authorized by Sections 301 and 306 of the Trade Act of 1974, the United States Trade Representative (USTR) has determined modifications to the rates of duty on designated products from certain member countries of the European Communities (EC). This memorandum is to transmit those changes, implementation procedures, and program responsibilities for these duty modifications.

### Authorities

19 U.S.C. 1202, as amended
19 U.S.C. 1505, as amended
19 C.F.R. 24.3(e)
19 C.F.R. 24.3(a) and (b)(2)
19 C.F.R. 146.2, 146.32, 146.41
19 C.F.R. 152.2
Customs Directive 099 3550-071

### Responsibilities

Port Directors are responsible for ensuring the adequacy of bonds at cargo release and the collection of the 100 percent ad valorem rate of duty, with interest, if applicable, for importations of the designated products from the specified countries. Port Directors are also responsible for the accuracy of quota input, monitoring broker compliance with respect to this program, measuring the effectiveness of this program and implementing local measures, if needed, for improvement.

The Chief, Other Government Agency Liaison, Trade Programs, OFO is responsible for program coordination and implementation.

The Director, National Commodity Specialist Division, OR&R is responsible for ensuring resolution of classification issues.

National Import Specialists, NCSD, OR&R, in conjunction with National OAS, OST, are responsible for creating and maintaining selectivity criteria.

### Procedures

For all merchandise classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings listed below, that is entered, or withdrawn from warehouse, for consumption on or after July 29, 1999, a duty of 100 percent ad valorem will be collected. Subject merchandise for which estimated duties are deposited at the column 1 rate of duty are to be classified under the appropriate Chapter 99 subheading and liquidated at the 100 percent ad valorem rate of duty with any applicable interest on the underpayment of duties.

Merchandise classifiable in the HTSUS subheadings listed below that is admitted to U.S. foreign-trade zones on or after July 29, 199 must be admitted as "privileged foreign status" as defined in 19 C.F.R. 146.41.

New HTSUS Subheadings in Subchapter III, Chapter 99
**Articles the product of Austria, Belgium, Denmark, Finland, France, the Federal Republic of Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, or Sweden:**

**Meat of bovine animals, fresh or chilled (provided for in heading 0201)**

9903.02.21
Articles of subheading 0201.10.05, 0201.10.10, 0201.20.02, 0201.20.04, 0201.20.06, 0201.20.10, 0201.20.30, 0201.20.50, 0201.30.02, 0201.30.04, 0201.30.06, 0201.30.10, 0201.30.30 or 0201.30.50

9903.02.22
Articles of subheading 0201.10.50, 0201.20.80 or 0201.30.80

**Meat of bovine animals, frozen (provided for in heading 0202)**

9903.02.23
Articles of subheading 0202.10.05, 0202.10.10, 0202.20.02, 0202.20.04, 0202.20.06, 0202.20.10, 0202.20.30, 0202.20.50, 0202.30.02, 0202.30.04, 0202.30.06, 0202.30.10, 0202.30.30 or 0202.30.50

9903.02.24
Articles of subheading 0202.10.50, 0202.20.80 or 0202.30.80

9903.02.25
Meat of swine, fresh or chilled (provided for in subheading 0203.11, 0203.12, or 0203.19)

9903.02.26
Carcasses and half-carcasses of swine, frozen (provided for in subheading 0203.21)

9903.02.27
Hams, shoulders and cuts thereof, with bone in, of swine, frozen (provided for in subheading 0203.22)

9903.02.28
Edible offal of bovine animals, fresh or chilled (provided for in subheading 0206.10)

9903.02.29
Edible offal of bovine animals, frozen (provided for in subheading 0206.21, 0206.22 or 0206.29)

9903.02.30
Roquefort cheese (provided for in subheading 0406.40.20 or 0406.40.40)

9903.02.31
Onions (other than onion sets or pearl onions not over 16 mm in diameter) and shallots, fresh or chilled (provided for in subheading 0703.10.40)

**see also:**

**in Agriculture:**

Overview of Agriculture: A Priority Trade Issue (PTI)

Quota Information for Agricultural Products

What is the Importance of U.S. Agriculture Inspection?

The Agriculture Inspection Process
(pdf - 853 KB.)

Import Alerts

Wood Packaging Materials (WPM)

National Agriculture Release Program (NARP)

...more

**on cbp.gov:**

Entry, Summary, and Drawback Point of Contact

**9903.02.33**

Dried carrots, whole, cut, sliced, broken or in powder, but not further prepared (provided for in subheading 0712.90.10)

**9903.02.34**

Other prepared or preserved meat, meat offal or blood, of liver of any animal (provided for in subheading 1602.20)

**9903.02.35**

Rusks, toasted bread and similar toasted products (provided for in subheading 1905.40)

**9903.02.36**

Juices of any other single fruit, not elsewhere specified or included, not fortified with vitamins or minerals, unfermented and not containing added spirit, whether or not containing added sugar or other sweetening matter (provided for in subheading 2009.80.60)

**9903.02.37**

Roasted chicory and other roasted coffee substitutes and extracts, essences and concentrates thereof (provided for in subheading 2101.30)

**9903.02.38**

Prepared mustard (provided for in subheading 2103.30.40)

**Articles the product of France, the Federal Republic of Germany, or Italy:**

**9903.02.39**

Tomatoes prepared or preserved otherwise than by vinegar or acetic acid, whole or in pieces (provided for in subheading 2002.10)

**Articles the product of France or the Federal Republic of Germany:**

**9903.02.40**

Guts, bladders and stomachs of animals (other than fish), whole and pieces thereof, fresh, chilled, frozen, salted, in brine, dried or smoked (provided for in heading 0504)

**9903.02.41**

Soups and broths and preparations therefor (provided for in subheading 2104.10)

**9903.02.42**

Single yarn (other than sewing thread), not put up for retail sale, containing 85 percent or more by weight of artificial staple fibers (provided for in subheading 5510.11

**Articles the product of France:**

**9903.02.43**

Hams, shoulders and cuts of meat with of swine, with bone in, salted, in brine, dried or smoked (provided for in subheading 0210.11)

**9903.02.44**

Wool grease (other than crude wool grease) and fatty substances derived from wool grease (including lanolin) (provided for in subheading 1505.90)

**9903.02.45**

Chocolate and other food preparations containing cocoa, in blocks, slabs or bars, filled, weighing 2 kg or less each (provided for in subheading 1806.31)

**9903.02.46**

Lingonberry and raspberry jams (provided for in subheading 2007.99.05)

**9903.02.47**

Products suitable for use as glues or adhesives (other than animal glue, including casein glue, but not including fish glue) put up for retail sale as glues or adhesives, not exceeding a net weight of 1 kg (provided for in subheading 3506.10.50)

Please note that the United Kingdom is not included among the countries for items 9903.02.21 through 9903.02.47, HTSUS. Note also that items 9903.02.39 through 9903.02.47, HTSUS, are limited to the member countries listed for those items. Accordingly, the countries that are NOT listed for a subheading will remain at the column 1 rate of duty in chapters 1-97.

For classification purposes, the product descriptions are not intended to limit the scope of the products that are subject to the increased duties. The HTSUS subheading from chapters 1-97 cited in the description shall determine whether a product is subject to this additional duty.

Quota Merchandise

Please note that ABI transmissions cannot be made for articles classified in 9903.02.22 and 9903.02.24, HTSUS, because these articles remain subject to the additional duties provided for in 9904.02.01 through 9904.02.37, HTSUS. Field personnel processing these entries for QSUP should enter the 9904 classification in the first tariff field and the Chapter 2 number in the second tariff field. The 9903 number should be entered in the remarks column.

ABI transmissions for 9903.02.21 and 9903.02.23, HTSUS, are permitted. Field personnel will follow established quota procedures to process these entries.

Questions concerning this should be directed to the:
Office of International Trade
Trade Policy and Programs
( Entry, Summary, and Drawback Point of Contact )

**How to Use the Website**

**Featured RSS Links**

**What's New** 🔳 **Contacts** 🔳 **Ports** 🔳 **Questions** 🔳 **Forms** 🔳 **Sitemap**

EEO | FOIA | Privacy Statement | Get Plugins | En Español

**Department of Homeland Security**

**USA.gov**

Inquiries (877) CBP-5511  |  International Callers (703) 526-4200  |  TTD (866) 880-6582  |  Media Only (202) 344-1780

# EXHIBIT B


# AMS Bill of Lading Detail
### Source: AMS Database

**Shipper**
GENERAL NOLI
VALENCIA CALLE REINA 6-4 PISO 46011
SPAIN   SPAIN

**Consignee**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Notify Party**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Also Notify**

## Packaging Information
| | | | |
|---|---|---|---|
| **Weight:** | 7090 KG | **Measurements:** | 35 CM |
| **Quantity:** | 1696 BOX | **TEU's:** | 2.00 |

## Shipment Detail
**Carrier:** MSCU - MEDITERRANEAN SHIPPING CO
**Vessel:** P&O NED. FALCON
**Voyage:** 504R
**B/L:**   MSCUJ1675923
**Pre Carrier:**   BILBAO
**Lloyd's Code:**   8619053
**Inbond Code:**
**Estimated Value:** $ 11,875.00

**Country of Origin:**  SPAIN
**Coastal Region:**   EAST
**US Port:**  5201    MIAMI
**For Port:** 42737    LE HAVRE
**US Dest:**
**For Dest:**
**Mode of Transport:** 10
**Arrival Date:**   11/24/2002

## AMS Commodities

| Container | Qty | Description |
|---|---|---|
| MSCU8318231 | 1696 | TOASTED BREAD |

## PIERS Commodities

| Qty | Units | Commodity Description | | Harm Code | JOC Code |
|---|---|---|---|---|---|
| 1696 | CTN | TOASTED BREAD | | 190540 | 130100C |

*Note: Bills of lading that contain multiple commodities will list the total weight and TEU's for the entire bill of lading*

This listing contains information which is the property of the Journal of Commerce. it is provided for the exclusive use of our clients in accordance with our purchase agreement.
may not be sold or released for the benefit of a third party. Commonwealth Business Media,Inc 33 Washington St., 13 fl.,Newark,NJ 07102

# EXHIBIT C

**PIERS**
Global Intelligence Solutions®

Find Out How Companies Use PIERS | Complete Product Catalogue | Become a Subscriber

About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insights

PIERS Home > Trade Data > Competitive Comparison

- Competitive Comparison

## PIERS Trade Data Competitive Comparison

The data that is at the core of PIERS trade databases – selected information gathered from the ship manifests and bills of lading – is available to the public under the Freedom of Information Act, subject to U.S. Customs regulations. Since PIERS was launched over 30 years ago, competitors have routinely entered the marketplace as purveyors of this raw data. None has yet matched PIERS on the comprehensiveness, verifiable quality, or added value of its trade information.

|  | **PIERS** | **Competition** |
|---|---|---|
| **Experience** | • Roots go back to 1827 founding of the *Journal of Commerce*.<br>• Launched by the JoC over 30 years ago as its first venture in electronic information.<br>• Created the current trade data business with its 1980s' Freedom of Information Act filings to obtain access to Customs documents. | • Entered business after the year 2000. |
| **Data Coverage** | • U.S. containerized imports, bulk and breakbulk, as documented by both Automated Manifest System (AMS) and hardcopy filings.<br>• U.S. containerized exports, bulk and breakbulk, as documented by bills of lading.<br>• Historical data on cargoes moved through U.S. ports: available electronically back through 1984, on microfiche back through the 1950s.<br>• Latin American and Asian cross-border trade data, collected in cooperation with national Customs authorities. | • U.S. containerized imports as received from the Automated Manifest System (AMS) – does not include bulk/breakbulk data, does not capture non-AMS filings.<br>• *No export coverage.*<br>• Historical data available electronically back through 2003.<br>• *No international trade data.* |
| **Data Quality** | • Port reporters on-site verify data accuracy.<br>• Proprietary rules and audit protocols identify and resolve missing and/or inaccurate data elements.<br>• Records are cross-checked against maritime industry records – including Lloyds Ship Register and the carriers' own data. | • *No staff deployed for data collection or verification.*<br>• AMS data is relayed to customers as is – without corrections or amendments. |
| **Value-Added** | • Translates into standardized shipping records.<br>• Assigns harmonized tariff codes and commodity descriptions.<br>• Estimates value of cargoes.<br>• Enhances transaction detail with background information on trading parties.<br>• Records vehicle identification numbers (VINs). | • AMS data is relayed to customers *as is* – without corrections or amendments. |
| **Pricing** | • Subscription-based pricing reflects client's individual selection of import and/or export datasets (choice of geographic regions, tradelanes, commodities, etc.) relevant to business needs. | • Subscription-based pricing ... with only one option available (one year's subscription to current + two years' historical import data). |

**PIERS import-export trade databases are unique: This is global commercial intelligence you'll find nowhere else in the world.**

PIERS TI™ (Trade Intelligence)

**Page Index**
Use this Data
Subscription Information
See a Sample
Request More Info
Back to Product Catalogue

PIERS
U.S. Waterborne Import
Historical Data

Maritime Research

PIERS TI (Trade
Intelligence)

PIERS Trade Profiles

PIERS Trade Finance

Indian Import-Export
Trade Database

Korean Import-Export
Trade Database

Mexican Waterborne Trade
Database

South American Trade
Database

Anytime, anywhere Web access — with sophisticated search and report-generation capabilities -- to PIERS U.S. import and export data, from the latest data available (government-authorized for release two weeks after filing) to up to 36 months of historical data.

**Sources:** This is information gathered by PIERS directly from the **bills of lading** and **manifests** filed both manually and through the **U.S. Customs** Automated Manifest System (AMS). PIERS adds value by auditing, standardizing and validating the data, and by assigning harmonized tariff codes to all manifest commodity descriptions.

Features:

**PIERS TI** is a **three-step application** that makes it easy to **Search** the PIERS database, view and organize your **Results**, and generate a variety of **Reports**.

**Step 1: Select Search criteria.**

Search up to 12 months and retrieve up to 99,000 records at a time. Save search and report formats for easy periodic updating and comparison. Choose from:

- **Basic search criteria:** Find the basic who, what, when, and where of U.S. trade with the world. **PIERS TI Smart Fields** automatically hunt for search terms through multiple relevant fields to capture more data.

- **Advanced search criteria:** Conduct more detailed searches, such as shipments by bill of lading number, carrier, or twenty-foot equivalent unit (TEU) count. Or use **Smart Fields** to search across multiple fields for a key term – a company name, for example.

- **Miscellaneous search criteria:** Search the database by specialized categories, such as the estimated value of the cargo.

**Step 2: Organize Results.**

View and organize your search results in several ways:

- Select from a **range of field combinations** to view your results.

- Sort results **numerically** or **alphabetically**.

- Mark or unmark records to **include in** or **remove from Reports**.

**Step 3: Generate Reports.**

Reports can be displayed and printed in PDF format, and/or downloaded (up to 20,000 results per search) directly into MS Excel* spreadsheets. Select among a choice of **five basic types of reports** (offering more than 20 possible report options in all):

- **Detail Reports** provide a complete picture of an import or export transaction — supplying all the details on individual bills of lading, including identifying information of the parties involved in the trade, shipment detail, and detailed commodity information.

- **Profile Reports** survey the activities of the parties to a trade: the foreign shipper (the supplier), the consignee (importer), or the notify party — and reveal what, how much and with whom they are trading. U.S. export data includes profile reports of the U.S. shippers, the commodities and destination countries in U.S. export trade.

- **Summary Reports** aggregate transactions by weight, TEUs and shipments, enabling users to review summaries by specific criteria, such as foreign shippers or U.S. exporters, commodities and trading countries.

- **Ranking Reports** list the top foreign shippers (suppliers), U.S. shippers (exporters), U.S. consignees (importers), commodities or countries – with graphs making the information accessible at a glance.

- **Trending Reports** track monthly trends in U.S. export trade by country, commodity or U.S. exporter.

**Use this data:**

- **Identify & qualify new suppliers:** Search by harmonized tariff code, commodity description, geographic location; sort by volume, estimated value, level of activity.

- **Find new customers:** Look up consignees or notify parties; search by commodity, product, brand; follow purchasing patterns to spot importers of the products you sell.

- **Detect emerging market demand:** See where the need for products like yours is rising — or being met by competitors.

...purchase market shares... best-sellers by activity, volume, dollar value; identify buyers' mainstay suppliers.

- **Monitor the competition:** Weekly updates keep you on top of your industry's or sector's waterborne commerce.

- **Protect your intellectual property and brand equity:** See that your branded products get to the markets they were meant for (and detect when they've been diverted or counterfeited).

**Subscription Information:**

An annual subscription to **PIERS TI** provides unlimited access via the Web to PIERS U.S. import data, U.S. export data, or both, from the current release to as far back as 36 months.

> *Microsoft Excel is a registered trademark of Microsoft Corporation.*

See a Sample

Request More Information

Back to Product Catalogue

PIERS Home > Complete Product Catalogue > US Waterborne Import Historical Data

**PIERS Products**
i-PIERS

U.S. Waterborne Import Historical Data

Maritime Research

**Trade Intelligence PIERS.com**

PIERS TI (Trade Intelligence)

PIERS Trade Profiles

PIERS Trade Finance

**PIERS International Products**

Indian Import-Export Trade Database

Korean Import-Export Trade Database

Mexican Waterborne Trade Database

South American Trade Database

# PIERS U.S. Waterborne Import Historical Data

Historical information on **U.S. waterborne imports.**

*Sources:* The PIERS archives.

Features:

- U.S. waterborne import data from **1950 through 1980 ...** bill of lading and manifest data stored on microfiche: a PIERS information specialist will assist in researching this material

- U.S. waterborne import data from **1980 through 1991 ...** bill of lading and manifest data available in electronic format: a PIERS information specialist will assist in developing customized datasets.

- U.S. waterborne import data from **1992 through today ...** bill of lading and manifest data enhanced with additional information on foreign shippers, estimated value of goods - all the data fields provided by PIERS U.S. Waterborne Import product - available in electronic format: a PIERS information specialist will assist in developing customized datasets.

Data fields include:

- **Who ...** bill of lading number, carrier, consignee name & address, in-bond code, manifest number, notify parties' names & addresses, pre-carrier, shipper name & address, vessel, vessel registry, voyage number.

- **What ... ...** AMS detailed commodity description, container number, harmonized tariff code, marks & numbers, PIERS commodity description.

  Cargo quantity/unit of measure; cargo weight & volume; container size.

- **When ...** arrival date, departure date, lading date.

- **Where ...** coastal region, country of origin, foreign destination, foreign port name & code, U.S. final destination, U.S. port name & code.

Use this data:

- **Discover authoritative evidence for legal cases ...** PIERS historical data has been accepted as evidence in establishing liability in asbestos and other toxic tort and product liability cases.

- **Monitor contract and trade agreement compliance ...** PIERS detailed information clearly establishes chains of custody, uncovers breaches in sole-sourcing agreements, yields evidence of dumping, gray market diversions, etc

- **Protect intellectual property ...** PIERS data is used to trace counterfeiting, trademark piracy, parallel importing, bootlegged shipments.

- **Build long-range market studies ...** PIERS is a reliable and accessible source of data on decades-old commercial transactions and trade patterns.

See a Sample

Request More Information

Back to Product Catalogue

**Page Index**

Features
Data Fields
Data Applications
See a Sample
Request More Info
Back to Product Catalogue

PIERS Home > How Companies Use PIERS >

**Articles**

Attack of The Clones

Bright Outlook for Ag Exports

Cleared for Take-Off

Details Count in a Tight Market

Detecting Dumping

Detecting Trademark Pirates

Discovering Cost-saving Opportunities

Discovering a Global Dimension

A Few Good Sources

Fixing Liability

Keeping up as Customers Go Global

Measuring New Markets

Opening the Door to Sales

Port of San Diego Comes Back to PIERS

Protecting MPEG Patents

Remote Sourcing

Sharper Focus for Product Marketing

Shortcut to Settlement

Sourcing Medical Products

Tips from a PIERS Users' Conference

Tracing Parallel Imports

Tricks of the Investigators Trade

# PIERS Global Trade Intelligence at Work

**Businesses with a global perspective** use PIERS trade intelligence to:

- Find new suppliers, new markets and new business opportunities
- Benchmark performance against the competition
- Defend intellectual property against infringement and counterfeiting
- Support strategic decision-making
- Arbitrate trade disputes
- Understand international trade trends and forecasts

To see how commercial enterprises and government agencies have put PIERS to work for them, browse these **customer applications stories:**

**Attack of the Clones**
The car may be exported, but its cloned VIN can stay behind to cover illegal traffic in stolen or salvaged cars — as **Carfax** found out with some help from PIERS intelligence. Read more

**Bright Outlook for Ag Exports**
Ocean transport rates make the Pacific Rim the market of choice for U.S. ag exports. The **USDA** uses PIERS data to report on ocean transport trends. Read more

**Cleared for Take-Off**
Most business initiatives fail because they're launched without an unbiased appraisal of market realities. PIERS can supply the hard facts about your markets and your competitors. Read more

**Details Count in a Tight Market**
The chemical industry is experiencing a resurgence ... but with higher costs and heated competition, it's critical to keep close track on the marketplace - as **Arkema Inc.** does. Read more

**Detecting Dumping**
PIERS makes it easier for **Chattem Chemicals** to monitor shipping for below-market-price imports ... and compile the evidence for antidumping claims. Read more

**Detecting Trademark Pirates**
A California-based maker of color cosmetics had its trade name pirated; PIERS helped identify the culprit. Read more

**Discovering Cost-saving Opportunities**
For **PointTrade Services, Inc.** an international trade and customs services provider and consultancy, PIERS **Trade Profiles** is a tool for identifying and estimating savings for client importers. Read more

**Discovering a Global Dimension**
One bank identified untapped demand for its lucrative trade financing products within its existing customer base with the help of PIERS import-export trade data. Read more

**A Few Good Sources**
The **Army Corps of Engineers** relies on a few good sources for the information that guides its planning, including the U.S. Census, Customs, and PIERS. Read more

**Fixing Liability**
PIERS historical data can supply the evidence needed in asbestos cases where the claim of injury is made years — or decades — after exposure. Read more

**Keeping up as Customers Go Global**
Commercial services providers use **Trade Profiles** to keep up with — or, better yet, anticipate — the needs of their customers as they move into world markets. Read more

**Measuring New Markets**
A Gulf Coast barge company turned to PIERS for the hard data that will test the feasibility of their business model. Read more

**Opening the Door to Sales**
**Trade Profiles** supports sales tactics and marketing strategy at **Lynden International**, providers of freight transport and logistics services. Read more

**Port of San Diego Comes Back to PIERS**
The Port of San Diego tried an alternate provider of trade data only to find critical details missing. Read more

**Protecting MPEG Patents**
**Audio MPEG, Inc.**, finds PIERS Trade Intelligence is an invaluable asset in its business of licensing patents in the consumer electronics industry. Read more

**Remote Sourcing**
Is there any substitute for being there when it comes to finding and qualifying new sources for global supply chains? PIERS trade data supplies an alternative. Read more

**Sharper Focus for Product Marketing**
**LINPAC Materials Handling** uses **Trade Profiles** to focus on companies in the industries — and shipping the volumes — its packaging solutions best serve. Read more

**Shortcut to Settlement**
PIERS import data bolstered **Zeta Espacial's** claim that its U.S. distributor had not honored their exclusive agreement. Read more

**Sourcing Medical Products**
An international distributor finds PIERS is "tremendous resource" for locating new vendors – and monitoring existing suppliers. Read more

**Tips from a PIERS Users' Conference**
A PIERS Users' Conference included a panel of customers who discussed how they use commercial intelligence in their companies — **Trans-i Technologies, Inc.**, and **Dow.** Read more

**Tracing Parallel Imports**
Gray market goods undermine prices and tarnish trade names; areas where few importer **Khong Guan**... Read more

**Tricks of the Investigators Trade**
The **James Mintz Group** specializes in "finding hidden business facts quickly, quietly, cost-effectively."
Read more

# EXHIBIT D



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

June 26, 2008

VIA ELECTRONIC TRANSMISSION
pherrick@bellsouth.net

Mr. Peter S. Herrick, Esq.
Peter S. Herrick, P.A.
3520 Crystal View Court
Miami, Florida 33133-4025

Re: <u>Herrick v. U.S. Customs and Border Protection,</u>
Civ. Act. No. 08-0036 (JR)

Dear Mr. Herrick:

As was requested in the aforementioned FOIA matter, please find attached a three page spreadsheet with the names and addresses of companies that have paid vessel repair duties for the period 2/1/2006 through 11/15/2007.

I am also sending you a Notice of Dismissal. Should you need anything further, please do not hesitate to call me at (202) 305-1334.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

/s/

By:    _____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| AMBERMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| AMERICA CARGO TRANSPORT INC | 16300 CHRISTENSEN ROAD | SUITE 203 | TUKWILA | WA | 98188-3403 |
| AMERICAN OVERSEAS MARINE CORPORATION | 100 NEWPORT AVENUE EXT | | QUINCY | MA | 02171-1734 |
| AMERICAN ROLL ON ROLL OFF | 1 MAYNARD DRIVE | | PARK RIDGE | NJ | 07656-1878 |
| APL MARITIME LTD | 6901 ROCKLEDGE DRIVE | | BETHESDA | MD | 20817-1817 |
| CENTRAL GULF LINES INC | PO BOX 1987 | | MOBILE | AL | 36633-1987 |
| CROWLEY PETROLEUM SERVICES INC | 9487 REGENCY SQUARE BOULEVARD | | JACKSONVILLE | FL | 32225-8126 |
| E-SHIPS INC | 1 WHITEHALL STREET | | NEW YORK | NY | 10004-2109 |
| FORTUNE MARITIME LLC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |
| GLOBAL CONTAINER LINES LTD | 100 QUENTIN ROOSEVELT BOULEVARD | SUITE103 | GARDEN CITY | NY | 11530-4843 |
| HORIZON LINES LLC | 1675 LINCOLN AVENUE | BUILDING 300 | TACOMA | WA | 98421-2906 |
| INTERMARINE LLC | 365 CANAL STREET | SUITE 2400 | NEW ORLEANS | LA | 70130-1142 |
| ISS MARINE SERVICES INC | 118 NORTH ROYAL STREET | SUITE 400 | MOBILE | AL | 36602-3603 |
| K-SEA TRANSPORTATION LLC | 2700 WEST COMMODORE WAY | | SEATTLE | WA | 98199-1246 |
| LIBERTY MARITIME CORPORATION | 1979 MARCUS AVENUE | SUITE 20 | NEW HYDE PARK | NY | 11042-1002 |
| LOWER LAKES TRANSPORTATION COMPANY | 625 MAIN STREET | PORT DOVER | CANADA | ON | N0A1N0 |
| LUXMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| MAERSK LINE LTD | 1 COMMERCIAL PLACE | 20TH FLOOR | NORFOLK | VA | 23510-2103 |

FOIA 2008F1621

1 of 3

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| MAREMAR TANKER CORPORATION | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| MARINE TRANSPORT MANAGEMENT INC | 9487 REGENCY SQUARE BOULEVARD | | JACKSONVILLE | FL | 32225-8126 |
| MAR-TEX SHIPPING/CHARTING AGENCY | 1314 TEXAS STREET | SUITE 814 | HOUSTON | TX | 77002-3500 |
| MATSON NAVIGATION COMPANY INC | 555 12TH STREET | | OAKLAND | CA | 94607-4046 |
| MORAN TOWING & TRANSPORTATION | 50 LOCUST AVENUE | | NEW CANAAN | CT | 06840-4737 |
| OCEAN BULK SHIPS INC | 1209 NORTH ORANGE STREET | | WILMINGTON | DE | 19801-1120 |
| OSG CAR CARRIERS INC | 666 3RD AVENUE | | NEW YORK | NY | 10017-4011 |
| SARGEANT MARINE INC | 3020 NORTH MILITARY TRAIL | SUITE 100 | BOCA RATON | FL | 33431-1805 |
| SEABULK INTERNATIONAL INC | 2200 ELLER DRIVE | | FORT LAUDERDALE | FL | 33316-0000 |
| SEALIFT INC | 68 WEST MAIN STREET | SUITE 200 | OYSTER BAY | NY | 11771-2298 |
| SEA STAR LINE LLC | 200 NORTH DAIRY ASHFORD STREET | | HOUSTON | TX | 77079-1101 |
| SHELL OFFSHORE INC | 200 NORTH DAIRY ASHFORD STREET | | HOUSTON | TX | 77079-1101 |
| STRONG PATRIOT LLC | 68 SOUTHFIELD AVENUE | SUITE 210 | STAMFORD | CT | 06902-7237 |
| STRONG VESSEL OPERATORS LLC SVO | 68 SOUTHFIELD AVENUE | SUITE 210 | STAMFORD | CT | 06902-7237 |
| TECO OCEAN SHIPPING | 702 NORTH FRANKLIN STREET | FLOOR 5 | TAMPA | FL | 33602-4440 |
| THE FISHING COMPANY OF ALASKA INC | 200 WEST THOMAS STREET | SUITE 440 | SEATTLE | WA | 98119-4215 |
| TRANSATLANTIC LINES LLC | 6 LINCOLN AVENUE | | GREENWICH | CT | 06830-5751 |
| TRANSBULK CARRIERS INC | 666 3RD AVENUE | | NEW YORK | NY | 10017-4011 |

Names and Address of Companies -- Vessel Repair Duties During Period 2/01/2006 - 11/15/2007

| Company Name | ADDRESS 1ST LINE | 2ND LINE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| U.S. MARITIME ADMINISTRATION | 400 7TH STREET SW | ROOM 2122 | WASHINGTON | DC | 20590-0001 |
| USS CHARTERING LLC | PO BOX 2945 | | EDISON | NJ | 08818-2945 |
| VICTORY MARITIME INC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |
| WALLENIUS WILHELMSEN LOGISTICS | 188 BROADWAY | | WOODCLIFF LAKE | NJ | 07677-8067 |
| WATERMAN STEAMSHIP CORPORATION | PO BOX 2008 | | MOBILE | AL | 36652-2008 |
| WILSON SHIPPING COMPANY LLC | 68 WEST MAIN STREET | | OYSTER BAY | NY | 11771-2284 |

FOIA 2008F1621

3 of 3

# EXHIBIT E

# SUBSCRIPTION AGREEMENT

**PIERS**
Global Intelligence Solutions

Salesperson: Aliet Martinez          Phone: 1-800-991-9994 x 145          Fax: 954-628-0085

Client:          **Peter S. Herrick, Attorney**

Client Contact:          **Peter S. Herrick**

Client Address:          **3520 Crystal View Ct - Miami, FL 33132**

This Subscription Agreement and the accompanying PIERS User License Agreement set forth the terms and conditions upon which Commonwealth Business Media, Inc., acting through its PIERS division ("PIERS"), will make certain PIERS Product(s) available to the Client identified above. Client acknowledges that it has read and accepted the terms and conditions of the EULA.

1.  **Effective Date:**          **07/09/2008**
2.  **PIERS Products:** The following PIERS Products are subject to this Agreement:
    ☒ PIERS Declaration

    **Medium:**
    ☒ E-mail

    **Subscription Frequency:**
    ☒ One Time

    **Special Comments**
    _____**ORDERING A PIERS CERTIFICATION**_____

5.  Fees: Client shall pay a Fee for the selected PIERS Product(s) as follows:

    PIERS Certification - $500

    **Please check the appropriate payment type:**

    ☑ Credit Card
    Credit Card Type: *MC*
    Credit Card Number: *5888 3200 2084 2135*          Expiration Date: *01/09*          Approval Code: *800*
    Name as it appears on credit card: *Peter S Herrick*          Zip Code (of credit card billing address): *33133*

    **Credit CARDHOLDER'S SIGNATURE:**

| For PIERS | For Client |
|---|---|
| Signed: ***Aliet Martinez*** | Signed: |
| Print Name: **Aliet Martinez** | Print Name: *Peter S Herrick* |
| Date: | Date: *07/09/08* |
| Title: **Regional Manager** | Title: *Attorney* |
| Phone: **1-800-991-9994 x 145** | Phone: *305 358 2832* |
|  | E-Mail: *pherrick @ Bellsouth net* |

● Page 2

July 9, 2008

For PIERS internal purposes only:  WFOrder No. _____ _____

# PIERS User Agreement

The following terms and conditions are incorporated in and are a part of the attached Subscription Agreement between PIERS and the Client identified in the Subscription Agreement.

1.    **License**

PIERS grants Client a non-exclusive, non-transferable, revocable license, without the right to sublicense, to download and use Licensed Information identified in the Subscription Agreement, solely and exclusively in connection with the pursuit of Client's business by the Authorized Employees designated in the Subscription Agreement, during the Term of this Agreement, subject to the terms of this Agreement. PIERS grants Client no other right or license with respect to Licensed Information, whether by implication, estoppel, operation of law, or otherwise. All rights not expressly granted to Client by this Agreement are reserved to PIERS or its licensors.

2.    **Restrictions on Use of Licensed Information**

Client and its Authorized Employees shall **not**: (a) directly or indirectly, allow any third party to download or use Licensed Information; (b) disclose the substance of Licensed Information to any third party, except that Authorized Employees may communicate discrete data derived from Licensed Information to third parties in order to carry out Client's business; (c) modify, reverse engineer, disassemble, or decompile any software programs associated with Licensed Information; (d) store or transmit Licensed Information in or to any web site, newsgroup, mailing list, or electronic bulletin board, or regularly or systematically store Licensed Information in electronic or print form, without the prior written consent of PIERS.  Any breach of these restrictions may result in immediate termination of this Agreement and liability for damages.

3.    **Ownership and Confidentiality of Licensed Information**

Client acknowledges that PIERS and its licensors own all right, title and interest in and to Licensed Information and all associated software and other materials. Client agrees that it shall not remove, obscure, or modify any copyright, trademark, or other form of proprietary notice or indicia of origin on Licensed Information, or use PIERS's trademarks or other form of proprietary notice or indicia of origin absent the prior written consent of PIERS.  Client further acknowledges that Licensed Information contain valuable trade secrets and confidential information of PIERS and its licensors, and Client agrees to take all reasonable measures to maintain the confidentiality of Licensed Information and to ensure that it is not downloaded, used, or disclosed by or to third parties.

4.    **Injunctive Relief**

Client acknowledges that any unauthorized use, disclosure, or transfer of Licensed Information may diminish substantially the value of such Information and cause PIERS irreparable harm.  Therefore, Client agrees that PIERS shall be entitled to injunctive or other equitable relief, without any requirement to post an injunction or surety bond, in addition to all available legal remedies, arising from or related to any breach of the obligations of Client or its Authorized Employees of the provisions of Sections 1 through 3.

5.    **Payment of Subscription Fee and Taxes**

PIERS will issue monthly invoices in U.S. dollars to Client for the Subscription Fee(s) set forth in the Subscription Agreement, plus payment of all applicable sales and other taxes which may be levied or assessed based on Client's payment for, or use of, Licensed Information, and any other amounts that may be due and payable under this Agreement.  Client shall pay each invoice within thirty (30) days of the date of the invoice.  All payments are non-refundable.

6.    **Term and Termination**

This Agreement shall be in effect for the Initial Term set forth in the Subscription Agreement.  Either party may terminate a subscription on or after the subscription terms by giving the other party not less than thirty (30) days' prior written notice.  PIERS may terminate this Agreement, with immediate effect upon written notice to Client, if Client breaches a material provision of this Agreement.  Upon the termination or expiration of this Agreement for any reason, Client shall promptly remove or delete all software and data related to Licensed

*PIERS is a division of Commonwealth Business Media, Inc.*

● Page 3

Information from all computer equipment and electronic memories, and return all tangible copies of Licensed Information and associated documentation to PIERS.

7.    **Disclaimer of Warranties**

Client expressly acknowledges that Licensed Information and associated data are derived from third-party sources, such as ship manifests and other documents submitted to the United States Customs Service by shippers, freight forwarders, and consignees, over which PIERS has no control, and that PIERS has not made, and does not make, any representations whatsoever as to the accuracy, completeness, reliability, or timeliness of Licensed Information. PIERS accordingly makes no warranties with respect to Licensed Information or associated software, and **DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OF LICENSED INFORMATION.**

8.    **Disclaimer of Liability**

PIERS SHALL HAVE NO LIABILITY TO CLIENT OR ANY OTHER ENTITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFIT OR GOODWILL, OR OTHER DAMAGES OR LOSSES, NO MATTER HOW CAUSED, FOR ANY CLAIM OR DEMAND ARISING OUT OF OR RELATING TO: (i) THIS AGREEMENT OR ITS PERFORMANCE; (ii) THE CORRUPTION OR ERASURE OF DATA OR INFORMATION TRANSMITTED, RECEIVED, OR STORED IN ANY MANNER; and (iii) ANY SOFTWARE ERRORS OR BUGS, COMPUTER VIRUSES, OR ANY INABILITY TO ACCESS THE INTERNET OR SERVERS HOSTING LICENSED INFORMATION.

9.    **Force Majeure**

PIERS shall not be deemed to be in default for any delay or failure in performance or interruption of the delivery of Licensed Information resulting directly or indirectly from any cause or circumstance beyond its reasonable control, including but not limited to failure of electronic or mechanical equipment or communication lines, telephone or other interconnect problems, computer viruses, unauthorized access, theft, operator errors, severe weather, earthquakes, or natural disasters, strikes or other labor problems, wars, or governmental restrictions.

10.    **Unauthorized Use**

Client agrees to immediately notify PIERS if it becomes aware of any unauthorized use of Licensed Information or any Software.

11.    **Entire Agreement and Amendment**

This User Agreement and the attached Subscription Agreement constitute the entire and complete understanding of the parties and supersede all prior communications, representations, understandings, and agreements, whether oral or written, by or between the parties. This Agreement may only be amended or modified by written instrument executed by both parties.

12.    **Governing Law and Forum Selection**

The parties consent and agree that the construction, interpretation, and enforcement of this Agreement shall be governed by the laws of the United States of America and the State of New Jersey, without reference to any choice of law principles, and that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. The parties further consent and agree that the courts of the State of New Jersey or the United States District Court for the District of New Jersey shall have exclusive jurisdiction over any claim or dispute arising under or related to this Agreement. Client hereby irrevocably waives any objection to the jurisdiction, process, or venue of any such court, and to the validity, effectiveness, execution, and enforcement of any order or judgment (including, but not limited to, judgment by default) of any such court in relation to this Agreement.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUSTOMS & INTERNATIONAL TRADE NEWSLETTER, <br><br> Plaintiff, <br><br> v. <br><br> U. S. CUSTOMS AND BORDER PROTECTION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 08-0478 (RMC) <br> ) <br> ) <br> ) <br> ) <br> ) <br> / |

## PIERS DECLARATION

1.  My name is Aliet Martinez. I'm over 21 years of age. I have personal knowledge of the facts stated in this declaration, and the facts stated in this declaration are true and correct.

2.  I am a Regional Manager at PIERS Global Intelligence ("PIERS"). PIERS is an acronym, which stands for the Port Import Export Reporting Service.

3.  PIERS maintains a comprehensive database of timely, accurate, import and export information on all the cargoes moving through ports in the United States, Mexico, Latin America, and Asia. PIERS collects data from over 25,000 bills of lading *every day.*

4.  PIERS has access to import and export data through the U.S. Freedom of Information Act and other federal laws. In fact, federal law authorizes press organizations, such as PIERS, to copy certain publicly available shipping documents.

5.  PIERS obtains information about shipments arriving to U.S. ports from vessel manifests and from the U.S. Customs & Border Protection's Automated Manifest System ("AMS") data tapes. Reporters throughout the United States—including Alaska, Hawaii, and Puerto Rico—collect import information from all U.S. ports.

6.  PIERS' information is verified by PIERS' quality-control staff, members of which audit PIERS' records every month. They check PIERS' information against a list of vessels arriving at U.S. Ports. PIERS' obtains this list from the U.S. Customs &

Border Protection ("CBP"). PIERS does not alter the information in any way. If there is

a discrepancy between PIERS' information and the information from the CBP, PIERS

requests the appropriate documentation either from the CBP, or the shipping company,

and if necessary corrects any error. In addition, shipping companies and importers that

subscribe to PIERS verify their own shipments in PIERS' system and notify PIERS of

any discrepancies, which PIERS verifies and, if necessary, corrects.

7.     Companies worldwide rely on the data PIERS collects to find new

suppliers, new markets, and new business opportunities; to compare their performance to

their competitors'; to defend intellectual property rights against infringement and

counterfeiting; to understand international trade trends; to support strategic decision-

making; and to resolve trade disputes in arbitration and litigation. Shipping companies

and importers that subscribe to PIERS even use PIERS to verify their own shipments.

8.     PIERS has the most complete commercially available collection of AMS

data. The AMS data details each importer's name, city and state, each exporter's name,

city and country, each export shipment's port of departure and destination, a description

of the commodity and its weight, quantity, unit of measure, and PIERS product code, and

vessel name.

9.     AMS Data comes directly from the CBP. PIERS does not amend, edit, or

consolidate this data.

10.    PIERS employees and representatives review the data underlying the

AMS Data in the regular course of PIERS' business, and it is the regular course of

PIERS's business for a PIERS employee or representative—with knowledge of the AMS

Data—to obtain the underlying documents and data from the CBP. CBP obtains this

information and documents pursuant to CBP's official obligations, and CBP is obliged to

provide access to this data.

11.    True and correct copies of "Import Bill of Lading Detail" are attached

hereto. This report is a data compilation that PIERS prepared in the regular practice of its

ordinary business activities. The information contained in the report was recorded at or

near the time the data was collected from AMS data by a person with knowledge of that

data.

12.    Courts routinely admit in evidence PIERS reports like the report in

Exhibit 1. I have personal knowledge of such instances.

13.    With three exceptions—"TEU's," "Estimated Value," and "PIERS

COMMODITY CODES"—all the information in the Import Bill of Lading Detail comes

from bills of lading in the AMS data. The information from AMS data is stated verbatim in the Bill of Lading Detail, without being amended, consolidated, or edited.

14.    "TEU's" in the Detail refers to the number of "Twenty Foot Equivalent Units"—or containers—used for that particular shipment.

15.    The figure for "Estimated Value" is based on a proprietary table that PIERS has developed. The PIERS table incorporates the "waterborne values" from the United States Department of Commerce. PIERS generates the "Estimated Value" by multiplying the average value from its proprietary reference table by the number of metric tons in that particular shipment.

16.    The description in "PIERS COMMODITIES" comes verbatim from the description of the shipment in the bill of lading, as stated in the AMS data from CBP.

I declare under penalty of perjury that all of the foregoing is true and correct.

Executed on July 10, 2008, at Miramar, FL.

Aliet Martinez

# EXHIBIT 1



Global Intelligence Solutions®

Find Out How Companies Use PIERS / Complete Product Catalogue / Become a Subscriber

**About PIERS** | Customer Support | Contact PIERS | New! Join | Tips | Reports

PIERS Home > Trade Data > Competitive Comparison

- Competitive Comparison

## PIERS Trade Data Competitive Comparison

The data that is at the core of PIERS trade databases -- selected information gathered from the ship manifests and bills of lading -- is available to the public under the Freedom of Information Act, subject to U.S. Customs regulations. Since PIERS was launched over 30 years ago, competitors have routinely entered the marketplace as purveyors of this raw data. None has yet matched PIERS on the comprehensiveness, verifiable quality, or added value of its trade information.

| | PIERS | Competition |
|---|---|---|
| **Experience** | • Roots go back to 1827 founding of the *Journal of Commerce*.<br>• Launched by the *JoC* over 30 years ago as its first venture in electronic information.<br>• Created the current trade data business with its 1980s' Freedom of Information Act to obtain access to Customs documents. | • Entered business after the year 2000. |
| **Data Coverage** | • U.S. containerized imports, bulk and breakbulk, as documented by both Automated Manifest System (AMS) and hardcopy filings.<br>• U.S. containerized exports, bulk and breakbulk, as documented by bills of lading.<br>• Historical data on cargoes moved through U.S. ports: available electronically back through 1984, on microfiche back through the 1950s.<br>• Latin American and Asian cross-border trade data, collected in cooperation with national Customs authorities. | • U.S. containerized imports as received from the Automated Manifest System (AMS) – does not include bulk/breakbulk data, does not capture non-AMS filings.<br>• *No export coverage.*<br>• Historical data available electronically back through 2003.<br>• *No international trade data.* |
| **Data Quality** | • Port reporters on-site verify data accuracy.<br>• Proprietary rules and audit protocols identify and resolve missing and/or inaccurate data elements.<br>• Records are cross-checked against maritime industry records – including Lloyds Ship Register and the carriers' own data. | • *No staff deployed for data collection or verification.*<br>• AMS data is relayed to customers as is – without corrections or amendments. |
| **Value-Added** | • Translates into standardized shipping records.<br>• Assigns harmonized tariff codes and commodity descriptions.<br>• Estimates value of cargoes.<br>• Enhances transaction detail with background information on trading parties.<br>• Records vehicle identification numbers (VINs). | • AMS data is relayed to customers *as is* – without corrections or amendments. |
| **Pricing** | • Subscription-based pricing reflects client's individual selection of import and/or export datasets (choice of geographic regions, tradelanes, commodities, etc.) relevant to business needs. | • Subscription-based pricing … with only one option available (one year's subscription to current + two years' historical import data). |

PIERS import-export trade databases are unique: This is global commercial intelligence you'll find nowhere else in the world.



**PIERS TI™ (Trade Intelligence)**

**Page Index**
Features
Use this Data
Subscription Information
See a Sample
Request More Info
Back to Product Catalogue

I-PIERS
U.S. Waterborne Import Historical Data
Maritime Research

PIERS TI (Trade Intelligence)
PIERS Trade Profiles
PIERS Trade Finance

Indian Import-Export Trade Database
Korean Import-Export Trade Database
Mexican Waterborne Trade Database
South American Trade Database

Anytime, anywhere Web access -- with sophisticated search and report-generation capabilities -- to PIERS U.S. import and export data, from the latest data available (government-authorized for release two weeks after filing) to up to 36 months of historical data.

**Sources:** This is information gathered by PIERS directly from the bills of lading and manifests filed both manually and through the U.S. Customs Automated Manifest System (AMS). PIERS adds value by auditing, standardizing and validating the data, and by assigning harmonized tariff codes to all manifest commodity descriptions.

**Features:**

PIERS TI is a three-step application that makes it easy to Search the PIERS database, view and organize your Results, and generate a variety of Reports.

**Step 1: Select Search criteria.**

Search up to 12 months and retrieve up to 99,000 records at a time. Save search and report formats for easy periodic updating and comparison. Choose from:

- **Basic search criteria:** Find the basic who, what, when, and where of U.S. trade with the world. PIERS TI Smart Fields automatically hunt for search terms through multiple relevant fields to capture more data.

- **Advanced search criteria:** Conduct more detailed searches, such as shipments by bill of lading number, carrier, or twenty-foot equivalent unit (TEU) count. Or use Smart Fields to search across multiple fields for a key term – a company name, for example.

- **Miscellaneous search criteria:** Search the database by specialized categories, such as the estimated value of the cargo.

**Step 2: Organize Results.**

View and organize your search results in several ways:

- Select from a range of field combinations to view your results.
- Sort results numerically or alphabetically.
- Mark or unmark records to include in or remove from Reports.

**Step 3: Generate Reports.**

Reports can be displayed and printed in PDF format, and/or downloaded (up to 20,000 results per search) directly into MS Excel® spreadsheets. Select among a choice of **five** basic types of reports (offering more than 20 possible report options in all):

- **Detail Reports** provide a complete picture of an import or export transaction — supplying all the details on individual bills of lading, including identifying information of the parties involved in the trade, shipment detail, and detailed commodity information.

- **Profile Reports** survey the activities of the parties to a trade: the foreign shipper (the supplier), the consignee (importer), or the notify party — and reveal what, how much and with whom they are trading. U.S. export data includes profile reports of the U.S. shippers, the commodities and destination countries in U.S. export trade.

- **Summary Reports** aggregate transactions by weight, TEUs and shipments, enabling users to review summaries by specific criteria, such as foreign shippers or U.S. exporters, commodities and trading countries.

- **Ranking Reports** list the top foreign shippers (suppliers), U.S. shippers (exporters), U.S. consignees (importers), commodities or countries – with graphs making the information accessible at a glance.

- **Trending Reports** track monthly trends in U.S. export trade by country, commodity or U.S. exporter.

**Use this data:**

- **Identify & qualify new suppliers:** Search by harmonized tariff code, commodity description, geographic location; sort by volume, estimated value, level of activity.

- **Find new customers:** Look up consignees or notify parties; search by commodity, product, brand; follow purchasing patterns to spot importers of the products you sell.

- **Detect emerging market demand:** See where the need for products like yours is rising -- or being met by competitors.

- **Measure market share:** Rank sellers by activity, volumes, estimated values; identify buyers' mainstay suppliers.

- **Monitor the competition:** Weekly updates keep you on top of your industry's or sector's waterborne commerce.

- **Protect your intellectual property and brand equity:** See that your branded products get to the markets they were meant for (and detect when they've been diverted or counterfeited).

Subscription Information:

An annual subscription to **PIERS TI** provides unlimited access via the Web to PIERS U.S. import data, U.S. export data, or both, from the current release to as far back as 36 months.

\* *Microsoft Excel is a registered trademark of Microsoft Corporation.*

See a Sample

Request More Information

Back to Product Catalogue

**PIERS**
Global Intelligence Solutions®

Find Out How Companies Use PIERS    Complete Product Catalogue    Become a Subscriber

About PIERS | Customer Support | Contact PIERS | New Users | Trade Insights

PIERS Home > Complete Product Catalogue > US Waterborne Import Historical Data

**PIERS Tutorial Previous**
i-PIERS
U.S. Waterborne Import Historical Data
Maritime Research

**Trade Intelligence Intelligence Partners**
PIERS TI (Trade Intelligence)
PIERS Trade Profiles
PIERS Trade Finance

**PIERS International Markets**
Indian Import-Export Trade Database
Korean Import-Export Trade Database
Mexican Waterborne Trade Database
South American Trade Database

# PIERS U.S. Waterborne Import Historical Data

Historical information on **U.S. waterborne imports.**

*Sources:* The PIERS archives.

Features:

- U.S. waterborne import data from **1950 through 1980** ... bill of lading and manifest data stored on microfiche; a PIERS Information specialist will assist in researching this material

- U.S. waterborne import data from **1980 through 1991** ... bill of lading and manifest data available in electronic format: a PIERS Information specialist will assist in developing customized datasets.

- U.S. waterborne import data from **1992 through today** ... bill of lading and manifest data enhanced with additional information on foreign shippers, estimated value of goods - all the data fields provided by PIERS U.S. Waterborne Import product - available in electronic format: a PIERS Information specialist will assist in developing customized datasets.

Data fields include:

- **Who** ... bill of lading number, carrier, consignee name & address, in-bond code, manifest number, notify parties' names & addresses, pre-carrier, shipper name & address, vessel, vessel registry, voyage number.

- **What** ... ... AMS detailed commodity description, container number, harmonized tariff code, marks & numbers, PIERS commodity description.

  Cargo quantity/unit of measure; cargo weight & volume; container size.

- **When** ... arrival date, departure date, lading date.

- **Where** ... coastal region, country of origin, foreign destination, foreign port name & code, U.S. final destination, U.S. port name & code.

Use this data:

- **Discover authoritative evidence for legal cases** ... PIERS historical data has been accepted as evidence in establishing liability in asbestos and other toxic tort and product liability cases.

- **Monitor contract and trade agreement compliance** ... PIERS detailed information clearly establishes chains of custody, uncovers breaches in sole-sourcing agreements, yields evidence of dumping, gray market diversions, etc.

- **Protect intellectual property** ... PIERS data is used to trace counterfeiting, trademark piracy, parallel importing, bootlegged shipments.

- **Build long-range market studies** ... PIERS is a reliable and accessible source of data on decades-old commercial transactions and trade patterns.

See a Sample

Request More Information

Back to Product Catalogue

**Page Index**
Features
Data Fields
Data Applications
See a Sample
Request More Info
Back to Product Catalogue



Global Intelligence Solutions®



Find Out How Companies Use PIERS | Complete Product Catalogue | Become a Subscriber

About PIERS | Customer Support | Contact PIERS | Newsroom | Trade Insights

PIERS Home > How Companies Use PIERS >

**STORIES**
- Attack of The Clones
- Bright Outlook for Ag Exports
- Cleared for Take-Off
- Details Count in a Tight Market
- Detecting Dumping
- Detecting Trademark Pirates
- Discovering Cost-saving Opportunities
- Discovering a Global Dimension
- A Few Good Sources
- Fixing Liability
- Keeping up as Customers Go Global
- Measuring New Markets
- Opening the Door to Sales
- Port of San Diego Comes Back to PIERS
- Protecting MPEG Patents
- Remote Sourcing
- Sharper Focus for Product Marketing
- Shortcut to Settlement
- Sourcing Medical Products
- Tips from a PIERS Users' Conference
- Tracing Parallel Imports
- Tricks of the Investigators Trade

## PIERS Global Trade Intelligence at Work

Businesses with a global perspective use PIERS trade intelligence to:

- Find new suppliers, new markets and new business opportunities
- Benchmark performance against the competition
- Defend intellectual property against infringement and counterfeiting
- Support strategic decision-making
- Arbitrate trade disputes
- Understand international trade trends and forecasts

To see how commercial enterprises and government agencies have put PIERS to work for them, browse these customer applications stories:

**Attack of the Clones**
The car may be exported, but its cloned VIN can stay behind to cover illegal traffic in stolen or salvaged cars -- as Carfax found out with some help from PIERS intelligence. Read more

**Bright Outlook for Ag Exports**
Ocean transport rates make the Pacific Rim the market of choice for U.S. ag exports. The USDA uses PIERS data to report on ocean transport trends. Read more

**Cleared for Take-Off**
Most business initiatives fail because they're launched without an unbiased appraisal of market realities. PIERS can supply the hard facts about your markets and your competitors. Read more

**Details Count in a Tight Market**
The chemical industry is experiencing a resurgence ... but with higher costs and heated competition, it's critical to keep close track on the marketplace - as Arkema Inc. does. Read more

**Detecting Dumping**
PIERS makes it easier for Chattem Chemicals to monitor shipping for below-market-price imports ... and compile the evidence for antidumping claims. Read more

**Detecting Trademark Pirates**
A California-based maker of color cosmetics had its trade name pirated; PIERS helped identify the culprit. Read more

**Discovering Cost-saving Opportunities**
For PointTrade Services, Inc. an international trade and customs services provider and consultancy, PIERS *Trade Profiles* is a tool for identifying and estimating savings for client importers. Read more

**Discovering a Global Dimension**
One bank identified untapped demand for its lucrative trade financing products within its existing customer base with the help of PIERS import-export trade data. Read more

**A Few Good Sources**
The Army Corps of Engineers relies on a few good sources for the information that guides its planning, including the U.S. Census, Customs, and PIERS. Read more

**Fixing Liability**
PIERS historical data can supply the evidence needed in asbestos cases where the claim of injury is made years -- or decades -- after exposure. Read more

**Keeping up as Customers Go Global**
Commercial services providers use *Trade Profiles* to keep up with -- or, better yet, anticipate -- the needs of their customers as they move into world markets. Read more

**Measuring New Markets**
A Gulf Coast barge company turned to PIERS for the hard data that will test the feasibility of their business model. Read more

**Opening the Door to Sales**
*Trade Profiles* supports sales tactics and marketing strategy at Lynden International, providers of freight transport and logistics services. Read more

**Port of San Diego Comes Back to PIERS**
The Port of San Diego tried an alternate provider of trade data only to find critical details missing. Read more

**Protecting MPEG Patents**
Audio MPEG, Inc., finds PIERS Trade Intelligence is an invaluable asset in its business of licensing patents in the consumer electronics industry. Read more

**Remote Sourcing**
Is there any substitute for being there when it comes to finding and qualifying new sources for global supply chains? PIERS trade data supplies an alternative. Read more

**Sharper Focus for Product Marketing**
LINPAC Materials Handling uses *Trade Profiles* to focus on companies in the industries -- and shipping the volumes -- its packaging solutions best serve. Read more

**Shortcut to Settlement**
PIERS import data bolstered Zeta Espacial's claim that its U.S. distributor had not honored their exclusive agreement. Read more

**Sourcing Medical Products**
An international distributor finds PIERS is "tremendous resource" for locating new vendors -- and monitoring existing suppliers. Read more

**Tips from a PIERS Users' Conference**
A PIERS Users' Conference included a panel of customers who discussed how they use commercial intelligence in their companies -- Trans-i Technologies, Inc., and Dow. Read more

**Tracing Parallel Imports**
Gray market goods undermine prices and tarnish trade names; PIERS helps food importer **Khong Guan** fight back. Read more

**Tricks of the Investigators Trade**
The **James Mintz Group** specializes in "finding hidden business facts quickly, quietly, cost-effectively." Read more



## AMS Bill of Lading Detail
### Source: AMS Database

Page 1
7/1/2008

**Shipper**
GENERAL NOLI
VALENCIA CALLE REINA 6-4 PISO 46011
SPAIN   SPAIN

**Consignee**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Notify Party**
GILDA INDUSTRIES INC.
2525 WEST 4TH AVENUE
HIALEAH FL 33010 UNITED STATES

**Also Notify**

**Packaging Information**

| | | | | |
|---|---|---|---|---|
| Weight: | 7090 KG | Measurements: | | 35 CM |
| Quantity: | 1696 BOX | TEU's: | | 2.00 |

**Shipment Detail**

Carrier:  MSCU - MEDITERRANEAN SHIPPING CO
Vessel:  P&O NED. FALCON
Voyage:  504R
B/L:  MSCUJ1675923
Pre Carrier:  BILBAO
Lloyd's Code:  8619053
Inbond Code:
Estimated Value:  $ 11,875.00

Country of Origin:  SPAIN
Coastal Region:  EAST
US Port:  5201  MIAMI
For Port:  42737  LE HAVRE
US Dest:
For Dest:
Mode of Transport: 10
Arrival Date:  11/24/2002

### AMS Commodities

| Container | Qty | Description |
|---|---|---|
| MSCU3318231 | 1696 | TOASTED BREAD |

### PIERS Commodities

| Qty | Units | Commodity Description | Harm Code | JOC Code |
|---|---|---|---|---|
| 1696 | CTN | TOASTED BREAD | 190540 | 130100C |

*Note: Bills of lading that contain multiple commodities will list the total weight and TEU's for the entire bill of lading*

This listing contains information which is the property of the Journal of Commerce. It is provided for the exclusive use of our clients in accordance with our purchase agreement. It may not be sold or released for the benefit of a third party. Commonwealth Business Media, Inc 33 Washington St., 13 fl., Newark, NJ 07102

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CUSTOMS & INTERNATIONAL TRADE NEWSLETTER,** ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **Civil Action No. 08-0478 (RMC)** |
| **U. S. CUSTOMS AND BORDER PROTECTION,** ) ) ) | |
| **Defendant.** ) / | |

## <u>ORDER</u>

UPON CONSIDERATION OF Plaintiff's Motion for Summary Judgment, Statement of Material Facts To Which There Are No Genuine Issues, and Memorandum of Points and Authorities in Support Thereof, and the entire record herein, it is this _____ day of __ _____, 2008,

**ORDERED** that Plaintiff's Motion for Summary Judgment is **GRANTED,** and it is

**FURTHER ORDERED** that defendant shall immediately release to the plaintiff the names and addresses of importing companies paying 100% duties pursuant to HTSUS subheading 9903.02.

_____
UNITED STATES DISTRICT JUDGE